Scottlynn J Hubbard, SBN 212970
**DISABLED ADVOCACY GROUP, APLC**
12 Williamsburg Lane
Chico, CA 95926
Telephone: (530) 895-3252
Facsimile: (530) 894-8244

United States District Court

Eastern District of California

| | |
|---|---|
| William Barker, | Case No. 2:16-cv-3008-CKD |
| Plaintiff, | |
| | **Plaintiff's Appendix of Exhibits** |
| v. | |
| Stephen Osemwingie, et al., | Date: May 29, 2019 |
| Defendants. | Time: 10:00 a.m. |
| | Room: 24 (8th Floor) |
| | Hon. Carolyn K. Delaney |

Pursuant to the Ninth Circuit holding in *Orr v. Bank of America, NT & SA*, plaintiff hereby submits an Appendix of Exhibits in support of his opposition to defendants' motion for summary judgment:

1. Copy of condensed transcript of plaintiff's deposition;

2. Copy of Instruction Guide for Golvo 7007 ES;

3. Copy of California Correctional Health Care Services Nursing Scope of Service Procedure, Volume 5, Chapter 20.

Dated: May 15, 2019            DISABLED ADVOCACY GROUP, APLC


*/s/ Scottlynn J Hubbard*
SCOTTLYNN J HUBBARD
Attorney for Plaintiff William Barker

Exhibit I

1
              SUPERIOR COURT OF THE STATE OF CALIFORNIA
2        FOR THE EASTERN DISTRICT OF CALIFORNIA SACRAMENTO
                              DIVISION
3                           ---oOo---

4

5    WILLIAM BARKER,                    )
                                        )
6                 PLAINTIFF,            )
                                        )
7    vs.                               ) Case No:  2:16-cv-03008
                                        ) JAM-CKD (PC)
8    OSEMWINGIE, et al.,               )
                                        )
9                 DEFENDANTS.           )
                                        )
10

11

12

13

14

15                        DEPOSITION OF

16                       WILLIAM BARKER

17                     STOCKTON, CALIFORNIA

18                     OCTOBER 3, 2018

19

20

21

22
     ATKINSON-BAKER, INC.
23   COURT REPORTERS
     (800) 288-3376
24   www.depo.com
     REPORTED BY:  MICHELLE SAVAGE, CSR NO. 12957
25   FILE NO:  AC09D82

## Page 2

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE EASTERN DISTRICT OF CALIFORNIA SACRAMENTO
DIVISION
---oOo---

WILLIAM BARKER,              )
                            )
          PLAINTIFF,        )
                            )
vs.                         ) Case No:  2:16-cv-03008
                            ) JAM-CKD (PC)
OSEMWINGIE, et al.,         )
                            )
          DEFENDANTS.       )

Deposition of WILLIAM BARKER, taken on behalf of Defendants, at the California Health Care Facility, 7707 Austin Road, Stockton, California 95215, commencing at 10:26 a.m., Wednesday, October 3, 2015, before Michelle Savage, CSR No. 12957.

## Page 4

I N D E X

WITNESS:  WILLIAM BARKER
EXAMINATION:                    PAGE
DIANA ESQUIVEL                   5

--oOo--

E X H I B I T S

1   NOTICE OF TAKING PLAINTIFF'S DEPOSITION    23
2   RESPONSE TO INTERROGATORIES, SET ONE       23
3   RESPONSE TO DEMAND FOR PRODUCTION OF       33
    DOCUMENTS, SET ONE
4   COMPREHENSIVE NOTE DATED 3/2/2015          84
5   HAND SKETCH FROM WITNESS                   59
6   HAND SKETCH FROM WITNESS                   59
7   HAND SKETCH FROM WITNESS                   61

--oOo--

## Page 3

A P P E A R A N C E S

FOR PLAINTIFF WILLIAM BARKER

    SCOTTLYNN J. HUBBARD IV, ESQ
    DISABLED ADVOCACY GROUP, APLC
    12 Williamsburg Lane
    Chico, CA 95926
    (530) 895-3252
    Usdceast@hubslaw.com
FOR DEFENDANTS OSEMWINGIE AND RAMISCAL
    DIANA ESQUIVEL, ESQ
    Deputy Attorney General
    1300 I Street
    Suite 125
    P.O. Box 944255
    Sacramento, CA 94244-2550
    (916) 210-7320
    Diana.Esquivel@doj.ca.gov

---oOo---

## Page 5

                    WILLIAM BARKER,
the deponent herein, having been sworn by the deposition officer, testified as follows:
        THE WITNESS:  Yes.

            EXAMINATION
BY MS. ESQUIVEL:
    Q.   Good morning, Mr. Barker.  Before we started I reintroduced myself.  I know it's been a while and you probably don't remember me.  I have actually taken your deposition before a couple years ago, and I am the attorney representing the defendants in this lawsuit that you have brought arising from an incident where you alleged that the two nursing assistants improperly used a Hoyer lift on March 3rd, 2015.  Is that your understanding of why we are here today?
    A.   Yes.
    Q.   As I mentioned, I know I have taken your deposition before.  When was the last time that you were deposed prior to today?
        MR HUBBARD:  If you don't remember, you can say that you don't remember.
        THE WITNESS:  I don't remember.
        BY MS. ESQUIVEL:  Q.  So it might have been a few years so let me go though the admonitions and the

1  rules governing a deposition, some of them might sound
2  familiar to you and might help refresh your recollection
3  as to how this process is going to go forward, okay.
4      First of all, the court reporter administered an
5  oath before I started asking you questions.  That is the
6  same oath that you would take in a court of law, and
7  it's your affirmation that you swore to tell the truth
8  under penalty of perjury.  Do you understand that?
9      A.   Yes.
10     Q.   There will be times when we might be inclined
11 to speak over each other, you might anticipate my
12 questions, I might anticipate your answer.  The only
13 thing I request is that we do our best to try to keep
14 this in an answer-question process and not speak over
15 one another because as you can see the court reporter is
16 taking down everything that we say.  So for that reason
17 it's important that you let me finish my question before
18 you start answering, and I will give you the same
19 courtesy and allow you to finish your answer before I
20 start asking my next question.  Do you understand that?
21     A.   Yes.
22     Q.   Because everything is being taken down as far
23 as what we are saying it's important that you answer in
24 words.  Again, we are in an informal setting, you can
25 see me, I can see you.

1      Sometimes during the course of conversation
2  there is nonverbal communications such as shakes and
3  nods of the head, but that does not translate well for a
4  written record.  So it's important at all times you use
5  words to respond, as opposed to shakes or nods of the
6  heads, "uh-huh" or "huh-huh."  You need to answer
7  "yes/no" or other words to convey your response.  Do you
8  understand that?
9      A.   Yes.
10     Q.   If at any time you do not understand the
11 question that I asked, please let me know and I will be
12 happy to repeat it, rephrase it, or ask it in another
13 way, or maybe just withdraw it all together.  If you
14 answer I'm going to assume you understood the question
15 asked.
16     If sometime down the road should this case
17 proceed to trial and you -- I ask you a question that I
18 ask you here and you contend that you didn't understand
19 the question, I am going to argue to the jury, well, you
20 answered it so that must have meant that you understood
21 it.  So for that reason, because it can subsequently
22 bind you to your testimony, it's important that you
23 understand what you are being asked.  If you don't, like
24 I said, please let me know and I'll be happy to rephrase
25 it or re-ask it.  Do you understand that?

1      A.   Yes.
2      Q.   We are going to be talking about events that
3  occurred over three years ago, possibly further back,
4  and I don't expect you to have recollection of specific
5  information such as times or dates, specific words or
6  conversations that you had with individuals.  But I am
7  entitled to your best estimate, your best summary of the
8  nature of a conversation you had, your best estimate in
9  terms of the times, places, and dates.  So even though
10 you may not, like I said, have an exact recollection of
11 something specific, I'm still entitled to an estimate.
12 Do you understand that?
13     A.   Yes.
14     Q.   And do you understand the difference between
15 an estimate and a guess?
16     A.   Yes.
17     Q.   Probably about into an hour, hour and 15
18 minutes, unless you tell me otherwise, we will take a 5
19 to 10-minute break to give you an opportunity to use the
20 restroom, stretch out, or just mentally relax for a few
21 minutes as opposed to sitting here and answering
22 questions.  We'll do that every, like I said, every
23 hour, hour and a half, hour 15 minutes, and so it's
24 important to give the court reporter time to rest her
25 hands.

1      So like I said, if any time before that
2  estimated break you require a break beforehand, just let
3  me know and we'll take a break.  The only thing I do
4  request is that if there is a question pending, that you
5  answer the question before we take the break, and it
6  just makes a clean place to stop in the record.  Do you
7  understand that?
8      A.   Okay.
9      Q.   Now before we started your deposition you had
10 indicated that you were feeling the effects of back pain
11 at the current time, but you indicated that you're able
12 to proceed; is that correct?
13     A.   That's correct.
14     Q.   Okay.  And we also agree that if at any time
15 your pain level was such that you can no longer
16 concentrate, focus, or provide full and complete and
17 truthful testimony, you would also let me know that,
18 correct?
19     A.   That's correct.
20     Q.   Other than your pain levels that we have
21 already discussed, is there any other reason why we
22 can't proceed with your deposition today?
23     A.   No.
24     Q.   Is there any other reason why you can't
25 provide your best estimate or testimony today?

A. No.

Q. Other than your attorney, did you talk to anyone to prepare for your deposition?

A. No.

Q. Other than your attorney, did you speak with anyone to help you refresh your recollection about the events giving rise to this lawsuit?

MR. HUBBARD: Do you need her to rephrase the question?

THE WITNESS: Yeah.

BY MS. ESQUIVEL: Q. Other than your attorney, did you speak with anyone to help you refresh your recollection about the events giving rise to this lawsuit?

A. Yeah. I spoke with someone from my attorney's office where I believe you guys were asking for his interrogatories, if that counts me talking to somebody about what happened.

Q. So again, the people in your attorney's office is part of your attorney team?

A. Okay. Well, then no.

Q. Other than your attorney and his team, anybody you spoke to to help you refresh your recollection about the events?

A. No.

Q. Giving rise to this lawsuit?

A. No.

Q. Did you review any documents to prepare for this deposition?

A. With my attorney.

Q. Okay. Again, whatever was said between you --

A. Then no.

Q. I just need to know --

A. No.

Q. -- did you review --

A. No.

Q. You didn't review any documents?

A. No.

Q. Okay.

MR. HUBBARD: Can I -- I'm going to object to that question as vague and ambiguous. I'm not sure you two are asking -- and he's answering the same question, can you ask that one again?

MS. ESQUIVEL: Sure.

Q. To prepare for your deposition here today, did you review any documents?

A. Yeah. With my attorney just now.

Q. Okay. That's fine. I just need to know, so you did review documents?

A. Yes.

Q. Okay. What documents did you review -- and please listen to the question. The only thing I want to know is the documents that you reviewed. I don't want to know anything you said to your attorney, or your attorney said to you, or any discussions you had with your attorney. The only thing that I want to know is the identity of the documents that you reviewed to prepare for this deposition.

A. I reviewed the original 602 that was filed. That's basically it.

Q. When did you review that original 602?

A. A few minutes ago in the conference room back there with my attorney.

Q. Other than the 602 that you reviewed with your attorney a few minutes ago, any other documents that you prepared at any time after you were informed of this deposition --

MR. HUBBARD: I'm going to object, vague and ambiguous, but answer the question if you think you can.

MS. ESQUIVEL: I'm sorry, I hadn't finished my question.

MR. HUBBARD: My apologies. There was a pause.

BY MS. ESQUIVEL: Q. So allow me to just ask my question first, and then your attorney can object to

to it. Other than the 602 that you reviewed a few minutes ago, did you review any other documents after receiving notice of this deposition to help you refresh your recollection about the events giving rise to this lawsuit?

A. No.

Q. Mr. Barker, as I have mentioned, even though you don't recollect, I have taken your deposition before, and so some of this may not seem repetitive to you but I'm still going to ask you certain questions about your background because even though I have previously asked you those questions, it was in a different lawsuit, and I would like to have a self-contained transcript so we're not referring to the transcripts in other cases.

So like I said, even though it may not seem repetitive to you, it may come back to you like, oh, yeah, I've asked these questions before, but again, it was not in this lawsuit. So I'll be asking you about your background, both your prison history, your personal background, and your medical background, okay?

A. Okay.

Q. It's my understanding that you're serving a 20-year sentence for your 2005 conviction; is that correct?

1    A.   That's true.

2    **Q.   And that was a felony conviction, correct?**

3    A.   Yes.

4    **Q.   Since being incarcerated, can you briefly just**

5    **run down for me the prisons that you have been housed at**

6    **since you entered the custody of the Department of**

7    **Corrections?**

8    A.   San Quinton, CMF, Tracy, Donovan, and

9    Lancaster.

10    **Q.   I noticed you answered them by location.  I**

11    **didn't hear you mention Vacaville.**

12    A.   Oh, Vacaville.

13    **Q.   Okay.**

14    A.   I forgot about that.

15    **Q.   Okay.**

16    MR. HUBBARD:  Very forgettable place.

17    THE WITNESS:  Bunch of these places I'm trying

18    to forget.

19    BY MS. ESQUIVEL:  Q.  Before your 2005

20    conviction, had you previously served a prison term?

21    A.   Yes.

22    **Q.   How many?**

23    A.   I had a D number before.  Once I was sentenced

24    to prison and I had a D number at that time.

25    **Q.   Do you recall how many times you have been --**

1    **you were given a prison sentence before your 2005**

2    **conviction?**

3    A.   When I had that D number, I think -- I think I

4    had a couple of convictions on it, and this D number I

5    think I have had a couple of convictions on that.

6    **Q.   Well, let me try it this way.  Do you remember**

7    **the first time you were ever convicted of a felony that**

8    **resulted in a felony conviction -- a prison sentence?**

9    A.   I can't remember.  I don't remember that.

10    **Q.   Okay.  And just a friendly reminder, this is**

11    **one of those situations where you already anticipated my**

12    **question and started answering before I finished --**

13    A.   Excuse me?

14    **Q.   -- my question.  So just remember that so we**

15    **can be fair to the court reporter.**

16    **Do you remember how long those prior prison**

17    **sentences were?**

18    A.   No.

19    **Q.   Have you ever been convicted of a crime**

20    **involving falsehood, such as fraud, making a false**

21    **statement?**

22    A.   No.

23    **Q.   Forgery or identity theft?**

24    A.   No.

25    **Q.   Did you graduate from high school?**

1    A.   No.

2    **Q.   Did you subsequently obtain your GED?**

3    A.   No.

4    **Q.   Do you have any -- besides, well, did you**

5    **attend high school at all?**

6    A.   Yes.

7    **Q.   Okay.  Other than high school, have you ever**

8    **had any other education such as a trade school,**

9    **vocational school, anything of that nature?**

10    A.   No.

11    **Q.   Have you ever taken any classes or courses**

12    **involving the medical field, whether it be CPR?**

13    A.   No.

14    **Q.   First aid, or specific classes on certain**

15    **conditions or diseases?**

16    A.   No.

17    **Q.   Have you ever worked in the medical field?**

18    A.   No.

19    **Q.   In March of 2015 were you a participant in the**

20    **mental health delivery system of the Department of**

21    **Corrections?**

22    A.   Most likely, yeah.

23    **Q.   Do you recall if you were taking any**

24    **medications in March of 2015 for any mental health**

25    **conditions you would be here for?**

1    A.   Most likely.

2    **Q.   Do you remember what you were taking?**

3    A.   (Shakes head from side to side.)

4    **Q.   Do you remember what mental health condition**

5    **you had that you were being treated for?**

6    A.   No.

7    **Q.   I just want to confirm with you so this way**

8    **that we are on the same page, and I confine my questions**

9    **to what I think is the remaining claim in this case and**

10    **I just want to make sure you're in agreement with that.**

11    **Because if you think there is something else that**

12    **survived screening and motions to dismiss, we can**

13    **discuss that.  This way, like I said, this is my only**

14    **opportunity to ask you questions so I will ask you**

15    **questions; if not, I'm limited.**

16    **It's my understanding that the operative**

17    **complaint, meaning the complaint that governs this**

18    **lawsuit, is your second amended complaint, and the only**

19    **claim is for deliberate indifferent discerning the use**

20    **of a Hoyer lift against certified nursing assistants,**

21    **Osemwingie or Ramiscal.  I noticed that you put a D**

22    **sound near where the G is, is that how it's pronounced?**

23    A.   Osemwingie.

24    **Q.   Osemwingie?**

25    MR. HUBBARD:  Pronounce the last one?

1       MS. ESQUIVEL: Ramiscal.
2       MR. HUBBARD: Ramiscal. With respect to your
3   last question, it calls for a legal conclusion, but
4   answer if you can.
5       THE WITNESS: I don't remember what the
6   question was.
7       BY MS. ESQUIVEL: Q. The question was, is it
8   your understanding that the remaining claim, legal claim
9   is for deliberate indifference against the two
10  defendants that you named in this lawsuit arising from
11  the use of the Hoyer lift on March 3rd, 2015?
12      MR. HUBBARD: Same objection, go ahead and
13  answer if you can.
14      THE WITNESS: Is that what you understand it
15  to be or --
16      MR. HUBBARD: Well, I'm not under oath. So I
17  can't answer it for you, but if you don't know, just say
18  "I don't know."
19      THE WITNESS: I don't know.
20      BY MS. ESQUIVEL: Q. Am I correct that when
21  you first filed this lawsuit, you filed it pro se,
22  meaning you were representing yourself?
23      A. It's probably, yeah. Probably correct.
24      Q. Do you recall making a claim against nursing
25  assistant Ramiscal concerning her abandoning you on the

Page 18

1   toilet seat a few days after the March 3rd incident?
2       A. Yes.
3       Q. Okay. To your knowledge, do you know if that
4   claim is still viable, meaning it still exists?
5       MR. HUBBARD: Same objection, it calls for a
6   legal conclusion, but answer if you can.
7       THE WITNESS: I don't know.
8       BY MS. ESQUIVEL: Q. Do you recall when you
9   arrived at -- and I'll refer to the California
10  Healthcare Facility as the Stockton Facility where we
11  are currently at; is that okay?
12      A. Sure.
13      Q. Okay. Do you recall when you arrived at the
14  Stockton Facility before March 3rd, 2015?
15      A. I believe I came here from Lancaster on
16  February 28th of 2015.
17      Q. Do you remember if that was a leap year?
18      A. Yes, it was.
19      MR. HUBBARD: How do you remember that?
20      THE WITNESS: Because there was 29 days that
21  year.
22      MR. HUBBARD: Fair enough.
23      THE WITNESS: I think it was 29 days.
24      BY MS. ESQUIVEL: Q. So am I correct in
25  saying that you were here at the Stockton Facility for

Page 19

1   four days before the March 3rd incident that gave rise
2   to your lawsuit?
3       A. That's about right.
4       Q. From the time that you arrived at the Stockton
5   Facility to March 3rd, were you housed at the same
6   location for those four days?
7       A. No, I came here -- I got here, and then they
8   processed me, and moved me to D-1-A, and I stayed in
9   that cell for about, I don't know, maybe four hours or
10  so, and then they moved me to D-1-B.
11      Q. And did you remain in D-1-B for the next four
12  days?
13      A. Yes.
14      Q. After arriving at the Stockton Facility, what
15  accommodations were you provided given your various
16  medical conditions?
17      A. Can you repeat that again?
18      MR. HUBBARD: Did you understand the question?
19      THE WITNESS: No. That's why I'm asking her.
20      BY MS. ESQUIVEL: Q. By "accommodations" I
21  mean housing accommodations.
22      A. Oh.
23      Q. So what I'm asking -- well, do you know
24  what -- let me back up a little bit. When you arrived
25  at the Stockton Facility, were you wheelchair bound?

Page 20

1       A. Yes.
2       Q. Were you able to get in or out of your
3   wheelchair without any assistance at all?
4       A. No.
5       Q. Did you require low bunks --
6       A. Yes.
7       Q. -- assignment?
8       A. And I required wheelchair housing.
9       Q. So that was my question. So when you arrived
10  at the Stockton Facility and once they processed you,
11  what housing accommodations were you provided for your
12  various medical conditions?
13      A. Okay. When I came here after I was
14  interviewed by the lieutenant to see if I had any
15  enemies and whatnot -- the intake lieutenant over in
16  PMU, they ask you a bunch of questions, do you have any
17  enemies and that sort of stuff. Then they sent me to
18  see medical. They got all my meds and stuff together,
19  gave me my property and stuff, and then they were
20  looking for housing for me.
21      It took a while for them to find a place to
22  house me, because I required ADA housing, which is a
23  bigger cell, okay. They found an ADA cell in D-1-A. I
24  went there. I was there for about four hours, and then
25  they came and told me I was moving, and then they moved

Page 21

1  me to D-1-B to another ADA cell.
2      I was assisted by the medical staff here with
3  two persons transfer any time I went in and out of my
4  wheelchair from the night I arrived here until the date
5  of the incident on the Hoyer lift, okay, and then that
6  night -- well, you asked me when I first came, so that
7  was basically the accommodations they gave me.
8      **Q.   So you indicated that an accommodation was for**
9  **two staff members to assist you -- I take that back, two**
10 **persons to assist you?**
11     A.   Two medical staff.
12     **Q.   So it was medical staff?**
13     A.   Two medical staff, yes.
14     **Q.   Does the Stockton facility have inmate**
15 **assistance that sometimes assists medical staff, like**
16 **pushing inmates' wheelchairs across the yard, might help**
17 **with dressing or tying shoes or anything of that nature?**
18     A.   Well, they have an ADA program set up here,
19 and what those inmates primarily do is push people
20 around.  Some people allow them to go into the inmate's
21 room and make their beds and help dress them and stuff,
22 but primarily that's the job of the CNA's, okay.  There
23 is a lot of correctional officers that won't let the ADA
24 workers come into inmate rooms.
25     MR. HUBBARD:  That's not what she asked you.

Page 22

1      THE WITNESS:  Okay.  I'm sorry, excuse me -- I
2  don't mean to get off term, but yes.  They have ADA
3  workers.
4      BY MS. ESQUIVEL:  Q.  To the best of your
5  recollection in March of 2015, the ADA inmate workers
6  did not assist you in and out of your wheelchair,
7  whether it be to the bed, to the toilet, or another
8  location?
9      A.   I wouldn't let them.  They used to try and I
10 would tell them, "no, you're not licensed to do it, and
11 if I get injured or something, I don't want to put you
12 guys in that position."  So and then again, I didn't
13 trust them so I always used the medical staff.
14     **Q.   Let me follow up with that.  I have already**
15 **had the deposition notice marked as Exhibit 1, and I**
16 **want to show you what's been marked as Exhibit 2.  And**
17 **this is your responses to -- if you can please take a**
18 **look at that.**
19         **(Exhibit 1 & 2 marked.)**
20     A.   Let him look at it and tell me what I'm
21 looking at.
22     **Q.   It's your responses to --**
23     MR. HUBBARD:  It's your interrogatory
24 responses.
25     THE WITNESS:  Oh, okay.

Page 23

1      BY MS. ESQUIVEL:  Q.  Let me just have you
2  take a quick minute to look through that.
3      MR. HUBBARD:  While he's looking through that,
4  do you mind if I use the restroom?
5         (Short break taken.)
6
7      BY MS. ESQUIVEL:  Q.  Mr. Barker, just let me
8  know when you're done reviewing your responses which is
9  marked as Exhibit number 2.
10     Mr. Hubbard, I have requested the
11 verification.  I still haven't received that from your
12 office.
13     MR. HUBBARD:  I instructed Kaina to send it to
14 you.  My apologizes for that.  We can probably verify it
15 on the record, or I can track it down and get it to you,
16 whichever you prefer.
17     It will probably be easier I will just track
18 it down and send it to you, so.  It takes him a while to
19 read so you might want to consider that.
20     THE WITNESS:  Okay.  The only one I really
21 understand is --
22     BY MS. ESQUIVEL:  Q.  There is no question
23 pending.  Let me just ask you some questions.  Before me
24 handing you what's been marked as Exhibit number 2, had
25 you seen this document before?

Page 24

1      A.   Oh, yes.
2      **Q.   And you remember signing a verification**
3  **stating that the responses are true and correct to the**
4  **best of your knowledge and that verification is**
5  **under penalty of perjury?**
6      A.   Yes.
7      **Q.   Okay.  You indicated in response to**
8  **interrogatory number 2, so did you look on page 2?**
9      A.   Excuse me for one second.
10     **Q.   Sure.**
11     A.   Can I clarify something that I just read here.
12     **Q.   Well --**
13     MR. HUBBARD:  Let her -- answer her question.
14     BY MS. ESQUIVEL:  Q.  Unless it's an answer
15 you previously gave and you want to clarify that.
16     A.   Yes.
17     **Q.   That's fine.**
18     A.   That's what I want to do.
19     **Q.   If there is something that's written in here,**
20 **I'll ask you when we get to that number and then you can**
21 **clarify at that time; is that okay?**
22     A.   But I -- so that I can remember and don't
23 forget, there is just one thing that I would like to be
24 corrected -- hold on, wait, wait.
25     **Q.   Tell me what number are you looking at?**

Page 25

7 (Pages 22 to 25)

A.   I'm looking at number 4.

Q.   **Okay.**

A.   Okay.  I misread it.  It's okay as it is.

Q.   **Okay.  So let's go to your response to interrogatory number 2, which is on page 2, lines 15 through 20.  The question was to specify the date and time on which you contend that the defendants Ramiscal and Osemwingie failed to use the Hoyer lift as it was designed to be operated as you alleged in paragraph 15 of the second amended complaint.**

**Your response did not identify any dates and times.  As you sit here today, do you remember what date and time or times it occurred that the defendants did not properly use the Hoyer lift?**

A.   Okay.  Can you repeat what you asked, what the question was?

Q.   **Sure.  The question is asking you for a date and times of when the Hoyer lift was improperly used.  Your response is pursuant to Rule 33-D, "plaintiff incorporates the information contained in the 602 for this incident, which is equally available to opposing counsel.  That said, the Hoyer shift should not have been used at all.  Ramiscal and Osemwingie should have continued adhering to previous doctor's notes until those notes were revised."**

Page 26

**So you never provided specific dates and times as requested.  As you sit here today, can you provide those specific dates and times or time?  I don't know if it was on more than one occasion.**

MR. HUBBARD:  Object.  Compound question.  Vague and ambiguous.  Calls for legal conclusion, but feel free to answer if you can.

THE WITNESS:  So you are asking me for the date --

BY MS. ESQUIVEL:  Q.   And times.

A.   And times when Osemwingie and Ramiscal used the Hoyer lift on me improperly?

Q.   **Correct.**

A.   Okay.  That would have been the day of this incident, which was I believe it was 3, 3-15, I think it was.  Okay.  That would have been that day, that day they used the Hoyer lift on me improperly.

Q.   **And what time?**

A.   At the time of this incident.

Q.   **What time was the incident?**

A.   I don't remember the exact time.

Q.   **Okay.  In your response you put pursuant to Rule 33-D you incorporate the information contained in the 602.  Are you aware that Rule 33-D requires you to attach the document that you are referring to?**

Page 27

MR. HUBBARD:  Objection, calls for a legal conclusion.

THE WITNESS:  No.  I wasn't aware of that.  Oh, I'm sorry.  Sorry about that.  I wasn't aware of it.

BY MS. ESQUIVEL:  Q.   When you provided this response to number 2, did you have a copy of your 602 available?

A.   No.

MR. HUBBARD:  Objection.  You need to pause so that I can get an objection in.  Objection, calls for attorney/client communication, calls for a legal conclusion, assumes facts not in evidence, and calls for speculation on his part, but if you can answer the question feel free to go ahead.

THE WITNESS:  Okay.  Please ask me again, because I forgot what you --

BY MS. ESQUIVEL:  Q.   Sure.  At the time that you provided response number 2, did you have a copy of the 602 that you are referring to in your response available to you?

MR. HUBBARD:  Same objections.

THE WITNESS:  Okay.  No.  No.  I had been moved and I lost a lot of legal work.  Because I had been moved several times so I don't believe I had a copy of that 602.

Page 28

BY MS. ESQUIVEL:  Q.   You indicated in here that the Hoyer lift should not have been used at all, that the defendant should have adhered to previous doctor's notes until those notes were revised.  What notes are you referring to in your response to number 2?

A.   There were -- there was -- there were written orders about my medical care and medical treatment from the other prison that I came from, which was Lancaster.  When I was seen by the nursing staff here the night I arrived here, they explained to me, because I was concerned about my transfer and whatnot, they explained to me that they generally go along with what the other prisons had wrote, the doctors that wrote, that they generally follow it until I'm seen by the doctor here in this prison.

And for the first few days that I was here, when they -- when the medical staff came to assist me in my cell and was wondering how to assist me, I would tell them I need two persons assist to transfer, and that's what they were doing.

And the first thing they did was they went back and they checked with the registered nurse who looked in my medical files and explained to them, this is the way they are to assist me.  And so this is how they were assisting me based on the doctor's notes from

Page 29

8 (Pages 26 to 29)

1   the other prison when I came here from Lancaster. They
2   were assisting me the same way.
3       **Q. Do you recall who, which doctor at Lancaster**
4   **issued the orders -- let me back up before I ask you**
5   **that question -- so the orders from Lancaster was that a**
6   **Hoyer lift not be used?**
7       A. I was being assisted, if I remember correctly
8   -- I mean, to answer your question, I believe I was
9   being assisted by two persons transfer, two people to
10  assist me to transfer when I was at Lancaster, and I
11  believe that's what the orders were when I arrived here.
12      **Q. My question was a little more specific. My**
13  **question is, do you recall if the Lancaster orders**
14  **specifically stated that a Hoyer lift was not to be**
15  **used?**
16      A. Oh, I don't remember.
17      MR. HUBBARD: It's fine if you don't remember.
18      THE WITNESS: Yeah. To say that -- yeah, I
19  don't remember that.
20      BY MS. ESQUIVEL: Q. Do you remember the
21  doctor that issued the orders or the notes that you're
22  referring to in response to number 2?
23      A. I don't know the names, but I remember them.
24  I can see their faces, but I don't remember their names.
25      **Q. You stated that soon after you arrived, the**

1   **nurse verified in your records that you had this order**
2   **referenced in response to number 2. Did you have a copy**
3   **of those orders?**
4      A. No. But I had -- go ahead. That's all right.
5   I would like to add something to that. No, I didn't
6   have a copy of the orders, but the doctor, the treating
7   physician that was treating me at Lancaster did show
8   them to me. Because she used to come in once a week,
9   and then I would see her even more than that depending
10  if I told the nurses I need to see her, and she would
11  show me the different orders that she had wrote for me.
12      **Q. At the time that you provided your responses**
13  **to interrogatory number 2, did you have your medical**
14  **records that included the Lancaster orders?**
15      A. No, I didn't have the copies of the orders
16  from Lancaster.
17      **Q. Have you ever requested copies of your medical**
18  **records from the Stockton facility?**
19      A. Yes.
20      **Q. Did you request copies of those Lancaster**
21  **orders at the time that you provided your response to**
22  **interrogatory number 2?**
23      A. No.
24      **Q. Why not?**
25      MR. HUBBARD: Objection, calls for a

1   narrative, but feel free to answer -- actually, don't
2   answer.
3      Can you rephrase the question please?
4      BY MS. ESQUIVEL: Q. Why not?
5      MR. HUBBARD: Same objection, calls for a
6   narrative, don't answer. I want to get out of here at a
7   reasonable hour.
8      MS. ESQUIVEL: You can't instruct him to
9   answer unless there is a privilege. I have not heard an
10  objection based on privilege.
11      HUBBARD: All right. The question is vague
12  and ambiguous. Calls for speculation. Compound. Calls
13  for narration, and I have no idea what you are asking,
14  which means he probably doesn't have any idea what you
15  are asking, but by all means go ahead and answer.
16      THE WITNESS: I would like you to re-ask the
17  question in a way that I can understand it, because I
18  don't understand what you are asking me for.
19      BY MS. ESQUIVEL: Q. Okay. So we'll have the
20  court reporter read back, because it was --
21      A. Let me tell you that this particular question
22  that you --
23      (Unreportable crosstalk.)
24      **Q. -- that was related to your prior answer.**
25      **So I'm going to have the court reporter -- you**

1   **will need to stop speaking so that she can read it, and**
2   **no one should speak because she's going to be reading as**
3   **opposed to writing down what people say.**
4      **Madam, Court Reporter, can you please read**
5   **back from the question where I asked him if he requested**
6   **the medical records?**
7      **(Portion of transcript read.)**
8      **"QUESTION: Have you ever requested copies of**
9   **your medical records from the Stockton**
10  **facility?"**
11      **"WITNESS: Yes."**
12      **"QUESTION: Did you request copies of those**
13  **Lancaster orders at the time that you provided**
14  **your response to interrogatory number 2?"**
15      **"WITNESS: No."**
16      **"QUESTION: Why not?"**
17      MR. HUBBARD: Same objections. If you
18  understand the question, go ahead and answer it.
19      THE WITNESS: I didn't feel I needed it.
20      BY MS. ESQUIVEL: Q. Let me show you what has
21  been marked as Exhibit number 3, which is your responses
22  to production request.
23      And I have a copy for you Mr. Hubbard.
24      (Exhibit 3 marked.)
25      In addition to the interrogatories, do you

**Page 34**

1  recall receiving production requests asking you for
2  various documents?
3      A.  Yes.
4      **Q.   Request for production number 2 asks you for**
5  **all questions stating the date and time concerning the**
6  **improper use of the Hoyer lift by the defendants.**
7  **Request number 3 asks you for all documents to support**
8  **your contention that defendants improperly used a Hoyer**
9  **lift, as you alleged.  So your response to number 2 was**
10 **that there was these Lancaster -- these orders from**
11 **Lancaster that said that two persons should assist you**
12 **from and to your wheelchair.  So did you not feel that**
13 **those -- if you read request number 3, that asks all**
14 **documents that show evidence or demonstrate any fact in**
15 **support of your contention that defendants Ramiscal and**
16 **Osemwingie failed to use the Hoyer lift as it was**
17 **designed to be operated as alleged in the second amended**
18 **complaint.**
19     MR. HUBBARD:  Are you finished?
20     BY MS. ESQUIVEL:  Q.  And your response was
21 that you do not have any document in your possession,
22 custody, or control, other than those equally available
23 to defense in his central and medical files.
24 Specifically, Barker would direct his defense to his 602
25 and medical records surrounding the time of injury.  Did

**Page 35**

1  you not feel that those orders from Lancaster were
2  needed given the response that you gave to interrogatory
3  number 2?
4      MR. HUBBARD:  I'm going to object to the
5  question as compound.  Assumes facts not in evidence.
6  Vague and ambiguous.  Calls for legal collusion, and
7  speculation, but go ahead and answer the question if you
8  followed it.
9      THE WITNESS:  I don't really understand what
10 you guys were asking me for.
11     MR. HUBBARD:  Just now or in the interrogatory
12 or the production?
13     THE WITNESS:  She read them and asked me the
14 questions, but I really didn't understand it.  I was
15 having a bad day.  My back and stuff was hurting real
16 bad, and my thought process wasn't right.  So that's the
17 only reason that I didn't produce these documents to you
18 guys.  Because if I would have understood it, I would
19 have just put in a request.  I would have asked for my
20 copy of my medical records as it relates to these dates.
21 I would have made copies of them and stapled them to the
22 interrogatories and had my attorney's office to mail
23 them off to you guys.
24     BY MS. ESQUIVEL:  Q.  And that's because you
25 have access to your medical records, correct?

**Page 36**

1      A.  Well, if I request them, yes.
2      **Q.   Right.**
3      A.  I can request them, but they're not always
4  there.
5      **Q.   Okay.**
6      A.  Okay, but I can request them.
7      **Q.   Okay.**
8      A.  Okay.  So but I have requested medical records
9  and they couldn't locate them, so, you know, but yes, I
10 can request for them.  Yes.
11     MR. HUBBARD:  We have been going about an
12 hour.  Do you need a break?
13     THE WITNESS:  I want to try to get this over
14 with so I can go back and lay down.
15     BY MS. ESQUIVEL:  Q.  Okay.  So let's push
16 through.  Before March 3rd, 2015, you had any
17 interactions with defendant Osemwingie?
18     A.  Yes.
19     **Q.   How many, if you recall?**
20     A.  From a few times, a few interactions.
21     **Q.   How did you come to interact with him?**
22     MR. HUBBARD:  Objection, vague and ambiguous,
23 question calls for a narrative, speculation, but if you
24 understand it, go ahead and answer it.
25     MS. ESQUIVEL:  Mr. Hubbard, if it's okay with

**Page 37**

1  you, just so we cannot be interrupted and then make
2  Mr. Barker forget what the question was, I am agreeable
3  to having a running objection to every single question I
4  ask on every imaginable ground that you can possibly
5  think of.  So this way I'm not repeating the questions
6  after you get your objections out.
7      MR. HUBBARD:  Well, it's been my experience
8  that the judge likes specific objections to specific
9  questions, and that's how they operate.  So I appreciate
10 the courtesy you are extending me, but I got to do what
11 I know the judge historically likes.  So that's -- thank
12 you, but I am going to have to politely decline.
13     BY MS. ESQUIVEL:  Q.  Do you remember the
14 question?
15     A.  You asked when I interacted with Osemwingie,
16 is that what you are asking?
17     **Q.   On the few times that you mentioned before**
18 **March 3rd, 2015, how did you come to interact with**
19 **Osemwingie?**
20     A.   If my memory serves me right, I would press my
21 call light and request to be assisted, whether it was
22 for getting in bed, out of bed, or to the toilet,
23 whatever the case may be, and he would come to my cell
24 with another staff member to assist me -- another
25 medical staff member, I should say.

10 (Pages 34 to 37)

Q. Other than those interactions when he came to assist you, did you have any conversations with him before March 3rd?

A. Yes.

Q. And what was the extent of those conversations?

A. I had an argument with him once in reference to the way he was treating other inmates. I told him that I was watching what he was doing, because where my cell was at that time, 105, I could see across the hall about from this door to where you are sitting at. I would be inside my cell here, and I could see probably, I don't know, five cells to my left on this side where you are at.

Say that's a wall. Well, no, probably to that wall behind you, but I could see maybe all the cells going down to my left, and I could probably see about four or five cells going to my right. But I could see when he would go in and interact with other inmates, the way that he talked to -- I could hear the way he would talk to them, and I could see the way he would handle the inmates who needed his assistance.

Q. So what was it about the way he interacted with the inmates that resulted in you having an argument with him as you stated earlier?

Page 38

MR. HUBBARD: Objection, vague and ambiguous, speculation, calls for a narrative, but go ahead and answer if you know.

THE WITNESS: Well, he wanted to -- he carried himself like he was an alpha male leader-type individual. He was aggressive with the inmates that I was able to witness him interact with. And then there were also other inmates that had complaints against him that I was able to hear, you know. This was before the incident and this was after the incident.

BY MS. ESQUIVEL: Q. Remember my question was limited to before March 3rd, 2015, so just that four-day period before.

A. Okay. Well, I just used to observe his conduct and the way he interacted with those other inmates, the way he talked to them.

Q. You used the word that he was aggressive with other inmates, what did you mean by aggressive?

A. Well, his attitude, the tone of voice, the way he handled -- like this one guy, he's deceased now, he was in CMF with me. He used to have to be fed, and he used to have to be changed. His diaper had to be changed. He was real aggressive with him. I used to give him books, you know. And he was an older white guy, and I knew him and another guy that was also in the

Page 39

building from CMF, Vacaville, and we used to do breathing treatments together. And I used to give him books because they were up in the hospital at the time, but I was in regular GP.

So when I came to CHCF, they were in the same building with me, D-1-B, and one of them got real sick and became bedridden. And I saw Osemwingie treated him like crap.

Q. Again, before March 3rd, 2015, did you ever hear Osemwingie use profanity towards the other inmates?

A. I never heard him curse, but the way he talked to the other inmates wasn't professional or right. And then when you would try and talk to him in that manner, he would get upset and would tell you don't talk to him like that. That was one of the things he and I was arguing about.

Q. Did Osemwingie ever use profanity towards you before March 3rd?

A. No. He didn't use profanity, but he used a loud voice, aggressive, a loud, aggressive voice. I in turn checked him about it, told him, "hey, man, don't talk to me like that." That's when I told him, "I have been watching you, I've seen how you talk to these other guys, I see how you treat them." He says, "what do you mean how I treat them." I say, "Man, I sit here and

Page 40

watch how you flip these guys and you snap on them and stuff every say."

They wanted to move me, okay, from my cell 105 over to I believe it was cell 108, which would have been all the way down in the corner, okay. Because they didn't want me in a position to see his conduct, and I refused to move.

Q. Who told you that, that they wanted to move you for that reason?

A. When he and I were talking, I saw him go over and start talking to nurse Coloma, and then I saw them summon the CO to come over where they were at. And then about five minutes later after they finished talking, the CO comes in my door to tell me I'm moving to 108.

Q. Did you hear the conversation between Osemwingie and nurse Coloma?

A. That's all it could have been.

Q. My question is --

A. No, I didn't hear it. No, I didn't hear it, okay, but --

Q. Okay. I'm sorry.

MR. HUBBARD: Let her ask a question.

THE WITNESS: Yeah.

BY MS. ESQUIVEL: Q. Before March 3, 2015, did you ever see Osemwingie use excessive physical force

Page 41

11 (Pages 38 to 41)

on any of the other inmates?

A. Yes. The individual that I was just telling you about that I knew from CMF Vacaville that was bedridden.

Q. And what physical or excessive physical force -- strike that.

What did you see that you considered excessive physical force as to that other inmate?

A. The way he was snatching and pulling on his body, the way -- well, physical force, yeah. The way he was snatching and pulling on him. And then I used to talk to the guy because they used to leave his door open, okay, and I would go over and talk to him in his doorway. Okay, and he would complain that he wanted to get up out of bed because up until the day he died his mind was working clear. Okay, and he used to complain that they wouldn't get him up and put him in his wheelchair to bring him out of his cell.

Q. Okay. Just for clarification purposes, when you saw Osemwingie use physical force on this other inmate that you knew from Vacaville, was he assisting that inmate in moving him from his bed to another location, or from his wheelchair to another location?

A. He was changing his diaper.

Q. Did Osemwingie ever use, again, before

Page 42

March 3rd, 2015, what you considered excessive physical force in his treatment of you?

A. No, I would have to say no.

Q. Before March 3rd, 2015, had Osemwingie used the Hoyer lift to assist you to relocate either from your wheelchair to the bed or the bed to somewhere else?

A. No.

Q. Did you know defendant Ramiscal before March 3rd, 2013?

A. I believe I had saw her working in the unit as a CNA.

Q. Have you had any interactions with her before March 3rd?

A. I believe she assisted me with other medical staff before March 3rd, 2015.

Q. To relocate you from one position to another; is that correct?

A. Yes.

Q. On how many occasions before March 3rd, 2015?

A. I don't remember.

Q. Did you have any conversations with Ramiscar before March 3rd, 2015?

A. I may have said hello to her, because they come in when they feed us at dinner time and stuff. It's generally the CNA's that comes in to each cell and

Page 43

brings each inmate their dinner. So I'm probably certain that I said hello to her, like I did with Osemwingie.

Q. Did you ever have any -- before March 3rd, any discussions with Ramiscal about your medical conditions?

A. I'm sure I did, because when they -- by me being new, they inquired about what do I need help with, when I would hit the call light and I would explain to them what it was. Or some of them would see the call light on and they wouldn't answer it. They would just come and open the door if they were out on the floor near my cell, but I'm pretty sure because everybody that was working there, on the different shifts, they all came and asked me about my medical issues and what I need help with.

Q. So as you sit here today, you have a specific recollection of having a discussion with Ramiscal about your medical conditions?

A. Yes.

Q. Okay. Was that on more than one occasion?

A. I'm for certain it was when I first got there, because I talked to all of the shifts and they would, you know, they come in and inquire. They wouldn't read my medical file at that time, some of them would just pop open the door and start talking to me, and then I

Page 44

would explain to them what is going on, where did you come from, what is going on, why are you in a wheelchair. Blah, blah, blah, and I'll explain to them.

Q. Is that true for Osemwingie as well?

A. Yes.

Q. So you have specific recollection of discussing your medical conditions with him before March 3rd?

A. Yes, and the reason that I'm certain of this is because they were moving me. The two of them had moved me with assistance from in and out of my wheelchair, whether it was to the toilet, or rather it was I was getting out of the wheelchair, getting out of bed to get in the wheelchair, just to set up, whatever the case may be, they had assisted me before they used that Hoyer lift on me.

Q. Before March 3rd was -- did both defendants Ramiscal and Osemwingie assist you in relocating, again whether it was the bed to the wheelchair, wheelchair to the toilet, wherever it is that they were assisting you?

A. I believe so, yeah.

Q. On how many occasions were both of them, the two persons that were assisting you to relocate?

A. I can't remember how many times, but I believe they did, yes.

Page 45

12 (Pages 42 to 45)

**Q.** Was it on more than one occasion?

**A.** I can't say for sure, but I remember them assisting me.

**Q.** And you mentioned nurse Coloma; who was she?

**A.** Coloma.

**Q.** Coloma, I'm sorry.

**A.** Right. She was the shift lead, RN supervisor.

**Q.** And was she the shift lead for the four days before the March 3rd incident?

**A.** Yes.

**Q.** Did you get along with nurse Coloma?

**A.** Yeah.

**Q.** No adverse interactions with her before March 3rd --

**A.** No.

**Q.** I forgot to ask you, in any of your interactions with Ramiscal, did you feel she was ever disrespectful to you?

**A.** Before this date?

**Q.** Correct. Before March 3rd.

**A.** No.

**Q.** Any adverse interactions with her before March 3rd?

**A.** No, not that I remember.

**Q.** Who is nurse Qamer, Q-A-M-E --

Page 46

**A.** Qamer.

**Q.** Qamer, okay. Do you know who that is?

**A.** Yeah, he was the other third watch, because this all happened on the third watch. He was the other third watch RN.

**Q.** Had he assisted you before March 3rd to move you from one location to another?

**A.** I'm almost certain he had, yeah.

**Q.** And any adverse interactions with him before March 3rd?

**A.** No.

**Q.** I'm sorry. I forgot to ask you, Coloma, that's a female?

**A.** Yes.

**Q.** RN -- so I don't know if they are two different nurses. I have Kommer, K-O-M-M-E-R. I don't know if that's who you were referring to when I said Qamer, and there is a Q-A-M-E-R?

**A.** That's the same person, just misspelling.

**Q.** Oh, okay.

**A.** Actually, both of those are misspelled. I think his name is actually Q-A-U-M-A-R (sic). He's a middle eastern guy, but he announces his name Kommer.

**Q.** So it's the same person, the Q-A-M-E-R and the K-O-M-M-E-R?

Page 47

**A.** I believe it's Q-A-U-M-A-R, Quamar, if I remember right.

**Q.** In the four days before the incident were the unit housing officers the same in terms of the same for the second watch, the same for third watch?

**A.** I don't remember.

**Q.** Do you remember Officer R. Gonzalez?

**A.** He was working the night of that incident.

**Q.** Was that the first time that you had interacted with him, or had you interacted with him in the four days before the March 3rd incident?

MR. HUBBARD: I'm going to object. Compound. Answer if you can.

THE WITNESS: I don't remember.

BY MS. ESQUIVEL: Q. Do you remember Dr. Showalter?

**A.** That was my primary care physician.

**Q.** And that's a female, correct?

**A.** Yes.

**Q.** Is she still your primary care physician?

**A.** No. She quit working here and went to a prison for women, because she didn't like the way they were treating us here.

**Q.** How do you know that?

**A.** Because she informed me of that. She told me

Page 48

she was leaving.

**Q.** Did she tell you the reason why she was leaving?

**A.** That's what I just explained to you right now. She didn't like the way this place was being operated.

**Q.** Did she state to you that she didn't like the way the place was being operated, or she didn't like the way inmates were being treated?

**A.** You know what, I would like that, if possible, to not speak on what she told me, because she told me that in confidence.

MR. HUBBARD: Well --

THE WITNESS: Okay. I know I spoke on it, but I don't want to go in any further with what she told me.

MR. HUBBARD: Well, it's -- that ship's sailed. So if it was private medical issues involving you --

THE WITNESS: Yeah.

MR. HUBBARD: -- that's one thing.

THE WITNESS: I would like to say something to him off the record, please, if that's okay with you guys.

MS. ESQUIVEL: That's fine. I'll step out. Let's take a five-minute break.

(Short break taken.)

Page 49

13 (Pages 46 to 49)

BY MS. ESQUIVEL: Q. Mr. Barker, we took a break at your request to speak with your attorney, but there was a question pending, and the question was you had indicated that Dr. Showalter had made several comments to you in terms of why she was leaving the Stockton facility.

And my last question you to was whether Showalter stated that she was leaving because she didn't like the way the facility was being run, or because she didn't like the way the inmates were being treated? So that is the pending question.

A. I don't remember.

Q. Before March 3rd, 2015, had you treated with Dr. Showalter?

A. I don't remember.

Q. You stated she was your primary care physician before she left; is that correct?

A. Yes.

Q. How long was that?

A. I don't remember.

Q. Do you know who Dr. Nguyen is? N-G-U-Y-E-N, first name Q-H-E-U.

A. No.

Q. Do you recall a nurse C as in -- I don't know if it's a male or female -- C as in Charlie, Johnson?

Page 50

A. No.

Q. So let's talk about the events that occurred on March 3rd, 2015. At what time did you request to use the restroom?

A. I don't remember the exact time.

Q. Was it second watch, third watch?

A. It would have to be third watch, Osemwingie was working. He works third watch. Well, he did at that time.

Q. And when were -- where specifically were you when you requested to use the restroom?

A. I was in my cell.

Q. Were you in your bed, or were you in your wheelchair?

A. I was in my wheelchair.

MR. HUBBARD: Let her finish the question.

BY MS. ESQUIVEL: Q. Do you recall when -- how long it had been since you used the restroom before you requested to use it again that resulted in the use of the Hoyer lift?

A. No, I don't remember.

Q. Who responded to your request to use -- I'm sorry. I'm not that familiar in terms of whether this is run like a hospital where you have a buzzer and your light turns on or if you just yell out to the CO. So

Page 51

why don't you explain to me, how do you request assistant to use the restroom?

MR. HUBBARD: Objection, calls -- sorry, finish your --

BY MS. ESQUIVEL: Q. In 2015?

MR. HUBBARD: Objection, calls for narrative, assumes facts not in evidence. It's speculation, and vague and ambiguous, but if you can answer the question, go ahead.

THE WITNESS: All the rooms are equipped with a call light, which press and it lights up on the outside of the door, the cell, and it also goes to an answering system at the nurse's station.

BY MS. ESQUIVEL: Q. How long after you pressed the call light button did someone respond to your request?

MR. HUBBARD: Objection, vague and ambiguous, go ahead and answer.

THE WITNESS: I don't remember.

BY MS. ESQUIVEL: Q. Was it minutes, or was it hours?

A. I don't remember exactly how long it was, but I know -- I could say it wasn't hours, but I don't remember exactly at the time it was when they came.

Q. Right, and just as a reminder, when we started

Page 52

this deposition, I told you that given the passage of time you are not expected to remember everything with any level of specificity, but I am entitled to your best estimate. So that's why I'm asking you, was it hours, was it minutes, was it seconds?

A. It was minutes. It wasn't -- like I said, it wasn't hours or nothing like that.

Q. Who responded to your request?

A. I believe it was Osemwingie, and -- I don't know if Ramiscal came with him right then and there or if he called for her, but I just -- I remember the -- I remember he was present. I remember telling him that I need to use the restroom. I remember Ramiscal coming to the door. I remember they had a Hoyer lift. I remember the Hoyer lift was there. I don't know if he brought it with him or Ramiscal pushed it. I don't remember.

I remember he and I arguing over him using the -- wanting to use the Hoyer lift on me, and I remember him going to get a CO, and I remember Coloma, RN Coloma coming, and I remember me saying to him, "hey, man, you've been transferring me with two persons assist, and I have a bullet under my scrotum. My back is already messed up. Why are you trying to use the Hoyer lift on me now?"

I remember saying that to him and all this --

Page 53

1  at this time my bowels is about to come out.  I remember
2  because I had to use the restroom real bad, and I
3  remember RN Coloma trying to talk to him and the CO
4  trying to talk to him, and he wasn't listening to none
5  of that.
6      And then he finally said, "if he doesn't let
7  me transfer him with this Hoyer lift, then I'm not going
8  to assist him."  And me not wanting to defecate on
9  myself, I allowed him to put the Hoyer lift on me.
10     **Q.  Okay.  So that was a lot of information, so**
11  **let me just break it down for you.  At what point after**
12  **Osemwingie responded to your request did you learn that**
13  **he intended to use the Hoyer lift?**
14     A.  When he came -- I don't remember the exact
15  details other than I remember he came first.  Then I
16  remember Ramiscal came.  We had a conversation over him
17  using the Hoyer lift on me and not wanting him to use it
18  on me.
19     **Q.  So let me stop you right there because you**
20  **have already testified to that.  So let me just ask**
21  **specific questions, and hopefully I can get a specific**
22  **answer.  Did Osemwingie tell you when he arrived in**
23  **response to your call light that he was going to use the**
24  **Hoyer lift?**
25     A.  Yes.

1      **Q.  Okay.  When he arrived to your cell in**
2  **response to your call light, did he come alone?**
3      A.  I don't remember.  I don't remember if he came
4  by himself.  I just -- I don't remember.
5      **Q.  Okay.  After he arrived at your cell in**
6  **response to your call light, did he ever leave and then**
7  **come back?**
8      A.  Yes.
9      **Q.  Okay.  How long did he leave for?**
10     A.  If I remember correct, I think he -- after we
11  had got into the discussion of me not wanting him to use
12  the Hoyer lift on me, I believe he left and came back
13  with the CO.  And I believe, yeah, the  CO and I think
14  Ms. Coloma, the shift-lead nurse, I believe they came
15  back.  When they all came back, it was him, Ramiscal,
16  the CO, and Ms. Coloma, and they had the Hoyer lift.
17     **Q.  I'm sorry.  Go ahead.**
18     A.  That's it.
19     **Q.  Okay.  Do -- I'm assuming your cell in March**
20  **of 2015 --**
21     A.  Yes.
22     **Q.  -- had a toilet in there?**
23     A.  Uh-huh.
24     **Q.  Was that the toilet that you were going to**
25  **use, or were you normally taken elsewhere?**

1      A.  No.  I was going to use my cell toilet.
2      **Q.  The Hoyer lift that was brought to your cell,**
3  **was it electric or manual?**
4      A.  Uh, it had --
5      **Q.  I'm sorry.  I don't know if you are familiar.**
6  **There are some that you crank them, that's how they lift**
7  **the patient up, and then, of course, there is an**
8  **electric that you push a button and it lifts.  Do you**
9  **recall which one was brought?**
10         MR. HUBBARD:  Do you understand the question?
11         THE WITNESS:  Yeah, I'm trying to remember.
12  Did I ever -- did he lift me with a manual or an
13  electric Hoyer lift?
14         MR. HUBBARD:  If you don't remember, that's
15  okay.
16         THE WITNESS:  I don't remember.
17         BY MS. ESQUIVEL:  Q.  The wrap that was used
18  to lift you, was that similar to the type of wraps that
19  had been used on you before?
20     A.  When you say a "wrap" -- excuse me, what were
21  you going to say?
22         MR. HUBBARD:  Object as vague and ambiguous,
23  but go ahead and answer, if you know how.
24         THE WITNESS:  When you say "wrap," are you
25  talking about the device that they put me in to lift me;

1  is that what you are talking about?
2      BY MS. ESQUIVEL:  Q.  Correct.  I don't know
3  if there is another name for it.
4      A.  Yes.
5      **Q.  The one that has the straps that then hook**
6  **onto the lift itself.**
7      A.  Yes.
8      **Q.  Yeah.  Was the one that was brought on**
9  **March 3rd similar to ones that had been used on you**
10  **before?**
11     A.  When you say "before," are you talking about
12  here at CDCF?
13     **Q.  Any time you've had a Hoyer lift used on you,**
14  **not limited to the Stockton facility.**
15     A.  When you say "similar to," what do you mean
16  when you say similar to?
17     **Q.  Okay.  Well, let me ask you a different**
18  **question since it's apparent that you are not**
19  **understanding what I'm asking you.**
20     **Describe for me the object that was used on**
21  **your body and then hooked onto the lift itself to lift**
22  **you from your wheelchair to -- that was supposed to lift**
23  **you from the wheelchair to the toilet on March 3rd.**
24     A.  It was like a mesh material.  It's called a
25  sling.  That's the name of it.  It had four straps on

1   it. Two were supposed to go behind your back -- at this
2   time, I didn't know that. But I have learned since
3   then, two other straps --
4       Q.   Describe it for me literally; describe it to
5   me?
6       A.   It's like a --
7       Q.   If you need to draw it, I'll give you a paper
8   and we'll put it into the record.
9       A.   It's like this thick mesh, okay, and I guess
10  it would probably be, I would say, maybe about four
11  feet, maybe five feet long, and maybe about three feet
12  wide, maybe, and it has two straps on the bottom and two
13  straps on the top.
14      Q.   Let me just show you what I have seen as
15  slings. It kind of looks like a tooth. Does that look
16  like the sling that was brought and attempted to be used
17  on you on March 3rd?
18      A.   No.
19          MR. HUBBARD: Mark that as an exhibit just so
20  we know what it looked like.
21          MS. ESQUIVEL: I'll hand that over and --
22          THE WITNESS: Let me see your pen, please.
23          MR. HUBBARD: Well, let's do a separate piece
24  if you are going to draw it, just so we can reserve the
25  record.

Page 58

1   this would be your legs, and then your body would be
2   held by these two straps. They would hook these to --
3   generally, they would cross them between your legs and
4   then hook them onto the Hoyer lift at the bottom and
5   then hook these two on the Hoyer lift just straight.
6          MR. HUBBARD: "These two," the top, you are
7   going to have to do better.
8          THE WITNESS: Okay. The two straps at the top
9   are put on the Hoyer lift, just as they are, one over
10  this shoulder, one over this shoulder, and then your
11  body is inside the material here, okay. This is the
12  correct way to do it.
13          And then at the bottom, they would take the
14  bottom straps and crisscross them and put them on the
15  Hoyer lift. They would put them inside your legs,
16  whether you a lady or a man, no matter, and they would
17  crisscross them and hang them on the Hoyer lift to keep
18  you from sliding out, okay, and then they would lift the
19  Hoyer lift, okay.
20          When I was arguing with --
21          BY MS. ESQUIVEL: Q. I'm sorry, and where
22  would your legs be? Would they be inside between the
23  two bottom loops, or would they be on the outside of the
24  bottom loops?
25      A.   When they cross the bottom loops, your legs

Page 60

1           THE WITNESS: Okay.
2           MS. ESQUIVEL: We will mark that as Exhibit 5.
3               (Exhibit 5 marked.)
4           THE WITNESS: Okay. This is how it looks.
5           MS. ESQUIVEL: I can see it from here.
6           MR. HUBBARD: Let's get that marked as
7   Exhibit 6, I guess.
8               (Exhibit 6 marked.)
9
10          BY MS. ESQUIVEL: Q. Okay. Just keep that on
11  there, and to the best of your recollection, where did
12  the certain portion sides touch your body? So if you
13  were to go -- I'm looking at it. It looks like a
14  rectangle with four -- with four loops at each corner,
15  so did your body go parallel to the length, or did it go
16  perpendicular to the length?
17      A.   My body was -- my shoulders, say this is my
18  shoulders up here.
19          MR. HUBBARD: I have a different color pen.
20  Why don't you draw where your body would be on that with
21  black ink.
22          THE WITNESS: Normally, this will be the
23  shoulders. It would be up here. This would be the
24  shoulders up here. And then your legs would be down
25  here -- no, I'm sorry. This will be your shoulders, and

Page 59

1   would be on the outside.
2       Q.   So you were straddling the bottom part of the
3   mesh?
4       A.   That's not the way they hooked me up.
5       Q.   I'm not asking you. You said that that's the
6   proper way. I'm asking you. So your legs would be
7   straddling the bottom part of the sling?
8       A.   They would be on the outside of the crisscross
9   of the sling, yes.
10      Q.   Okay. So now -- and that's your understanding
11  of the proper way of using the sling, correct?
12      A.   Now I know that's the proper way to use it.
13      Q.   Okay. So now explain to me how defendants
14  used or put the sling on you on March 3rd.
15      A.   They -- you want me to draw it on another
16  piece of paper or just --
17      Q.   If you want, or if you want to draw it on the
18  side, it's up to you.
19          MR. HUBBARD: We can use another sheet. Call
20  this Exhibit 7.
21              (Exhibit 7 marked.)
22
23          BY MS. ESQUIVEL: Q. I'm sorry. I noticed
24  that this one is not rectangle.
25      A.   It's the same. It's just -- it's the same

Page 61

16 (Pages 58 to 61)

1 thing. It just doesn't look the same.
2     MR. HUBBARD: Art is not his strong suit.
3     THE WITNESS: No, not by a long-shot, okay.
4 Now, he took the two upper ones that were under my
5 armpits, okay, so when he hooked it up, he hooked it up
6 under like that.
7     MR. HUBBARD: Under your arm because she's
8 typing it.
9     THE WITNESS: Okay, okay. The Hoyer lift, I
10 mean, the sling, it has an area where when you connect
11 it to the Hoyer lift I can put my arms over it and then
12 you can -- when you connect it, you can connect it and
13 then have your arms -- it will have the -- be under your
14 armpits.
15     BY MS. ESQUIVEL: Q. Okay. I'm sorry. When
16 you said -- referring to Exhibit number 6, when you said
17 the proper way, you motioned while you were explaining
18 that the top ones are hooked up. I understood that the
19 sling is on your back. It rests up against your back,
20 correct?
21     A. Yes.
22     **Q. Okay, and then you made the motion that the, I**
23 **am going to call them loops that clip onto the Hoyer**
24 **lift, you went over your shoulder. Is that your**
25 **understanding the proper way that the hoops would come**

Page 62

1 **from behind and over your shoulders to hook onto the**
2 **Hoyer lift?**
3     A. With this diagram, what I'm trying to show
4 you, is the shoulder straps, the top of the sling would
5 go -- when they connect it to the Hoyer lift, the cross
6 bar, okay, your body is inside this material. So the
7 material you're enclosed, and then it's crossed between
8 your legs. So you're like sitting, like if you were in
9 a parachute sort of like, okay.
10     **Q. But you made that motion again as you were**
11 **explaining the upper part of it. You touched -- you put**
12 **your hands over the top of your shoulders. So that's my**
13 **question is, in your understanding of the proper way to**
14 **use the sling, is that the top loops come over the**
15 **shoulders?**
16     A. They have to come over the shoulders to hold
17 the sling up, but your body is inside of it. Your neck
18 is exposed a little bit and your shoulders are inside.
19     **Q. Correct. I understand.**
20     A. The material is covering you, and then the
21 straps are behind you holding the back part of the sling
22 up.
23     **Q. Just for the record, because obviously we**
24 **can't --**
25     MR. HUBBARD: You do realize the Judge is

Page 63

1 going to have a field day reading this.
2     BY MS. ESQUIVEL: Q. -- because you can't
3 interpret with your motions. Again, you put your hands
4 over the shoulder and you made a motion forward, but
5 over the shoulders.
6     A. All I'm trying to show you with this drawing
7 and with me explaining it to you, my understanding of
8 the correct way that I should have been put into the
9 Hoyer lift, the sling should have been -- my body should
10 have been -- the sling should have came under my butt,
11 all right, they should have crisscrossed the bottom part
12 of the sling with the two straps between my legs and
13 then attached it to the Hoyer lift cross bar. They then
14 should have taken the back of the back upper part of the
15 sling and simply connected it, both one side of the
16 sling straight away into the cross, the T, and then the
17 other one straight away across the T, and lifted me
18 straight up.
19     Okay. This way it would have ensured that I
20 would remain inside of the sling as they were attempting
21 to transfer me.
22     **Q. Okay. And again, just for the record, when**
23 **you again explain the upper body portion of how the**
24 **sling is connected to the lift, you made a motion with**
25 **your hand over your shoulder forward, correct?**

Page 64

1     A. Yes.
2     **Q. Okay. So now going to Exhibit 7 where you are**
3 **now going to explain how Osemwingie put the Hoyer lift**
4 **on you on March 3rd, 2015, so explain now how it was**
5 **placed on you.**
6     A. He placed the two back strings or straps. He
7 placed those -- he placed the sling under my arms like
8 that, and then he connected that -- those two straps to
9 the T bar.
10     **Q. Okay. So let me just stop you there, because**
11 **you made some motions that explained in addition to what**
12 **you were saying. So you brought a motion when you said**
13 **he connected the slings, this time you put your arms**
14 **under your pits and brought them forward as if though**
15 **you are now hooking it onto the lift, correct?**
16     A. Yes.
17     **Q. Okay. Was the material of the sling still to**
18 **your back, but as opposed to over the shoulder, it was**
19 **now under the armpits, correct?**
20     A. That's correct.
21     **Q. Okay. What else did he do?**
22     A. And then he took the bottom slings, and he ran
23 those, he put the material a little bit under my butt,
24 and he ran those the same way out he didn't crisscross
25 them between my legs. He put them under my butt a

Page 65

17 (Pages 62 to 65)

1   little bit and ran them straight out.
2       Q.  So he hooked them -- again, you're making a
3   hand motion that from your hip upward or straight out?
4       A.  Yes.
5       Q.  So he took the bottoms without crossing them
6   under your legs, correct?
7       A.  That's correct.
8       Q.  Such that the loops were on each side of your
9   outer legs?
10      A.  Yes.
11      Q.  And then he hooked them onto the bar of the
12  lift, correct?
13      A.  Osemwingie was connect to one side, CNA
14  Ramiscal connect to the other side.
15      Q.  Was that true for the upper body portion of
16  the loops?
17      A.  Was what true?
18      Q.  That Osemwingie had one side and Ramiscal had
19  the other side?
20      A.  He was directing, he was telling her how to do
21  it, because we were -- we were having a debate, and I
22  was telling him, "man, I have bullets under my scrotum.
23  If you crisscross this Hoyer lift -- I mean these strap,
24  it will put pressure on that bullet and hurt me, okay.
25  And I don't want to use this Hoyer lift, because" --

Page 66

1   this is what I was telling him, "it's going to hurt my
2   back, and it's going to irritate that bullet."
3       Q.  You stated right now that you told him that it
4   would hurt if he crisscrossed?
5       A.  Yes, I did tell him that.
6       Q.  Okay.  So I'm sorry.  Before we get a little
7   bit further more, let's finish explaining -- are you
8   done explaining how it was placed on you?  Because --
9       A.  I want to explain to you the reason he put
10  this like that.
11      Q.  Okay.
12      A.  Okay.  I'm saying to him, "don't do it.  I
13  don't want to be put in this Hoyer lift, because it's
14  going to hurt my back, okay, and it's going to irritate
15  this bullet, okay."  He's going "I'm going to do it in a
16  way that it doesn't hurt the bullet or hurt your back."
17  When he set me in the Hoyer lift and connect -- set me
18  in the sling and connected it the way that he did it,
19  Coloma, the shift lead, and Ramiscal is telling him
20  "don't do it like this," and he is telling them, "let me
21  do what I'm doing, I know what I'm doing."  Okay, and I
22  let -- I trusted him.
23      All right.  And when he started lifting me up
24  with the Hoyer lift -- because he was the one operating
25  it, okay -- the straps were under my armpits, as I said,

Page 67

1   and then when he got me up a little bit, the part that
2   was under my butt came off, all right, and then that
3   left me suspended.  I said six inches, but it probably
4   was maybe about -- maybe about this high.
5       MR. HUBBARD:  You have to give specific
6   measurements.  She can't do heights.
7       THE WITNESS:  Well --
8       BY MS. ESQUIVEL:  Q.  Would that be a fair
9   estimate?  You put one hand above the other and you said
10  "this high."  If I were to estimate that is about six
11  inches to me, but if you have a different estimate, I
12  will go with whatever estimate you have.
13      A.  Let me say this.  I don't know -- I said "six
14  inches," but he lifted me to the point to where the -- I
15  was suspended on just my armpits, okay, and my butt had
16  cleared the chair, all right.  And that's when my back
17  started popping.  And the way the Hoyer lift does you,
18  it doesn't lift you straight up.  It pulls you at an
19  angle, okay.  You don't come just straight up in it.
20      Q.  Okay.  So I'm sorry.  Were you done?
21      MR. HUBBARD:  Are you done?  Yes, we are good.
22      THE WITNESS:  Yes.  Well -- okay.
23      BY MS. ESQUIVEL:  Q.  You mentioned that the
24  sling came off your butt.  Are you saying that it slid
25  above your --

Page 68

1       A.  Yes.
2       Q.  -- from underneath your buttocks?
3       A.  Yeah.  He had a little bit under my butt, and
4   then when he started lifting me, it moved.  It came from
5   under there, and then I was just suspended by my arms.
6       Q.  Okay.  When it came off of there, where did
7   you feel it on the lower part of your body?
8       A.  I really couldn't tell, right, because I had
9   on clothes, and I really couldn't feel it that good.
10  But I just know that I was left suspended with just my
11  armpits holding me up, and the top half of my body, like
12  I said, my back started popping and I screamed out to
13  him, "hold it man, you just popped my back out," and
14  then he set me back down.  Then they left.  He
15  disconnected the Hoyer lift.
16      Q.  Okay.  Well, we'll get to that part.  Let's
17  just finish.  So when you were lifted and you said you
18  were suspended by your upper body, were your feet still
19  on the ground?
20      A.  Yeah.  I'm sitting in my wheelchair.
21      Q.  Okay.  You mentioned earlier that nurse
22  Coloma, who is the shift lead, and Ramiscal were telling
23  him that that was not a proper way to use it?
24      A.  Yeah.  He -- when they all came back into the
25  room.

Page 69

18 (Pages 66 to 69)

Q.   I'm sorry.  Let me just ask my questions before -- is that correct, that they were there?

A.   Yes.

Q.   Who else was there other than Ramiscal, Coloma, and obviously Osemwingie?

A.   The CO.

Q.   Was it more than one?

A.   Just one.

Q.   And was that Gonzalez or a different CO?

A.   Yes, yes.

Q.   And you stated that you let Osemwingie do it because you trusted him?

A.   No.  This is why I let him do it.  I let him do it because I had to go to the toilet, I was about to defecate on myself.

Q.   Okay.  So what did you mean when you testified earlier that you trusted him?

A.   Being that when he lifted me, that he was doing it in a professional manner that was safe for me.  I didn't know what he was doing was going to end up injuring me, because I wouldn't have let him do it.

Q.   But if you heard nurse Coloma, who is the shift lead and is a nurse, correct?

A.   Right.

Q.   And Osemwingie is a CNA, a certified nursing

Page 70

assistant, you were aware of that, correct?

A.   Yes.

Q.   Okay.  If you heard nurse Coloma saying that he wasn't doing it properly, why did you trust him to lift you in the manner that he did?

A.   Because I thought he knew what he was doing when he said, "let me do it, I know what I'm doing."

Q.   Was there anybody else in your cell besides the four individuals we already mentioned?

A.   No.  Myself.

Q.   Did you have a cell mate?

A.   No.  All those cells over there is a single cell for just one person.

Q.   When -- you testified that once you were lifted, you heard a pop?

A.   And I felt it as well.

Q.   Where exactly in your back did you feel and hear the pop?

A.   The lower part of my back.

Q.   Was it right above the waist line or below the waist line?

A.   Above.

Q.   Above?

A.   A little bit above, yeah.

Q.   Other than the pop -- and I'm assuming when

Page 71

you say you felt it, you are talking about the pain?

A.   Yes.

Q.   And the pain, did you have any other symptoms or sensations as a result of the pop?

A.   My back started hurting real bad immediately, and I told --

Q.   Your entire back?

A.   From above the waist up until about midback it started hurting real bad immediately, and when I -- when I told him this, that he had just popped my back out, you could hear it, he set me down because he was in front of me operating the little button.  He set me down, Ramiscal took off one side, he took off the other of this sling, and they all left the room.  The CO, shift lead RN Coloma, Ramiscal, and Osemwingie, and they drug the lift out.  And I am saying to them, "hey man, you just popped my back out.  I need to see somebody because my back is killing me."  I kept hitting my call light for at least over an hour.  I know it was over an hour.

Q.   Let me stop you right there before you move on.

A.   Yeah.

Q.   Did anyone -- did either Osemwingie or Ramiscal or Coloma tell you that they heard your back

Page 72

pop?

A.   I knew they -- no, they didn't tell me, but I knew they heard it because by the expression on their faces and how they all ran out of there, and then Coloma, she wouldn't give me medical attention.  This is how Qamer came into the picture.

Q.   Let me stop you right there before you get ahead of me.  Did you subsequently learn from any source whether someone told you or you read it from some document that Osemwingie heard your back pop?

A.   Please repeat that question.

Q.   Did you learn from any source whether someone told you or you read it from some document that Osemwingie heard your back pop on March 3rd?

A.   Did I learn from some source?

Q.   Any source.

MR. HUBBARD:  Object as vague and ambiguous, but go ahead and answer if you can.

THE WITNESS:  Or read --

BY MS. ESQUIVEL:  Q.  Uh-huh.

A.   -- anywhere where Osemwingie heard my back pop?

Q.   Correct.

A.   I'm only going on the expression on his face when he lifted me that he understood he had hurt me.

Page 73

19 (Pages 70 to 73)

**Q.** But please answer my question. Did you learn from any source that Osemwingie heard your back pop?

**A.** No, I didn't learn from a source. Well, yes, from him and his facial expression.

**Q.** Did -- other than the pop, did you make any other sound like cry out or scream out in pain?

**A.** Yes, I did. Right when it happened, I said, "awe, you just popped my back out."

**Q.** Did you learn from any source that the expression on Osemwingie's face was based on what you said as opposed to hearing a pop?

MR. HUBBARD: I'm going to object, vague and ambiguous, but answer the question if you can.

THE WITNESS: You asked me did I learn from any source?

BY MS. ESQUIVEL: Q. Any source.

**A.** That Osemwingie's facial expression --

**Q.** His reaction was based on hearing a pop or based on what you said?

**A.** I can only judge the way he reacted when I was -- 'cause I was looking at him, so but from another source, no, I can only go by what I saw in his body language.

**Q.** Okay. Did you learn from any source that whatever facial expression you saw on Ramiscal's face

Page 74

was in response to what you said or a popping sound that she might have heard?

**A.** Just from her body language.

**Q.** Was the popping sound and your -- and you crying out and making the statement, you did simultaneous?

**A.** One right after the other, yes. My back popped, I screamed out. They lowered me back in my wheelchair. I asked for medical attention because my back was hurting real bad, and they dispersed. They wouldn't answer my call light for over an hour and RN Qamer came down asking me, what was going on, "I see your light keep coming on. What's going on?"

Because they kept turning it off. They wouldn't answer it. And he asked me what's going on, and I told him, "man, they came in and tried to transfer me with the Hoyer lift, injured my back, can I please see a doctor because my back is hurting real bad."

**Q.** How much time lapsed from the time that defendants and nurse Coloma left your cell to the time that Qamer came and asked you what's wrong?

**A.** Well over an hour or so.

**Q.** And for that hour period you were turning on your --

**A.** Call light.

Page 75

**Q.** -- call light?

**A.** Yes, and you could hear it because when you press the call light in my cell, when they answer it, it has like a little crackle sound like if you're speaking into a walkie-talkie and you press the button down. Okay, because they have to hit the switch. They pick up a phone and talk into it. Okay, but if they don't pick -- even if they don't pick up the phone when they hit the switch, they going to have to hit the switch back down to deactivate the call light and you could hear it.

**Q.** What about Officer Gonzalez, did he respond to your call lights?

**A.** No, he doesn't respond to the call lights unless medical staff request him. That call light is for medical, for medical staff.

**Q.** If --

**A.** Not for custody.

**Q.** Why didn't you call for Officer Gonzalez if the medical staff was not responding to your call light for over an hour?

**A.** Because medical and custody is separate, and he's not going to override medical. He's not going to do it. They're going to say that's medical.

**Q.** Did Officer Gonzalez tell you he wouldn't do

Page 76

it, get help for you?

**A.** No. When he left my cell, I didn't see him again until after they were putting me over to -- I didn't have any interactions with him again until after they were transporting me over to SEMS is what it's called, and that's the equivalent of the emergency room here.

**Q.** Did any of the persons present there say anything to you in response to your remark that -- and your screaming of in pain and stating that your back popped, did anybody say anything in response to that?

**A.** No. In fact, Coloma tried cover it up. That's why they didn't -- when they left and dispersed like that, she would never answer the call light. She knew because I asked. I said -- I said "you just popped my back out. Please let me see somebody. My back is killing me."

**Q.** Why didn't you sue nurse Coloma if she was ignoring your request for medical care despite the fact that she was present when your back popped?

MR. HUBBARD: Objection, calls for a legal conclusion, speculation. Answer the question if you know how.

THE WITNESS: I'm going to listen to him on that.

Page 77

20 (Pages 74 to 77)

**Page 78**

1      MR. HUBBARD: Well, I also said answer the
2  question if you know how.
3      THE WITNESS: Well, I don't know why I didn't
4  sue Coloma to be honest with you.
5      BY MS. ESQUIVEL: Q. You stated that you had
6  pressed the call button so that you could be transferred
7  to the toilet because you had to have -- you needed to
8  empty your bowels. Did you ever have an opportunity to
9  use the restroom?
10     A. When my back started hurting, the sensation to
11  go to the restroom left. I know it's strange, but
12  that's what happened.
13     **Q. After the defendants left your room, were you**
14  **left in your wheelchair?**
15     A. Yes.
16     **Q. Are you able to come in and out of your cell**
17  **as you please, or do you have to request that your cell**
18  **door be opened?**
19     A. No. The door is secured. When you go in a
20  cell, they lock it behind you, or the CO locks it behind
21  you, and then they let you out for hourly unlocks. Or
22  if there is a medical staff there and they clear it with
23  the CO, they will open the door with the key if you are
24  trying to come out, you know, but you have to be
25  released out. You can't just come out when you are

**Page 79**

1  ready.
2     **Q. You are familiar with the term "man down,"**
3  **correct, man down?**
4     A. Yes.
5     **Q. And you understand that correctional officers**
6  **are required to respond to a man down?**
7     A. Yes.
8     **Q. Why didn't you call man down if you -- if**
9  **medical staff was refusing to respond to your call light**
10  **for over an hour?**
11     A. You don't -- now that I think about this, I
12  believe that -- I can't be for certain, but I believe
13  that there was a black sergeant working that day, I
14  believe, who came over, because I did yell "man down."
15  I believe I did.
16     **Q. So I'm sorry, what does the black sergeant**
17  **have to do with you yelling man down?**
18     A. I believe if I -- if I'm not confusing this
19  with another incident where medical refused to assist
20  me, I believe on this incident that officer -- I think
21  it was Rodriguez was his name, is that what you said his
22  name was?
23     **Q. You have Gonzalez?**
24     A. Gonzalez, okay. I believe he did notify the
25  sergeant and the sergeant came over, and I believe they

**Page 80**

1  did escort me over to the SEMS, which would be the
2  emergency room. I believe that -- I believe that's what
3  happened. I can't be a hundred percent sure because
4  it's been -- I have been having war with these people
5  here, ma'am, about my medical treatment here. Okay, but
6  I'm not for certain if that was the same incident.
7     **Q. Have you had any conversations with Officer --**
8  **did you have any conversations with Officer Gonzalez any**
9  **time after March 3rd, 2015, about what occurred on that**
10  **day?**
11     A. Yes.
12     **Q. And what did you guys talk about on those**
13  **occasions?**
14     A. Osemwingie and myself getting into it over the
15  way he wanted to assist me by using the Hoyer lift,
16  because it got ugly. He called me some things. I
17  called him some things that -- you know, it got real
18  ugly.
19     **Q. Was this on March 3rd or subsequent?**
20     A. After -- after I ended up hurting my back.
21     **Q. So after your back was injured, you and**
22  **Osemwingie exchanged --**
23     A. I had -- let me -- let me -- let me try to
24  clarify it for you. I did say a couple of things to
25  him.

**Page 81**

1     **Q. Okay. When?**
2     A. When he injured my back.
3     **Q. So while you were still in the sling?**
4     A. When he was putting me down, I said some
5  things to him. He responded. They unhooked me. They
6  dispersed. And then later after that, I spoke with
7  Officer Rodriguez -- Gonzalez, I spoke with him about
8  what transpired.
9     **Q. Okay. I'm sorry, I must have misunderstood**
10  **your prior testimony. I had asked you if anyone said**
11  **anything in response to you crying out for your pain,**
12  **and you said, no, that everybody just left.**
13     A. No, let me --
14     **Q. Now you are -- let me finish. Now are you**
15  **telling me that there was an exchange between you and**
16  **Osemwingie? So let's back up and talk about that**
17  **exchange while you're still in the sling. What did you**
18  **say and what did Osemwingie say to you?**
19     A. Basically I was upset that he used the Hoyer
20  lift on me. I said to him as much. I said to him I
21  wanted to see the doctor. I was cussing. I was
22  cursing, okay. He said some things back to me. I don't
23  recall verbatim what he said.
24     **Q. To the best of your recollection, can you**
25  **summarize?**

1   A.   I don't remember exactly what he said.

2   **Q.   Okay.**

3   A.   Okay, but I do know that after this happened,

4   a day or so after, I don't remember exactly, but Officer

5   Gonzalez and I did talk about it.

6   **Q.   Okay.  I will stop you there.  My question was**

7   **directed at the exchange between you and Osemwingie**

8   **while you were still in the sling right after you felt**

9   **the pop.  So can you just give me some kind of summary**

10  **about what Osemwingie said in response to what you said?**

11  A.   I don't --

12  **Q.   Did he tell you you deserved it?  Did he tell**

13  **you he was sorry?**

14  A.   I don't remember exactly.

15  MR. HUBBARD:  Hold on a second.  I will object

16  to that last question as compound and argumentative, but

17  go ahead and answer if you can.

18  THE WITNESS:  I'm going to say this again.  I

19  don't remember exactly what he said, but I do remember

20  that I did use some profanity after I got hurt.

21  BY MS. ESQUIVEL:  Q.  Did he use profanity in

22  response?

23  A.   No, but he said some things in a tone that was

24  disrespectful and aggressive.

25  **Q.   What was -- what was it about his tone that**

1   **you felt was disrespectful and aggressive?**

2   A.   Well, you just tried to use a method to

3   transfer me, and it caused me to get injured and I was

4   angry about it, and, yeah, I did use some profanity.  I

5   don't remember exactly what curse words I did say, but I

6   was upset that I became injured.  And I was requesting

7   medical assistance, and then they all -- he hurried up,

8   they both, him and Ramiscal hurried up and unhooked me,

9   and they snatched that Hoyer lift out and they all left,

10  okay.  And Coloma, the reason I say she tried to cover

11  it up was because she wouldn't answer that call light

12  and she knew I was in my cell injured and requesting to

13  be seen by medical.

14  **Q.   Okay.  Let's just stay with, again, what**

15  **happened while you were still in the Hoyer lift.  Is**

16  **that the extent of the verbal exchange between you and**

17  **Osemwingie?**

18  A.   Yes.

19  **Q.   Was there any verbal exchange between you and**

20  **Ramiscal?**

21  A.   No.  My issue was directed at him at that

22  time.

23  **Q.   Was there any verbal exchange between you and**

24  **Coloma?**

25  A.   Well, I said to all of them I need medical

1   assistance, my back is out.  My back is hurting.  I made

2   that blatant statement several times to all of them that

3   was present.  That was the only -- they didn't respond

4   to it.  They didn't say anything back to me.  Okay, but

5   I said that to them.

6   **Q.   At the time when you were still in the Hoyer**

7   **lift right soon after hearing the pop, was there any**

8   **verbal exchange between you and Officer Gonzalez?**

9   A.   No.  It was just me talking to them.

10  **Q.   So let me hand you what's been marked Exhibit**

11  **number 4.**

12  **(Exhibit 4 marked.)**

13  It's just a package of -- a 14 page package of

14  various medical records dated March 2nd through the 5th

15  of 2015 -- I'm sorry.  March 4th, 2015.  I numbered them

16  at the bottom so we could --

17  A.   Where are we looking at --

18  **Q.   I'm just explaining for the record what they**

19  **are.**

20  A.   Okay.

21  **Q.   And I numbered them at the bottom so we can**

22  **all refer to them at the same time.  So let me call your**

23  **attention to page number 6, and this is an**

24  **interdisciplinary progress notes dated March 3rd, 2015,**

25  **1800 hours, and you understand 1800 hours to be**

1   **6:00 p.m.?**

2   A.   Okay.

3   **Q.   Do you?**

4   A.   Yeah, okay.  I'll take your word for it.

5   **Q.   Just take a minute -- well, no, I don't want**

6   **you to take my word.**

7   **Are you aware that 1800 hours means 6:00 p.m.**

8   **in the afternoon or not?**

9   A.   I am taking your word that 1800 is 6:00.

10  **Q.   Take a minute to just review that page, and**

11  **then I'll ask you some questions, and let me know when**

12  **you are done reviewing it?**

13  A.   I can't understand the writing of this.  What

14  is -- can you read that?

15  MR. HUBBARD:  I can -- you're right.

16  BY MS. ESQUIVEL:  Q.  Okay.  And you can tell

17  me if you disagree with what it states under "report"

18  where it says "situation," and again it's 3-15,

19  1800 hours.

20  A.   Where you are reading at, on the same page?

21  **Q.   Yes.  Page 6 upper left-hand corner, I'm just**

22  **reading the time, the writing that's there, and then a**

23  **little bit to the right, it says "situation" and below**

24  **that it says "report," and then it says "IP," which I**

25  **understand to be patient, "reports severe low back pain**

1  from trying to use Hoyer lift."  There is a writing
2  there that I can't read, "staff to transfer him from
3  w/c," which I understand to be wheelchair, "to toilet.
4  IP demanded two ladies to lift him up manually.  Staff
5  did not honor IP's request to manually lift him up.
6  Staff need to use Hoyer lift because he weighs
7  227 pounds" --
8      A.  Where are you reading from?
9      Q.  **Right here on the writing in the middle of the**
10  **--**
11     A.  Up here?
12     Q.  **Yes.  Where I said where it says "report."**
13     A.  Okay.  Can you start over, please?
14     Q.  **Sure.  "IP reports severe low back pain from**
15  **trying to use Hoyer lift," and then I can't read the**
16  **word, "staff to transfer him from wheelchair to toilet.**
17  **IP demand two ladies to lift him up manually.  Staff did**
18  **not honor IP's request to manually lift him up.  Staff**
19  **need to use Hoyer lift because he weighs 227 pounds.  IP**
20  **demands to see a doctor.  Man down for low back pain."**
21     A.  Okay, can I just --
22     Q.  **Sure.**
23         MR. HUBBARD:  No.  Let her ask a question.
24         THE WITNESS:  I just want to interject one
25  thing, Scott.  You were asking me did I know about man

Page 86

1  down.  This shows that I did come in as a man down.
2         MR. HUBBARD:  Well, let her ask a question.
3         THE WITNESS:  I just want to put that into the
4  record, because I'm done, go ahead and ask the question.
5         BY MS. ESQUIVEL:  Q.  So this note was by J.
6  Coloma, is that -- is there another Coloma that you
7  recall in March of 2015?
8         MR. HUBBARD:  I'm going to object, assumes
9  facts not in evidence, vague and ambiguous, calls for
10  speculation, but go ahead and answer the question if you
11  know how.
12         BY MS. ESQUIVEL:  Q.  At the bottom --
13     A.  Right.
14     Q.  **-- it says "RN," it says "J. Coloma."  My**
15  **question to you is, do you recall if in March 2015 if**
16  **there was more than one nurse called Coloma?**
17         MR. HUBBARD:  Same objection, go ahead.
18         THE WITNESS:  What are you asking me?
19         BY MS. ESQUIVEL:  Q.  In March of 2015, did
20  you -- was there more than one nurse called Coloma?
21     A.  I only knew this Coloma.  I don't know if
22  there is more than one nurse here called Coloma.
23     Q.  **And this note was written at 6:00 p.m.,**
24  **1800 hours.  Does that help you recall what time the**
25  **Hoyer lift was used on you?**

Page 87

1         MR. HUBBARD:  Same objections.  Go ahead and
2  answer if you can.
3         THE WITNESS:  I don't know the time the Hoyer
4  lift was used on me.  I can't tell you exactly what time
5  it was, so I don't know.
6         BY MS. ESQUIVEL:  Q.  Right, but my question
7  is, looking at the note that was written at 6:00 p.m. in
8  the evening and you say that you were left in your cell
9  for an hour -- about an hour and a half after you heard
10  the pop --
11     A.  Right.
12     Q.  **-- does that in any way refresh your**
13  **recollection that the Hoyer lift might have been used**
14  **about 4:30, around that time?  Again, we're dealing with**
15  **approximates.  We're not dealing with exact times.**
16         MR. HUBBARD:  Same objection, plus asked and
17  answered, go ahead.
18         THE WITNESS:  Can you tell me where it says
19  "recommendation" on your page at?  Can you see that?
20         BY MS. ESQUIVEL:  Q.  Yes.
21     A.  What time does that say right there?
22     Q.  **There are several.**
23     A.  No, I'm saying that time right there, "sent to
24  SEMS," what time do they have written right there?  What
25  does that say?  What does it look like to you?

Page 88

1     Q.  **That says "2030."**
2     A.  What time is 2030?
3     Q.  **That would be about 10:30.**
4     A.  Okay.  So she's writing in here that I was --
5  that this happened at 6:15.
6     Q.  **I'm sorry.  Where do you get 6:15?**
7     A.  Or 6:00.  You say it was 6:00, right?
8     Q.  **Well, not necessarily, because let me -- you**
9  **know what, if I read the whole note, maybe you can**
10  **decide if that helps you refresh your recollection about**
11  **the time when the Hoyer lift was used on you, because**
12  **right above that, you have various times on this note.**
13     A.  I want to say this to you, okay.
14         MR. HUBBARD:  Let her --
15         THE WITNESS:  Okay.  Let me, just one second
16  Scott, please.  I know you are my lawyer and I respect
17  you, but just give me one second.
18         MR. HUBBARD:  Fair enough.
19         THE WITNESS:  She's entering this as a report
20  on my medical history at 6:00.  That's the time that
21  she's recording this as.  So the incident had to happen
22  either at 6:00 or before, okay.  I will go with you and
23  say it happened at 6:00, okay, just to make a point to
24  you.
25         I knew it was hours before I went to SEMS, and

Page 89

23 (Pages 86 to 89)

1  that's about right.  10:30 that night is about right.
2  That's what she had.  "Inmate sent to SEMS, accompanied
3  by custody 10:30," and this incident happened about
4  6:00.  When I said to you guys they left me in there for
5  hours and wouldn't answer that call light, I knew, yeah,
6  that's about right.
7      Q.  Okay.  Well, you know, like I said, let's go
8  through the notes and see if that helps refresh some
9  recollection about what happened after everyone left
10  your cell.  Where it says "muscle skeletal," right above
11  the time period circled, you see that?  It says "chronic
12  low pain, low back pain issue"?
13      A.  Yeah.
14      Q.  "1930"?
15      A.  Right.
16      Q.  "Hours IP complaining of tingling sensation on
17  his back.  He never felt tingling sensation before,
18  refused vital signs repeatedly."  Then it says "MSER
19  recommendation see MD orders."  Then it has "MSER
20  15 milligrams, PO due 1830"?
21      A.  Where are you reading?  What is that?
22      Q.  Right above where you were reading, where it
23  says "recommendations, see MD orders."
24      MR. HUBBARD:  Are you reading from this
25  circled part?

Page 90

1      BY MS. ESQUIVEL:  Q.  Where it says
2  "recommendations," that line, right there.
3      A.  Okay.  Recommendation.  Okay.
4      Q.  Right there.  "See MD orders," that's typed
5  in.  Then it says MSE....
6      A.  I don't see where it says "see MD orders."  Do
7  you see that on there?
8      Q.  Right next to "recommendations."
9      A.  Are you on page 6?
10      Q.  Yes.
11      MR. HUBBARD:  It says that right there, "see
12  MD orders."
13      THE WITNESS:  Oh, okay.  Yeah, I didn't see it
14  at first.
15      BY MS. ESQUIVEL:  Q.  And then there is a
16  handwritten note that says "MSER 15 MG, PO due 1830,"
17  and then has "-- IP," and it has initials "J.C."  Then
18  it says, "2030 IP sent to SEMS, accompanied by custody."
19  And I'm sorry, I think I read that wrong.  It says "MSER
20  15 MG."  It has "PO," then it says "due," but underneath
21  it says "given 1830."  So I'm not sure what that means.
22      Does that help you in any way remember whether
23  you were given your medication at about 1830 hours?
24      MR. HUBBARD:  I'm going to object, vague and
25  ambiguous, calls for speculation, and assumes facts, but

Page 91

1  go ahead and answer if you can.
2      THE WITNESS:  I don't know.  I cannot answer
3  this.
4      BY MS. ESQUIVEL:  Q.  Do you remember
5  complaining to Coloma about tingling sensation on your
6  back that you had never felt before?
7      A.  I don't remember that, so I would have to say,
8  no, I don't remember exactly.
9      Q.  If you turn to page 7, this is a note from
10  Dr. Nguyen who saw you at around 10:00 p.m. on
11  March 3rd, 2015, and I'll read to you what it say on the
12  top part.  "49-year old with past medical history,
13  significant for chronic back pain, right hip pain.  HIV,
14  Hep B, who was sent here due to back pain.  He said pain
15  is okay now.  He said the pain is diffused all over his
16  back.  He said he has been having back pain, but it
17  worse after Hoyer lift.  He request no Hoyer lift
18  tonight.  He denies any loss of bladder or bowl control.
19  There has been no new numbness or weakness.  There has
20  been no new leg weakness.  There has been no fever, no
21  chills.  There has been no new drug use.  No fall."
22      Does that help you refresh your recollection
23  of your encounter with Dr. Nguyen on March 3rd, 2015?
24      MR. HUBBARD:  I'm going to object, assumes
25  facts not in evidence, speculation, vague and ambiguous,

Page 92

1  but go ahead and answer if you can.
2      THE WITNESS:  I don't remember tellingly this
3  man that my back pain -- "diffused" means gone, right?
4      MR. HUBBARD:  I see the word -- I see the
5  word.  I don't know what he is writing, so this is just
6  -- she just asked if this refreshed your recollection;
7  that was it.  It's a yes-or-no question.
8      THE WITNESS:  No, I don't really remember this
9  meeting with him.  I remember you asking me did I know a
10  doctor, somebody at the beginning of this hearing.  I
11  don't remember this -- I remember going, but I don't
12  remember the actual events once I got there.
13      BY MS. ESQUIVEL:  Q.  I'm sorry, so I can
14  clarify.  So you recall going to SEMS, which is like the
15  emergency room?
16      A.  Yes.
17      Q.  Correct?
18      A.  My back was still giving me a lot of pain and
19  stuff, I remember that.
20      Q.  Do you recall who you interacted with once you
21  arrived in the SEMS?
22      A.  No, I don't remember that.
23      Q.  You don't remember if it was a man, female,
24  nurse, doctor, nothing like that; you don't remember?
25      A.  I know it was medical personnel.  I don't

Page 93

24 (Pages 90 to 93)

remember who and what gender and all that.  I don't
remember all that.
    Q.   Do you remember talking to anyone in the SEMS
about the Hoyer lift?
    A.   No.
    MR. HUBBARD:  Soon as you finish this line of
questioning, can we take a break?  It's been over an
hour.
    MS. ESQUIVEL:  Sure.  This will be a good -- I
was going to move on, but we'll go ahead and take a 5-10
minute break.
    (Short break taken.)

    BY MS. ESQUIVEL:  Q.  So turning your
attention to page 8 of Exhibit 4, that's Dr. Nguyen's
order stating "no Hoyer lift for tonight."  Do you see
that?
    A.   Yes.
    Q.   Okay.  Does that help you refresh your
recollection as to whether an order existed that a Hoyer
lift was or was not allowed to be used on you before
this incident?
    MR. HUBBARD:  I will object, assumes facts not
in evidence, speculation, vague and ambiguous, but go
ahead and answer if you can.

Page 94

where there is a bullet.  He says he can hold some
weight on his legs and would prefer to have two people
help him transfer.  Pain level is 6 out of 10 currently
with range this last week 5 to 10/10 to the point 'I
don't each have a desire to read the Koran or do
anything.'  The only side effect from morphine is
constipation.  He would like more morphine and increased
medication for constipation."
    And this is dated at the top March 2nd, 2015,
10:30; do you see that?
    A.   Okay.
    Q.   Does that help you refresh your recollection
that a Hoyer lift had been used on you before March 3rd,
2015, here at the Stockton facility?
    MR. HUBBARD:  I'm just going to say, same
objection.
    THE WITNESS:  No.
    BY MS. ESQUIVEL:  Q.  Do you recall discussing
with Dr. Showalter on March 2nd the use of the Hoyer
lift?
    A.   No.
    MR. HUBBARD:  Same objection.
    BY MS. ESQUIVEL:  Q.  Let me have you turn to
page 5 of Exhibit 4.
    MR. HUBBARD:  It looks like this.

Page 96

    THE WITNESS:  No.
    BY MS. ESQUIVEL:  Q.  Do you recall seeing
Dr. Showalter the day before on March 2nd, 2015?
    A.   No.
    Q.   Let me have you turn to page 1 of the
Exhibit -- of Exhibit 4.  It's a very lengthy note, so I
am just going to read certain sections of it.  The first
paragraph, "it's a high acuity housing comprehensive
evaluation, the care team gathered and discussed the
patient's care in real time.  The last comprehensive
visit/evaluation was on:  This is my first visit with
patient, who is still in orientation, newly arrived to
CHCF."
    And then the fourth paragraph down, it starts
with, "normally he has been wheelchair bound but able to
transfer by himself.  However, he has fallen five times
between January 21st and 24th.  He states partly because
his usual personally-owned wheelchair was taken away and
he was given an older, smaller one that would fit
through the doors in Lancaster, but its brakes were not
good and it moved so he fell.  He hit his left buttock
and jammed his spine, and every time he puts weight on
his left leg, it hurts badly so he can't pivot on it
like he usually does.  He was tried in the Hoyer lift
here, but that caused severe pain in his scrotal area

Page 95

    THE WITNESS:  Five page?
    BY MS. ESQUIVEL:  Q.  Correct.  It's a
physician's order dated 3-2-15, 2130 hours.  "Number 1,
patient states that when he tried the Hoyer lift, it
caused pain in his scrotal area where he has a bullet
lodged there, such that he could not tolerate it.  He
says that until his recent falls in January, he had been
able to transfer independently, and now he just needs a
little help and guidance as he is able to partially
weight bear."
    Does that help you refresh your recollection
about the Hoyer lift used, discussions you might have
had with Dr. Showalter --
    A.   No.
    Q.   -- on March 2nd, 2015?
    MR. HUBBARD:  Let her finish the question,
then let me throw in my objection, then you can answer.
Same objections, go ahead and answer.
    THE WITNESS:  No.
    BY MS. ESQUIVEL:  Q.  Did you ever have any
animosity or disagreements with Dr. Showalter during the
entire time that she was your primary care physician?
    A.   I don't remember.
    Q.   To the best of your recollection, did you
trust her medical opinion?

Page 97

25 (Pages 94 to 97)

A. I don't really trust anybody.

Q. Did she provide you with adequate medical care during the time that she was your primary care physician?

A. I don't know. That's a kind of like a difficult question to answer.

Q. Did you ever file any 602's against Dr. Showalter for any medical care she provided you?

A. No.

MR. HUBBARD: Let her finish, then answer.

BY MS. ESQUIVEL: Q. Did you ever file any complaints with the medical board from the medical care she provided you while she was your primary care provider?

A. Not that I recall.

Q. Let me call your attention to page 11 of Exhibit 14. This is an interdisciplinary progress note dated March 4th, 2015, 1330 hours. And I'll just read to you the subjective part and see if that helps -- well, strike that.

Let me ask you first, do you recall your encounter with Dr. Showalter on March 4th, 2015, the day after the incident we have been talking about?

A. Do I recall this visit, is that what you are asking me?

Page 98

Q. Yes.

A. No.

Q. Let me read to you this subjective and see if this helps refresh your recollection. So it says, "3/26/15 comprehensive visit and the reason admission H and P for full history, yesterday 'against my better judgment ' he allowed the CNA's to try using the Hoyer lift around his back and under his arms to try to help transfer him to the toilet. After his body was just a few inches off the chair, he had a shooting pain in his low back and had to stop. It felt like something pulled and stretched and has continued to hurt more afterwards. 7 to 8.5/10 consistently with max 10/10 in the night, while before it was 6-8/10. He says he asked to see a doctor, but only after several hours was brought to SEMS. (Nursing reported to me at our huddle meeting that there had been an emergency at SEMS, and that he had been asked to wait to bring anyone). Also last night when he had a bowl movement, it hurt very badly, which has never happened to him before, hurting at the anus and the low back. Through the night he was able to sleep 'in bits and pieces,'" in quotation marks, "waking up often due to pain. He's had decreased appetite today and he hasn't gotten up out of bed yet today, partly because he was told he would have to use the Hoyer lift

Page 99

and he was afraid he would get hurt more."

Does that help you refresh your recollection about your encounter you had with Dr. Showalter on March 4th?

MR. HUBBARD: Same objections, go ahead.

THE WITNESS: I don't remember what I told her back then.

BY MS. ESQUIVEL: Q. Do you recall Dr. Showalter telling you that you had several levels of disk protrusions in your lumbar spine?

A. Do I remember if she told me I had protrusions in my spine?

Q. You had several levels of disk protrusions of your lumbar spine?

A. I don't remember. It was quite a while ago.

Q. Has she ever told about your spinal -- strike that.

Do you recall speaking with Dr. Showalter about your spinal stenosis?

A. No. I could have. I don't remember.

Q. After March 4th, 2015, do you recall how many times you saw medical -- you sought medical care for back pain that you attributed to the pop that you heard on March 3rd?

A. I don't remember.

Page 100

Q. Your back pain that you were experiencing before March 3rd, 2015, can you briefly describe to me the frequency, the duration, the intensity of the back pain you had before the incident here?

A. I can't remember.

MR. HUBBARD: I'm going to object, compound and vague and ambiguous, but go ahead and answer.

THE WITNESS: I don't remember, ma'am.

BY MS. ESQUIVEL: Q. How did it change after March 3rd, as far as your back pain is concerned, whether it be the intensity, frequency, or duration?

A. It hurted a lot more. Wait, wait, wait. After when?

Q. After March 3rd.

A. Oh, all I can say is, it hurt like hell when it happened, and I sustained quite a bit of continued pain from it afterwards. How long and how many times I was seen by medical for it, I don't know, but I know I was.

Q. What was the difference? Like you said, you felt more pain. How was that different from pre-March 3rd, either in terms of the frequency, the duration, or the intensity?

A. It was a little less pain in my back. That was the main thing, and like I say, it lasted quite a

Page 101

26 (Pages 98 to 101)

1 while afterwards. I couldn't give you the exact time of
2 it, but it increased is all I can tell you.
3     **Q. And how long did it increase for before it**
4 **went back to pre-March 3rd pain levels?**
5     A. I couldn't tell you, ma'am, because I don't
6 remember exactly how long, but it was -- I just could
7 tell you that it was more. I believe I was given a
8 higher level of pain meds to try and help with the pain
9 I was experiencing after I injured myself on March 3rd,
10 if memory serves me right.
11     **Q. Did you request more pain medication, or how**
12 **did it come about?**
13     A. I could have, because I was having a lot of
14 problems with the pain, so I probably did.
15     **Q. Did you ever discuss with Dr. Showalter or any**
16 **of the other doctors that were treating you whether the**
17 **increase in pain was due to this pop or the recently**
18 **diagnosed disk protrusions in your lumbar spine?**
19     MR. HUBBARD: I'm sorry, can you repeat that
20 question? I got lost in it.
21     MS. ESQUIVEL: Sure.
22     **Q. Did you ever discuss with Dr. Showalter or any**
23 **other doctor that was treating you whether the increased**
24 **pain you started feeling after March 3rd was due to the**
25 **March 3rd incident or to the recent diagnosis of several**

Page 102

1 **disk protrusions in your lumbar spine?**
2     MR. HUBBARD: Object, assumes facts, and
3 almost calls for expert opinion, but go ahead and answer
4 if you can.
5     THE WITNESS: I don't remember if I did or
6 not.
7     BY MS. ESQUIVEL: Q. Did you ever discuss
8 with Dr. Showalter or any other doctor that was treating
9 you whether the increased pain in your back was due to
10 the March 3rd incident or the various falls you had
11 experienced in March -- I mean, in January of 2015?
12     MR. HUBBARD: Same objection, go ahead and
13 answer.
14     THE WITNESS: I don't remember that.
15     BY MS. ESQUIVEL: Q. Calling your attention
16 to exhibit -- your interrogatory responses number 9 at
17 page 5, I asked you to list all of the injuries that you
18 had suffered to the same part of your body, in this case
19 your back, before March 2015, and in response to that,
20 you stated that your car accident in the 1990s, and then
21 number 3, left shoulder and sought treatment but does
22 not remember when, where, or how. You never recovered
23 from the injury.
24     Is there a reason why your December 21st,
25 2013, fall in the shower at the Vacaville facility is

Page 103

1 not listed here?
2     A. Okay, can you ask me your question one more
3 time please?
4     **Q. Sure the question asks you for all injuries**
5 **you sustained on your back. You listed two incidents,**
6 **your 1990 car accident and a left shoulder injury.**
7     A. And your question is.
8     **Q. My question is, isn't it true that you injured**
9 **your back on December 21st, 2013, when you fell in the**
10 **shower at CMF in Vacaville?**
11     A. Yes.
12     **Q. Why was that not listed in response to number**
13 **9?**
14     A. Ma'am, it was an honest omission. Like I
15 said, I was the best, best way I can answer it is, I
16 probably didn't understand the question. That's the
17 best way I can answer it. I was having a bad day, and
18 it just slipped my mind, you know. So that's the best
19 way I can answer it.
20     **Q. Why did you not list the five falls you had**
21 **suffered between January 21st and January 24th, 2015, at**
22 **Lancaster?**
23     A. Same, once again, just brain was fried, fried.
24 You know, suffering, going through pain issues, and then
25 again, probably I really didn't understand the question

Page 104

1 itself. So other than that, I would have given it you
2 to guys.
3     **Q. As you sit here today, are there any other**
4 **pre-March 2015 injuries to your back that you have**
5 **sustained?**
6     A. I couldn't tell you off the top of my head,
7 ma'am. I really couldn't. I would have to look at my
8 medical records and whatnot. Just to remember off the
9 top of my head, I don't know.
10     **Q. When you responded to interrogatory number 9,**
11 **did you make any effort to review your medical records**
12 **so you could fully respond to that request?**
13     MR. HUBBARD: I'll object to the extent it
14 calls for attorney/client communication, but go ahead
15 and answer if you can.
16     THE WITNESS: No.
17     BY MS. ESQUIVEL: Q. In response to
18 interrogatory number 5, and this is on page 4 --
19     A. Okay.
20     **Q. -- it asks you to identify all persons who you**
21 **claim have knowledge that the defendants improperly used**
22 **a Hoyer lift, and you you stated "correctional**
23 **officers." Is there any other correctional officer that**
24 **you had in mind when you responded to number 5 other**
25 **than Officer Gonzalez that we already talked about?**

Page 105

27 (Pages 102 to 105)

1    A.   I don't know.  And the reason I say that is
2   because I don't know if, in fact, Officer Gonzalez
3   notified the sergeant that day that I need to go to
4   SEMS.  I don't know if that was during the same incident
5   or not.
6        So if he did notify the sergeant, then I'm
7   sure he explained to him what transpired, and I remember
8   talking to the sergeant as well, okay, but I'm not for
9   certain if this was the same incident.
10        And then there were two S&E, security escort
11  officers, who also -- who I believe escorted me to SEMS
12  that night, because we lock up for count at 8:30.  And
13  anybody that moves out of their cell after I believe
14  it's 9:00, then they are escorted by S&E's.
15       **Q.   Other than Coloma, Osemwingie and Ramiscal you**
16  **identified "doctor on duly" in response to number 5.**
17  **Which doctor on duty did you have in mind when you**
18  **provided your response to the interrogatory 5?**
19       A.   What was the question on it?
20       **Q.   The question is to identify the individual who**
21  **have knowledge -- who you claim have knowledge that the**
22  **defendants used the Hoyer lift improperly.  So you**
23  **identified on duty correctional officers that we just**
24  **talked about, Coloma, whom we already talked about,**
25  **Qamer, who we already talked about, and then you**

Page 106

1   **identified doctor on duty.**
2        **So my question is, who did you have in mind**
3   **when you wrote "doctor on duty"?**
4        A.   Whatever this guy is you said saw me at SEMS
5   that night, he was the doctor that was on duty.
6        **Q.   Dr. Nguyen?**
7        A.   I guess that would be him.
8        **Q.   Okay.**
9        MR. HUBBARD:  Are you guessing?
10       THE WITNESS:  No.  That's -- look.
11       BY MS. ESQUIVEL:  Q.  My question was, who did
12  you have in mind?
13       A.   Let me clarify.  When I made that statement, I
14  was speaking about the doctor that I saw the night of
15  the incident.
16       MR. HUBBARD:  But you don't know their name?
17       THE WITNESS:  I didn't know their name, so I
18  used "doctor on duty."  Then when she provided me with
19  the paperwork today --
20       MR. HUBBARD:  So you're assuming that's the
21  same doctor?
22       THE WITNESS:  I'm assuming that was the doctor
23  that was on duty that I saw.
24       BY MS. ESQUIVEL:  Q.  Did you see more than
25  one doctor that evening in SEMS?

Page 107

1    A.   I don't even remember seeing him, actually,
2   but I just -- I just know I went to SEMS, and I was
3   examined and whatnot.  So I don't know if I saw more
4   than one doctor.
5        **Q.   Okay.  As you sit here today, is there anybody**
6   **else that you can think of that would be responsive to**
7   **interrogatory number 5 in terms of who you believe has**
8   **knowledge about the defendants improper use of the Hayer**
9   **lift?**
10       A.   I don't know, ma'am.  I couldn't -- I don't
11  know.
12       **Q.   All right.  I'm almost done.  I have a**
13  **question, since I did ask --**
14       A.   Can I ask her to explain to me what's --
15  because I don't know what she just asked me, to be
16  honest with you.  That's why I said --
17       MR. HUBBARD:  Sure.  Ask her.
18       BY MS. ESQUIVEL:  Q.  Sure.  What I was asking
19  you is, as you are sitting here today, since we have
20  been talking about it, I noticed that sometimes memories
21  get refreshed and things start coming back to you that
22  you start rethinking about the events of March 3rd,
23  2015.
24       So my question was, as you are sitting here
25  today, other than the individuals that you identified in

Page 108

1   number 5, in your response to number 5, is there someone
2   else that you now recall who has knowledge about the
3   defendants' conduct on March 3rd?
4        A.   Oh, no, there is nobody I can think of right
5   now.
6        **Q.   Okay.  So you now understand the question?**
7        A.   Right.
8        **Q.   Okay.  Interrogatory number 13 asked you to**
9   **identify by log number the 602 that you filed that would**
10  **exhaust your administrative remedies against the**
11  **defendants.  You didn't provide a log number.  And you**
12  **didn't provide a document as required under Rule 33-D.**
13       **So I'm going to ask you, as you sit here**
14  **today, do you know the log number of the 602 or 602's,**
15  **if there is more than one, that you exhausted concerning**
16  **the defendants' conduct?**
17       MR. HUBBARD:  I'm going to object it calls for
18  a legal conclusion, but go ahead special answer if you
19  can.
20       THE WITNESS:  I don't know the log number.
21  And the paperwork that I had, I lost a lot of my legal
22  work, so that's one of the reasons that I don't have it
23  here before me today.
24       BY MS. ESQUIVEL:  Q.  I looked at your
25  original complaint, and there were two 602's attached to

Page 109

28 (Pages 106 to 109)

1  that. The first one is log number SC15,344, and it's
2  concerning Osemwingie.
3      A.  Okay.
4      **Q.  And although Ramiscal is mentioned, there is**
5  **no actual complaint directed at her. There was log**
6  **number SC15,343 that dealt with Ramiscal's misconduct,**
7  **but this is regarding a March 7, 2015, incident where**
8  **she left you on the toilet and went home.**
9      A.  Yes, I remember that.
10     **Q.  But nothing regarding the Hoyer lift in this**
11  **602.**
12     A.  Okay.
13     **Q.  Do you have any recollection of whether you**
14  **filed another 602 against Ramiscal concerning the Hoyer**
15  **lift?**
16     MR. HUBBARD: I'm going to object, calls for a
17  legal conclusion, and assumes facts not in evidence, and
18  is compound, but go ahead special answer if you can.
19     THE WITNESS: I don't know.
20     BY MS. ESQUIVEL: Q.  When you received the
21  interrogatories and were asked to provide the
22  information, did you make any effort to contact the
23  litigation coordinator to get your appeal log?
24     MR. HUBBARD: I'm going to object to the
25  extent it calls for attorney/client communication, but

Page 110

1  if you can answer it without revealing that, go ahead.
2      THE WITNESS: I'm going to listen to the
3  attorney.
4      BY MS. ESQUIVEL: Q.  He didn't instruct you
5  not to answer, and there is no attorney/client privilege
6  between you and the coordinator. My question is, did
7  you contact the litigation coordinator to obtain your
8  appeal log so you can identify the 602's that exhausted
9  your administrative remedies?
10     A.  No, I did not.
11     **Q.  Did you make any effort, other than contacting**
12  **-- I don't want to know anything about your attorney --**
13  **to obtain information necessary to respond to**
14  **interrogatory number 13 which ask for the identification**
15  **of the 602's?**
16     A.  Please repeat that.
17     **Q.  Did you make any effort to obtain the**
18  **information requested in interrogatory number 13**
19  **regarding the 602's, other than contacting your**
20  **attorney? I don't want to know anything about your**
21  **attorney.**
22     A.  No.
23     **Q.  In your original complaint you requested a $1**
24  **million in damages. How did you come to value your loss**
25  **at a $1 million against the defendants?**

Page 111

1      A.  Oh, man.
2      MR. HUBBARD: Go ahead. I'm kind of curious
3  myself.
4      THE WITNESS: The amount of pain I went
5  through, the fact that I almost got a 115 rule violation
6  report before we even -- before I was even assisted by
7  Osemwingie, when he first, first brought up the Hoyer
8  lift. We went at it, and I was like, "man, the thing is
9  going to hurt me." It was like, I had a premonition.
10  It's like, "man, you know, this is a bad idea, keep
11  transferring me way you been transferring me, you know."
12     And then when he went against it, it made such
13  a big deal going and getting the CO and Ms. Coloma and
14  all that, and when they told him that "don't do it,"
15  basically, then he said he got it, he's going to deal
16  with it, he knows what he's doing and whatnot and I
17  ended up becoming injured, I felt like no amount of
18  money actually would compensate me adequately because I
19  went through a huge state of depression when he
20  reinjured my back.
21     It put me in a state of physically and
22  mentally where my concentration was off. I couldn't
23  read my Koran as I do daily. I couldn't make my five
24  obligatory prayers a day as I needed to, and I was just
25  depressed and angry at him because I didn't have to go

Page 112

1  through this if he would have just assisted me.
2      It wouldn't have took five seconds or so, ten
3  seconds or so. One person on each side and help me
4  slide out of the chair onto the toilet, whatever the
5  case maybe, it could have -- the problem could have been
6  solved real easily. Instead he ended up doing it his
7  way and it caused me to be injured, you know, from me
8  allowing him to do it his way.
9      If you would have been in that room that day,
10  ma'am, and listened to all of them was talking back and
11  forth and to me and trying to get him to transfer me
12  first the right way with the Hoyer lift since he was
13  going to do it, and, you know like I say, he's an alpha
14  male, head strong, you know, got a little size on him
15  from working out, you know.
16     And, you know, like I say, a $1 million is
17  really -- I don't believe it should -- I should have put
18  $5 million on there, you know, instead of 1 million, you
19  know. And I have had problems with my back continuously
20  since he hurt my back.
21     In fact, I even fell again and injured it even
22  worse, that's why I got this back brace on now, because
23  I have fractures in my disk now from a whole different
24  type of fall, but my back never healed.
25     **Q.  When did you fall after March 3rd?**

Page 113

29 (Pages 110 to 113)

A.   March has not been a good year for me.  March
of 2018 I fell and fractured disks in my back again.  It
seemed like from March come around -- the month of March
has not been a good month for me here in this prison,
because in '15 I got hurt with the Hoyer lift.  '18 I
fractured vertebras in my back from a fall.

Q.   Did any doctor that you saw following your
March 3rd, 2015, injury ever tell you what that pop, as
you describe it, was whether it was a sprain, a strain,
or a bulging disk?

A.   I don't recall exactly, but I believe
Dr. Showalter, I believe she put some things in her
notes as to what she felt it was, but I don't recall
exactly what her notes said, but I believe she did put
some notes in my medical file about it.  I'm not hundred
percent sure, but I believe she did.

Q.   Why do you believe that?

A.   Because she's a thorough doctor.

Q.   Any other basis for your damages claim of a
million dollars or so that we haven't talked about
already?

A.   Osemwingie's professional treatment of
patients here at CHCF that I observed was totally
unprofessional.  And after this incident, I talked with
him again about the way that he treated these inmates,

these patients.

There was another individual besides the guy
that passed away who had a stroke, and he only wanted to
help him get up out of bed one time on his whole shift.
He came here at 2:00, and he comes on.  Third watch
starts from 2:00 in the afternoon, 2:00 p.m. until 10:00
p.m., and he would make this gentleman sit up in his
wheelchair with his sleeve on, and he had a stroke on
one side.  And he would tell him that "if I take you out
of the wheelchair with the Hoyer lift and put you in
bed, I'm not going to help you back up."

And this guy I used to see sometimes, he would
hit his light, and there was another guy here who at
that time was -- we were all in D-1-B.  This is after I
came off of orientation.  We have what's called inmate
representatives who are elected by each building to
represent the building about whatever the situation
might be if there is a problem with an inmate and
medical staff or problem with the inmate in custody or
whatever the problem might be, we go to the building
representative and he tries to iron it out for us.

Then he meets once a month or so with the
captains and the medical staff and whatnot, and they --
it's a body of them, and they all come from different
buildings and discuss what problems is going on and

whatnot.

Well, I spoke with him and explained to him,
"hey, you need to look into this because they are
abusing this guy."  And Osemwingie, you know, he flew
off the handle and was real loud and arrogant towards us
and boastful.  I spoke with Coloma as well.

You know, when I was in D-1-B, about
Osemwingie and the medical treatment that was going on
there, the way that we were being neglected, because it
wasn't just me.  It's not an isolated incident.  Point
of fact, that's why I'm injured now, same thing, same
exact deal.

Q.   Did you ever talk to Osemwingie about after
March 3rd about the use of the Hoyer lift on March 3rd?

A.   Yes, I did speak with him again.

Q.   How long after March 3rd?

A.   I don't know, within a week, I'm sure.  It
wasn't that long, okay.  And I told him, you know, "man
you didn't have to do that.  You know, you had been
coming in here assisting me with another medical staff,
I don't even know why you went there with me."

Q.   What did he say in response to that?

A.   Basically it was his -- that's what he chose
to do basically is what he said.  "I chose to use the
Hoyer lift."  And basically I remember vaguely him

telling me he chose to use it and that's why he used it,
you know.  Because I wanted to understand, "hey, man,
why would you put me at risk to be hurt, you know, when
you are a certified nursing assistant where you went to
school for this.  You know what this entails.  That's
how you got your license, you know."

And like I say, he is just the kind of cat,
you know, the kind of guy that he does what he want to
do, and they know it.  You know, these people, they
allow him to basically run the building.

Q.   Who is "they"?

A.   The staff that works with him allows him
basically to run the building.  He's like the enforcer
in the building.

Q.   Did you ever have a conversation with Ramiscal
after March 3rd about the incident?

A.   Not just about the incident.  I also spoke to
her about the not answering my light in a timely manner,
about how long she was leaving me on the toilet and
different things.  Yeah, I had quite a few conversations
with Ramiscal.

Q.   Okay.  I just want to focus on the use of the
Hoyer lift on March 3rd.  How long after March 3rd did
you have that conversation?

A.   It was pretty short, within about a week.

**Q.  What was the nature of that conversation?**

A.  Same thing I was telling Osemwingie, that they didn't have to put me on the Hoyer lift that, they could have used -- they could have just assisted me the way they had done in the past.

**Q.  What did she say?**

A.  That it was on Osemwingie.  I told her, "you have your own license.  You know, you didn't have to listen to him.  You didn't have to go along with that."

**Q.  After March 3rd, 2015, have the Hoyer lift ever been used on you again?**

A.  I don't remember, so I can't answer that.  I don't remember for sure if it has or not.  From you talking about from Osemwingie?

**Q.  After.  No.  Talking about anyone.  After March 3rd, 2015, has the Hoyer lift ever been used on you?**

A.  Yes.

**Q.  When was the next time after March 3rd?**

A.  Oh, I couldn't tell you right now, but it's been used on me, yes.

**Q.  Can you estimate how many times it's been used on you from March -- after March 3rd, 2015, to the present?**

A.  Quite a bit.

Page 118

**Q.  Is it used daily?**

A.  Yes.

**Q.  More than once a day?**

A.  Yeah, if I have to, yeah, yes.

**Q.  And is the same sling used as the sling that was used on March 3rd?**

A.  No, I have a totally different one.

**Q.  What's the difference?**

A.  The size of it is bigger, the way that they put it on me is different.  That's about it.

**Q.  What's the difference in terms of how they put it on you?**

A.  Well, it might have been -- well, the difference is, Osemwingie didn't put it in between my legs to keep me from sliding out.  These people do, okay.  And it doesn't -- and then they put me inside the sling, as I said, my shoulders are inside.  He put me where the sling was under my armpits.  They don't do it like that.  They put me inside the material and lift me.  So it's totally different.

**Q.  Okay.  But in terms it's still a rectangle that you described before, it's just bigger, correct?  It's not a different shape, or is it a different shape, the sling?**

A.  To my -- to the best of my recollection, it's

Page 119

a bigger sling.  I believe it's -- it could be the same shape, I believe.

**Q.  And have you had any problems with the Hoyer lift since?**

A.  Originally I was having a lot of problems with that pulley under my scrotum and Hoyer lift pressing -- the sling pressing up against it, but I'm not having that problem no more because I have a bigger sling and it's not pressing up in that area like that no more.

**Q.  Okay.  Let's take a five minute break.  I think I'm done.  I just want to do a quick review of my notes.**

**And Scott if you have any questions.**

(Short break taken.)

BY MS. ESQUIVEL:  Q.  Has any doctor told you that the use of the Hoyer lift aggravated your preexisting back injury?

A.  I really don't remember, 'cause they could have and I just don't recall it.  So I don't remember.

**Q.  Have you suffered any other back injuries after March 3rd, 2015, other than the March 2018 fall that we already talked about?**

A.  I would have to look at my medical records.  I don't remember.

Page 120

**Q.  Okay.  I have no further questions.**

MR. HUBBARD:  I have no questions.

THE REPORTER:  Did you want the transcript?

MR. HUBBARD:  I always want the transcript.  Transcripts are awesome.

(Whereupon proceedings were concluded at 3:03 p.m.)

---o0o---

Page 121

31 (Pages 118 to 121)

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF SAN JOAQUIN  )

I, the undersigned, declare under penalty of
perjury that I have read the foregoing transcript, and I
have made any corrections, additions or deletions that I
was desirous of making; that the foregoing is a true and
correct transcript of my testimony contained therein.

EXECUTED this _____ day of _____,
20____, at _____, California.

_____
WILLIAM BARKER

Page 122

REPORTER'S CERTIFICATE

I, Michelle Savage, CSR No. 12957, Certified
Shorthand Reporter, certify;
That the foregoing proceedings were taken
before me at the time and place therein set forth, at
which time the witness was put under oath by me;
That the testimony of the witness, the
questions propounded, and all objections and statements
made at the time of the examination were recorded
stenographically by me and were thereafter transcribed;
That the foregoing is a true and correct
transcript of my shorthand notes so taken.
I further certify that I am not a relative or
employee of any attorney of the parties, not financially
interested in the action.
I declare under penalty of perjury under the
laws of California that the foregoing is true and
correct.

Dated this 16th day of October, 2018.

_____
MICHELLE SAVAGE, C.S.R. NO. 12957
(Signature not requested.)

Page 123

**A**

**a.m** 2:15
**abandoning** 18:25
**able** 9:11 21:2 39:7,9 78:16 95:15 97:8,9 99:21
**abusing** 116:4
**AC09D82** 1:25
**access** 35:25
**accident** 103:20 104:6
**accommodation** 22:8
**accommodations** 20:15 20:20,21 21:11 22:7
**accompanied** 90:2 91:18
**action** 123:17
**actual** 93:12 110:5
**acuity** 95:8
**ADA** 21:22,23 22:1,18,23 23:2,5
**add** 31:5
**addition** 33:25 65:11
**additions** 122:11
**adequate** 98:2
**adequately** 112:18
**adhered** 29:3
**adhering** 26:24
**administered** 6:4
**administrative** 109:10 111:9
**admission** 99:5
**admonitions** 5:25
**adverse** 46:13,22 47:9
**ADVOCACY** 3:4
**affirmation** 6:7
**afraid** 100:1
**afternoon** 85:8 115:6
**aggravated** 120:17
**aggressive** 39:6,17,18 39:23 40:20,20 82:24 83:1
**ago** 5:11 8:3 12:12,15 13:2 100:15
**agree** 9:14
**agreeable** 37:2
**agreement** 17:10
**ahead** 18:12 28:14 31:4 32:15 33:18 35:7 36:24 39:2 52:9,18 55:17 56:23 73:8,18 82:17 87:4,10,17 88:1 88:17 92:1 93:1 94:10 94:25 97:18 100:5 101:7 103:3,12 105:14 109:18 110:18 111:1 112:2
**aid** 16:14
**al** 1:8 2:8
**alleged** 5:14 26:9 34:9 34:17
**allow** 6:19 12:24 22:20 117:10
**allowed** 54:9 94:21 99:7
**allowing** 113:8
**allows** 117:12
**alpha** 95:3 113:13
**ambiguous** 11:16 12:19 27:6 32:12 35:6 36:22

39:1 52:8,17 56:22 73:17 74:13 87:9 91:25 92:25 94:24 101:7
**amended** 17:18 26:10 34:17
**amount** 112:4,17
**angle** 68:19
**angry** 83:4 112:25
**animosity** 97:21
**announces** 47:23
**answer** 6:12,19,23 7:6 7:14 9:5 12:19 18:4,13 18:17 19:6 25:13,14 27:7 28:13 30:8 32:1,2 32:6,9,15,24 33:18 35:7 36:24 39:3 44:10 48:13 52:8,18 54:22 56:23 73:18 74:1,13 75:11,15 76:3 77:14 77:22 78:1 82:17 83:11 87:10 88:2 90:5 92:1,2 93:1 94:25 97:17,18 98:6,10 101:7 103:3,13 104:15 104:17,19 105:15 109:18 110:18 111:1,5 118:12
**answer-question** 6:14
**answered** 7:20 14:10 88:17
**answering** 6:18 8:21 11:17 15:12 52:13 117:18
**anticipate** 6:11,12
**anticipated** 15:11
**anus** 99:20
**anybody** 10:22 71:8 77:11 98:1 106:13 108:5
**anything.'** 96:6
**APLC** 3:4
**apologies** 12:22
**apologizes** 24:14
**apparent** 57:18
**appeal** 110:23 111:8
**appetite** 99:23
**appreciate** 37:9
**approximates** 88:15
**area** 62:10 95:25 97:5 120:9
**argue** 7:19
**arguing** 40:16 53:17 60:20
**argument** 38:7,24
**argumentative** 82:16
**arising** 5:13 18:10
**arm** 62:7
**armpits** 62:5,14 65:19 67:25 68:15 69:11 119:18
**arms** 62:11,13 65:7,13 69:5 99:8
**arrived** 19:9,13 20:4,24 21:9 22:4 29:10 30:11 30:25 54:22 55:1,5 93:21 95:12
**arriving** 20:14

**arrogant** 116:5
**Art** 62:2
**asked** 7:11,15,23 13:12 13:18 22:6,25 26:15 33:5 35:13,19 37:15 44:14 74:14 75:9,15 75:21 77:15 81:10 88:16 93:6 99:14,18 103:17 108:15 109:8 110:21
**asking** 6:5,20 10:16 11:17 13:19 20:19,23 26:17 27:8 32:13,15 32:18 34:1 35:10 37:16 53:4 57:19 61:5 61:6 75:12 86:25 87:18 93:9 98:25 108:18
**asks** 34:4,7,13 104:4 105:20
**assignment** 21:7
**assist** 22:9,10 23:6 29:17,18,19,24 30:10 34:11 37:24 38:2 43:5 45:18 53:21 54:8 79:19 80:15
**assistance** 21:3 22:15 38:22 45:11 83:7 84:1
**assistant** 18:25 52:2 71:1 117:4
**assistants** 5:14 17:20
**assisted** 22:2 30:7,9 37:21 43:14 45:15 47:6 112:6 113:1 118:4
**assisting** 29:25 30:2 42:21 45:20,23 46:3 116:20
**assists** 22:15
**assume** 7:14
**assumes** 28:12 35:5 52:7 87:8 91:25 92:24 94:23 103:2 110:17
**assuming** 55:19 71:25 107:20,22
**ATKINSON-BAKER** 1:22
**attach** 27:25
**attached** 64:13 109:25
**attempted** 58:16
**attempting** 64:20
**attend** 16:5
**attention** 73:5 75:9 84:23 94:15 98:16 103:15
**attitude** 39:19
**attorney** 3:8 5:12 10:2,5 10:12,20,22 11:5,22 12:4,5,6,13,15,25 50:2 111:3,12,20,21 123:16
**attorney's** 10:15,19 35:22
**attorney/client** 28:11 105:14 110:25 111:5
**attributed** 100:23
**Austin** 2:15
**available** 26:21 28:7,20 34:22
**aware** 27:24 28:3,4 71:1

85:7
**awe** 74:8
**awesome** 121:5

**B**

**B** 4:7 92:14
**back** 8:3 9:10 12:12 13:17 20:24 22:9 29:22 30:4 32:20 33:5 35:15 36:14 53:22 55:7,12,15,15 58:1 62:19,19 63:21 64:14 64:14 65:6,18 67:2,14 67:16 68:16 69:12,13 69:14,24 71:17,19 72:5,7,10,17,18,25 73:10,14,21 74:2,8 75:7,8,10,17,18 76:10 77:10,16,16,20 78:10 80:20,21 81:2,16,22 84:1,1,4 85:25 86:14 86:20 90:12,17 92:6 92:13,14,16,16 93:3 93:18 99:8,11,21 100:7,23 101:1,3,10 101:24 102:4 103:9,19 104:5,9 105:4 108:21 112:20 113:10,19,20 113:22,24 114:2,6 115:11 120:18,21
**background** 13:11,20,21 13:21
**bad** 35:15,16 54:2 72:5,9 75:10,18 104:17 112:10
**badly** 95:23 99:19
**bar** 63:6 64:13 65:9 66:11
**Barker** 1:5,16 2:5,14 3:2 4:2 5:1,8 13:7 24:7 34:24 37:2 50:1 122:23
**based** 29:25 32:10 74:10 74:18,19
**basically** 12:10 22:7 81:19 112:15 116:23 116:24,25 117:10,13
**basis** 114:19
**bear** 97:10
**becoming** 112:17
**bed** 23:7 37:22,22 42:15 42:22 43:6,6 45:14,19 51:13 99:24 115:4,11
**bedridden** 40:7 42:4
**beds** 22:21
**beginning** 93:10
**behalf** 2:14
**believe** 10:16 19:15 27:15 28:24 30:8,11 41:4 43:10,14 45:21 45:24 48:1 53:9 55:12 55:13,14 79:12,12,14 79:15,18,20,24,25 80:2,2 102:7 106:11 106:13 108:7 113:17 114:11,12,14,16,17 120:1,2
**best** 6:13 8:7,7,8 9:25

23:4 25:4 53:3 59:11 81:24 97:24 104:15,15 104:17,18 119:25
**better** 60:7 99:6
**big** 112:13
**bigger** 21:23 119:9,22 120:1,8
**bind** 7:22
**bit** 20:24 63:18 65:23 66:1 67:7 68:1 69:3 71:24 85:23 101:16 118:25
**bits** 99:22
**black** 59:21 79:13,16
**bladder** 92:18
**blah** 45:3,3,3
**blatant** 84:2
**board** 98:12
**boastful** 116:6
**body** 42:10 57:21 59:12 59:15,17,20 60:1,11 63:6,17 64:9,23 66:15 69:7,11,18 74:22 75:3 99:9 103:18 115:24
**books** 39:24 40:3
**bottom** 58:12 60:4,13,14 60:23,24,25 61:2,7 64:11 65:22 84:16,21 87:12
**bottoms** 66:5
**bound** 20:25 95:15
**bowels** 54:1 78:8
**bowl** 92:18 99:19
**Box** 3:10
**brace** 113:22
**brain** 104:23
**brakes** 95:20
**break** 8:19 9:2,2,3,5 24:5 36:12 49:24,25 50:2 54:11 94:7,11,12 120:10,14
**breathing** 40:2
**briefly** 14:4 101:2
**bring** 42:18 99:18
**brings** 44:1
**brought** 5:13 53:15 56:2 56:9 57:8 58:16 65:12 65:14 99:15 112:7
**building** 40:1,6 115:16 115:17,20 117:10,13 117:14
**buildings** 115:25
**bulging** 114:10
**bullet** 53:22 66:24 67:2 67:15,16 96:1 97:5
**bullets** 66:22
**bunch** 14:17 21:16
**bunks** 21:5
**butt** 64:10 65:23,25 68:2 68:15,24 69:3
**buttock** 95:21
**buttocks** 69:2
**button** 52:15 56:8 72:12 76:5 78:6
**buzzer** 51:24

**C**

**C** 3:1 50:24,25

**C.S.R** 123:24
**CA** 3:5,10
**California** 1:1,2,17 2:1,2
2:14,15 19:9 122:3,16
123:19
**call** 37:21 44:8,9 52:11
52:15 54:23 55:2,6
61:19 62:23 72:18
75:11,25 76:1,3,10,13
76:14,15,19,20 77:14
78:6 79:8,9 83:11
84:22 90:5 98:16
**called** 53:11 57:24 77:6
80:16,17 87:16,20,22
115:15
**Calling** 103:15
**calls** 18:3 19:5 27:6 28:1
28:10,11,12 31:25
32:5,12,12 35:6 36:23
39:2 52:3,6 77:21 87:9
91:25 103:3 105:14
109:17 110:16,25
**captains** 115:23
**car** 103:20 104:6
**care** 2:14 29:7 48:17,20
50:16 77:19 95:9,10
97:22 98:2,3,8,12,13
100:22
**carried** 39:4
**case** 1:7 2:7 7:16 17:9
37:23 45:15 103:18
113:5
**cases** 13:15
**cat** 117:7
**cause** 74:21 120:19
**caused** 83:3 95:25 97:5
113:7
**CDCF** 57:12
**cell** 20:9 21:23,23 22:1
29:18 37:23 38:10,12
41:3,4 42:18 43:25
44:12 51:12 52:12
55:1,5,19 56:1,2 71:8
71:11,13 75:20 76:3
77:2 78:16,17,20
83:12 88:8 90:10
106:13
**cells** 38:13,16,18 71:12
**central** 34:23
**certain** 13:10 16:14 44:2
44:21 45:9 47:8 59:12
79:12 80:6 95:7 106:9
**CERTIFICATE** 123:2
**certified** 17:20 70:25
117:4 123:4
**certify** 123:5,15
**chair** 68:16 99:10 113:4
**change** 101:9
**changed** 39:22,23
**changing** 42:24
**Charlie** 50:25
**CHCF** 40:5 95:13 114:23
**checked** 29:22 40:21
**Chico** 3:5
**chills** 92:21
**chose** 116:23,24 117:1
**chronic** 90:11 92:13
**circled** 90:11,25

**claim** 17:9,19 18:8,8,24
19:4 105:21 106:21
114:19
**clarification** 42:19
**clarify** 25:11,15,21 80:24
93:14 107:13
**classes** 16:11,14
**clean** 9:6
**clear** 42:16 78:22
**cleared** 68:16
**clip** 62:23
**clothes** 69:9
**CMF** 14:8 39:21 40:1
42:3 104:10
**CNA** 43:11 66:13 70:25
**CNA's** 22:22 43:25 99:7
**collusion** 35:6
**Coloma** 41:11,16 46:4,5
46:6,11 47:12 53:19
53:19 54:3 55:14,16
67:19 69:22 70:5,22
71:3 72:15,25 73:5
75:20 77:12,18 78:4
83:10,24 87:6,6,14,16
87:20,21,22 92:5
106:15,24 112:13
116:6
**color** 59:19
**come** 13:17 22:24 31:8
36:21 37:18,23 41:12
43:24 44:11,23 45:2
54:1 55:2,7 62:25
63:14,16 68:19 78:16
78:24,25 87:1 102:12
111:24 114:3 115:24
**comes** 41:14 43:25
115:5
**coming** 53:13,20 75:13
108:21 116:20
**commencing** 2:15
**comments** 50:5
**communication** 28:11
105:14 110:25
**communications** 7:2
**compensate** 112:18
**complain** 42:14,16
**complaining** 90:16 92:5
**complaint** 17:17,17,18
26:10 34:18 109:25
110:5 111:23
**complaints** 39:8 98:12
**complete** 9:16
**compound** 27:5 32:12
35:5 48:12 82:16
101:6 110:18
**comprehensive** 4:12
95:8,10 99:5
**concentrate** 9:16
**concentration** 112:22
**concerned** 29:11 101:10
**concerning** 18:25 34:5
109:15 110:2,14
**concluded** 121:6
**conclusion** 18:3 19:6
27:6 28:2,12 77:22
109:18 110:17
**condition** 17:4
**conditions** 16:15,25

20:16 21:12 44:5,18
45:7
**conduct** 39:15 41:6
109:3,16
**conference** 12:12
**confidence** 49:11
**confine** 17:8
**confirm** 17:7
**confusing** 79:18
**connect** 62:10,12,12
63:5 66:13,14 67:17
**connected** 64:15,24
65:8,13 67:18
**consider** 24:19
**considered** 42:7 43:1
**consistently** 99:13
**constipation** 96:7,8
**contact** 110:22 111:7
**contacting** 111:11,19
**contained** 26:20 27:23
122:13
**contend** 7:18 26:7
**contention** 34:8,15
**continued** 26:24 99:12
101:16
**continuously** 113:19
**control** 34:22 92:18
**conversation** 7:1 8:8
41:15 54:16 117:15,24
118:1
**conversations** 8:6 38:2
38:6 43:21 80:7,8
117:20
**convey** 7:7
**convicted** 15:7,19
**conviction** 13:24 14:2,20
15:2,8
**convictions** 15:4,5
**coordinator** 110:23
111:6,7
**copies** 31:15,17,20 33:8
33:12 35:21
**copy** 28:6,18,24 31:2,6
33:23 35:20
**corner** 41:5 59:14 85:21
**correct** 9:12,13,18,19
13:25 14:2 18:20,23
19:24 25:3 27:13
35:25 43:17 46:20
48:18 50:17 55:10
57:2 60:12 61:11
62:20 63:19 64:8,25
65:15,19,20 66:6,7,12
70:2,23 71:1 73:23
79:3 93:17 97:2
119:22 122:13 123:13
123:20
**corrected** 25:24
**correctional** 22:23 79:5
105:22,23 106:23
**corrections** 14:7 16:21
122:11
**correctly** 30:7
**counsel** 26:22
**count** 106:12
**counts** 10:17
**COUNTY** 122:4
**couple** 5:11 15:4,5 80:24

**course** 7:1 56:7
**courses** 16:11
**court** 1:1,23 2:1 6:4,6,15
8:24 15:15 32:20,25
33:4
**courtesy** 6:19 37:10
**cover** 77:12 83:10
**covering** 63:20
**CPR** 16:12
**crackle** 76:4
**crank** 56:6
**crap** 40:8
**crime** 15:19
**crisscross** 60:14,17
61:8 65:24 66:23
**crisscrossed** 64:11 67:4
**cross** 60:3,25 63:5 64:13
64:16
**crossed** 63:7
**crossing** 66:5
**crosstalk** 32:23
**cry** 74:6
**crying** 75:5 81:11
**CSR** 1:24 2:16 123:4
**curious** 112:2
**current** 9:11
**currently** 19:11 96:3
**curse** 40:11 83:5
**cursing** 81:22
**cussing** 81:21
**custody** 14:6 34:22
76:18,22 90:3 91:18
115:19

**D**

**D** 4:1 14:23,24 15:3,4
17:21
**D-1-A** 20:8 21:23
**D-1-B** 20:10,11 22:1 40:6
115:14 116:7
**daily** 112:23 119:1
**damages** 111:24 114:19
**date** 22:4 26:6,12,17
27:9 34:5 46:19
**dated** 4:12 84:14,24 96:9
97:3 98:18 123:22
**dates** 8:5,9 26:11 27:1,3
35:20
**day** 27:14,16,16 35:15
42:15 64:1 79:13
80:10 82:4 95:3 98:22
104:17 106:3 112:24
113:9 119:3 122:15
123:22
**days** 19:1,20,23 20:1,6
20:12 29:16 46:8 48:3
48:11
**deactivate** 76:10
**deal** 112:13,15 116:12
**dealing** 88:14,15
**dealt** 110:6
**debate** 66:21
**deceased** 39:20
**December** 103:24 104:9
**decide** 89:10
**declare** 122:9 123:18
**decline** 37:12
**decreased** 99:23

**defecate** 54:8 70:15
**defendant** 29:3 36:17
43:8
**defendants** 1:9 2:9,14
3:7 5:12 18:10 26:7,13
34:6,8,15 45:17 61:13
75:20 78:13 105:21
106:22 108:8 109:11
111:25
**defendants'** 109:3,15
**defense** 34:23,24
**deletions** 122:11
**deliberate** 17:19 18:9
**delivery** 16:20
**demand** 4:10 86:17
**demanded** 86:4
**demands** 86:20
**demonstrate** 34:14
**denies** 92:18
**Department** 14:6 16:20
**depending** 31:9
**deponent** 5:2
**deposed** 5:20
**deposition** 1:15 2:14 4:8
5:3,11,19 6:1 9:9,22
10:3 11:4,20 12:8,17
13:3,8 23:15 53:1
**depressed** 112:20
**depression** 112:19
**Deputy** 3:8
**describe** 57:20 58:4,4
101:2 114:9
**described** 119:22
**deserved** 82:12
**designed** 26:9 34:17
**desire** 96:5
**desirous** 122:12
**despite** 77:19
**details** 54:15
**device** 56:25
**diagnosed** 102:18
**diagnosis** 102:25
**diagram** 63:3
**DIANA** 3:8 4:4
**Diana.Esquivel@doj.c...**
3:11
**diaper** 39:22 42:24
**died** 42:15
**difference** 8:14 101:20
119:8,11,14
**different** 13:13 31:11
44:13 47:16 57:17
59:19 68:11 70:9
101:21 113:23 115:24
117:20 119:7,10,20,23
119:23
**difficult** 98:6
**diffused** 92:15 93:3
**dinner** 43:24 44:1
**direct** 34:24
**directed** 82:7 83:21
110:5
**directing** 66:20
**DISABLED** 3:4
**disagree** 85:17
**disagreements** 97:21
**discerning** 17:19
**disconnected** 69:15

discuss 17:13 102:15,22 103:7 115:25
discussed 9:21 95:9
discussing 45:7 96:18
discussion 44:17 55:11
discussions 12:5 44:5 97:12
diseases 16:15
disk 100:10,13 102:18 103:1 113:23 114:10
disks 114:2
dismiss 17:12
dispersed 75:10 77:13 81:6
disrespectful 46:18 82:24 83:1
DISTRICT 1:2 2:2
DIVISION 1:2 2:2
doctor 29:14 30:3,21 31:6 75:18 81:21 86:20 93:10,24 99:15 102:23 103:8 106:16 106:17 107:1,3,5,14 107:18,21,22,25 108:4 114:7,18 120:16
doctor's 26:24 29:4,25
doctors 29:13 102:16
document 24:25 27:25 34:21 73:10,13 109:12
documents 4:11 11:3,12 11:21,24 12:1,3,7,15 13:2 34:2,7,14 35:17
doing 29:20 38:9 67:21 67:21 70:19,20 71:4,6 71:7 112:16 113:6
dollars 114:20
Donovan 14:8
door 38:1 41:14 42:12 44:11,25 52:12 53:14 78:18,19,23
doors 95:20
doorway 42:14
Dr 48:16 50:4,14,21 92:10,23 94:15 95:3 96:19 97:13,21 98:8 98:22 100:3,9,18 102:15,22 103:8 107:6 114:12
draw 58:7,24 59:20 61:15,17
drawing 64:6
dress 22:21
dressing 22:17
drug 72:16 92:21
due 90:20 91:16,20 92:14 99:23 102:17,24 103:9
duly 106:16
duration 101:3,11,23
duty 106:17,23 107:1,3,5 107:18,23

**E**

E 3:1,1 4:1,7
earlier 38:25 69:21 70:17
easier 24:17
easily 113:6
eastern 1:2 2:2 47:23

education 16:8
effect 96:6
effects 9:10
effort 105:11 110:22 111:11,17
either 43:5 72:24 89:22 101:22
elected 115:16
electric 56:3,8,13
emergency 77:6 80:2 93:15 99:17
employee 123:16
empty 78:8
enclosed 63:7
encounter 92:23 98:22 100:3
ended 80:20 112:17 113:6
enemies 21:15,17
enforcer 117:13
ensured 64:19
entails 117:5
entered 14:6
entering 89:19
entire 72:7 97:22
entitled 8:7,11 53:3
equally 26:21 34:22
equipped 52:10
equivalent 77:6
escort 80:1 106:10
escorted 106:11,14
ESQ 3:3,8
ESQUIVEL 3:8 4:4 5:7 5:24 10:11 11:19 12:20,24 14:19 18:1,7 18:20 19:8,24 20:20 23:4 24:1,7,22 25:14 27:10 28:5,17 29:1 30:20 32:4,8,19 33:20 34:20 35:24 36:15,25 37:13 39:11 41:24 48:15 49:23 50:1 51:17 52:5,14,20 56:17 57:2 58:21 59:2 59:5,10 60:21 61:23 62:15 64:2 68:8,23 73:20 74:16 78:5 82:21 85:16 87:5,12 87:19 88:6,20 91:1,15 92:4 93:13 94:9,14 95:2 96:18,23 97:2,20 98:11 100:8 101:9 102:21 103:7,15 105:17 107:11,24 108:18 109:24 110:20 111:4 120:16
estimate 8:7,8,11,15 9:25 53:4 68:9,10,11 68:12 118:22
estimated 9:2
et 1:8 2:8
evaluation 95:9
evening 88:8 107:25
events 8:2 10:7,13,24 13:4 51:2 93:12 108:22
everybody 44:12 81:12
evidence 28:12 34:14

35:5 52:7 87:9 92:25 94:24 110:17
exact 8:10 27:21 51:5 54:14 88:15 102:1 116:12
exactly 52:22,24 71:17 82:1,4,14,19 83:5 88:4 92:8 102:6 114:11,14
examination 4:3 5:6 123:11
examined 108:3
excessive 41:25 42:5,7 43:1
exchange 81:15,17 82:7 83:16,19,23 84:8
exchanged 80:22
excuse 15:13 23:1 25:9 56:20
EXECUTED 122:15
exhaust 109:10
exhausted 109:15 111:8
exhibit 23:15,16,19 24:9 24:24 33:21,24 58:19 59:2,3,7,8 61:20,21 62:16 65:2 84:10,12 94:15 95:6,6 96:24 98:17 103:16
existed 94:20
exists 19:4
expect 8:4
expected 53:2
experience 37:7
experienced 103:11
experiencing 101:1 102:9
expert 103:3
explain 44:8 45:1,3 52:1 61:13 64:23 65:3,4 67:9 108:14
explained 29:10,11,23 49:4 65:11 106:7 116:2
explaining 62:17 63:11 64:7 67:7,8 84:18
exposed 63:18
expression 73:3,24 74:4 74:10,17,25
extending 37:10
extent 38:5 83:16 105:13 110:25

**F**

face 73:24 74:10,25
faces 30:24 73:4
facial 74:4,17,25
facility 2:14 19:10,10,14 19:25 20:5,14,25 21:10 22:14 31:18 33:10 50:6,9 57:14 96:14 103:25
fact 34:14 77:12,19 106:2 112:5 113:21 116:11
facts 28:12 35:5 52:7 87:9 91:25 92:25 94:23 103:2 110:17
failed 26:8 34:16
fair 15:15 19:22 68:8

89:18
fall 92:21 103:25 113:24 113:25 114:6 120:22
fallen 95:16
falls 97:7 103:10 104:20
false 15:20
falsehood 15:20
familiar 6:2 51:23 56:5 79:2
far 6:22 101:10
February 19:16
fed 39:21
feed 43:24
feel 27:7 28:14 32:1 33:19 34:12 35:1 46:17 69:7,9 71:17
feeling 9:10 102:24
feet 58:11,11,11 69:18
fell 95:21 104:9 113:21 114:2
felony 14:2 15:7,8
felt 71:16 72:1 82:8 83:1 90:17 92:6 99:11 101:21 112:17 114:13
female 47:13 48:18 50:25 93:23
fever 92:20
field 16:12,17 64:1
file 1:25 44:24 98:7,11 114:15
filed 12:9 18:21,21 109:9 110:14
files 29:23 34:23
finally 54:6
financially 123:16
find 21:21
fine 11:23 25:17 30:17 49:23
finish 6:17,19 51:16 52:4 67:7 69:17 81:14 94:6 97:16 98:10
finished 12:20 15:12 34:19 41:13
first 6:4 12:25 15:7 16:14 18:21 22:6 29:16,21 44:21 48:9 50:22 54:15 91:14 95:7,11 98:21 110:1 112:7,7 113:12
fit 95:19
five 38:13,18 41:13 58:11 95:16 97:1 104:20 112:23 113:2 120:10
five-minute 49:24
flew 116:4
flip 41:1
floor 44:11
focus 9:16 117:22
follow 23:14 29:14
followed 35:8
following 114:7
follows 5:3
force 41:25 42:5,8,10,20 43:2
foregoing 122:10,12 123:6,13,19
Forgery 15:23

forget 14:18 25:23 37:2
forgettable 14:16
forgot 14:14 28:16 46:16 47:12
forth 113:11 123:7
forward 6:3 64:4,25 65:14
found 21:23
four 20:1,6,9,11 21:24 38:18 46:8 48:3,11 57:25 58:10 59:14,14 71:9
four-day 39:12
fourth 95:14
fractured 114:2,6
fractures 113:23
fraud 15:20
free 27:7 28:14 32:1
frequency 101:3,11,22
fried 104:23,23
friendly 15:10
front 72:12
full 9:16 99:6
fully 105:12
further 8:3 49:14 67:7 121:1 123:15

**G**

G 17:22
gathered 95:9
GED 16:2
gender 94:1
General 3:8
generally 29:12,14 43:25 60:3
gentleman 115:7
getting 37:22 45:13,13 80:14 112:13
give 6:18 8:19,24 39:24 40:2 58:7 68:5 73:5 82:9 89:17 102:1
given 15:1 20:15 35:2 53:1 91:21,23 95:19 102:7 105:1
giving 10:7,13 11:1 13:4 93:18
go 5:25 6:3 18:12 22:20 26:4 28:14 29:12 31:4 32:15 33:18 35:7 36:14,24 38:19 39:2 41:10 42:13 49:14 52:9,18 55:17 56:23 58:1 59:13,15,15 63:5 68:12 73:18 74:22 78:11,19 82:17 87:4 87:10,17 88:1,17 89:22 90:7 92:1 93:1 94:10,24 97:18 100:5 101:7 103:3,12 105:14 106:3 109:18 110:18 111:1 112:2,25 115:20 118:9
goes 52:12
going 6:3 7:14,19 8:2 11:15 12:18 13:10 32:25 33:2 35:4 36:11 37:12 38:17,18 45:1,2 48:12 53:19 54:7,23

55:24 56:1,21 58:24
60:7 62:23 64:1 65:2,3
67:1,2,14,14,15,15
70:20 73:24 74:12
75:12,13,15 76:9,23
76:23,24 77:24 82:18
87:8 91:24 92:24
93:11,14 94:10 95:7
96:15 101:6 104:24
109:13,17 110:16,24
111:2 112:9,13,15
113:13 115:11,25
116:8
**Gonzalez** 48:7 70:9
76:12,19,25 79:23,24
80:8 81:7 82:5 84:8
105:25 106:2
**good** 5:8 68:21 69:9 94:9
95:21 114:1,4
**gotten** 99:24
**governing** 6:1
**governs** 17:17
**GP** 40:4
**graduate** 15:25
**ground** 37:4 69:19
**GROUP** 3:4
**guess** 8:15 58:9 59:7
107:7
**guessing** 107:9
**guidance** 97:9
**guy** 39:20,25,25 42:12
47:23 107:4 115:2,12
115:13 116:4 117:8
**guys** 10:16 23:12 35:10
35:18,23 40:24 41:1
49:22 80:12 90:4
105:2

--- H ---

**H** 4:7 99:5
**half** 8:23 69:11 88:9
**hall** 38:10
**hand** 4:13,14,15 58:21
64:25 66:3 68:9 84:10
**handing** 24:24
**handle** 38:21 116:5
**handled** 39:20
**hands** 8:25 63:12 64:3
**handwritten** 91:16
**hang** 60:17
**happen** 89:21
**happened** 10:18 47:4
74:7 78:12 80:3 82:3
83:15 89:5,23 90:3,9
99:20 101:16
**happy** 7:12,24
**Hayer** 108:8
**head** 7:3 17:3 105:6,9
113:14
**heads** 7:6
**healed** 113:24
**health** 2:14 16:20,24
17:4
**Healthcare** 19:10
**hear** 14:11 38:20 39:9
40:10 41:15,19,19
71:18 72:11 76:2,11
**heard** 32:9 40:11 70:22

71:3,15 72:25 73:3,10
73:14,21 74:2 75:2
88:9 100:23
**hearing** 74:11,18 84:7
93:10
**heights** 68:6
**held** 60:2
**hell** 101:15
**hello** 43:23 44:2
**help** 6:2 10:6,12,23 13:3
22:16,21 44:7,15 77:1
87:24 91:22 92:22
94:19 96:3,12 97:9,11
99:8 100:2 102:8
113:3 115:4,11
**helps** 89:10 90:8 98:19
99:4
**Hep** 92:14
**hey** 40:21 53:20 72:16
116:3 117:2
**high** 15:25 16:5,7 68:4
68:10 95:8
**higher** 102:8
**hip** 66:3 92:13
**historically** 37:11
**history** 13:20 89:20
92:12 99:6
**hit** 44:8 76:6,9,9 95:21
115:13
**hitting** 72:18
**HIV** 92:13
**hold** 25:24 63:16 69:13
82:15 96:1
**holding** 63:21 69:11
**home** 11:8
**honest** 78:4 104:14
108:16
**honor** 86:5,18
**hook** 57:5 60:2,4,5 63:1
62:5,18 66:2,11
**hooked** 57:21 61:4 62:5
**hooking** 65:15
**hoops** 62:25
**hopefully** 54:21
**hospital** 40:3 51:24
**hour** 8:17,17,23,23,23
32:7 36:12 72:19,20
75:11,22,23 76:21
79:10 88:9,9 94:8
**hourly** 78:21
**hours** 20:9 21:24 52:21
52:23 53:4,7 84:25,25
85:7,19 87:24 89:25
90:5,16 91:23 97:3
98:18 99:15
**house** 21:22
**housed** 14:5 20:5
**housing** 20:21 21:8,11
21:20,22 48:4 95:8
**Hoyer** 5:15 17:20 18:11
22:5 26:8,14,18,22
27:12,17 29:2 30:6,14
34:6,8,16 43:5 45:16
51:20 53:14,15,18,23
54:7,9,13,17,24 55:12
55:16 56:2,13 57:13
60:4,5,9,15,17,19 62:9
62:11,23 63:2,5 64:9

64:13 65:3 66:23,25
67:13,17,24 68:17
69:15 75:17 80:15
81:19 83:9,15 84:6
86:1,6,15,19 87:25
88:3,13 89:11 92:17
92:17 94:4,16,20
95:24 96:13,19 97:4
97:12 99:7,25 105:22
106:22 110:10,14
112:7 113:12 114:5
115:10 116:14,25
117:23 118:3,10,16
120:3,6,17
**Hubbard** 3:3 5:21 10:8
11:15 12:18,22 14:16
17:25 18:2,12,16 19:5
19:19,22 20:18 22:25
23:23 24:3,10,13
25:13 27:5 28:1,9,21
30:17 31:25 32:5,11
33:17,23 34:19 35:4
35:11 36:11,22,25
37:7 39:1 41:22 48:12
49:12,15,19 51:16
52:3,6,17 56:10,14,22
58:19,23 59:6,19 60:6
61:19 62:2,7 63:25
68:5,21 73:17 74:12
77:21 78:1 82:15
85:15 86:23 87:2,8,17
88:1,16 89:14,18
90:24 91:11,24 92:24
93:4 94:6,23 96:15,22
96:25 97:16 98:10
100:5 101:6 102:19
103:2,12 105:13 107:9
107:16,20 108:17
109:17 110:16,24
112:2 121:2,4
**huddle** 99:16
**huge** 112:19
**huh-huh** 7:6
**hundred** 80:3 114:15
**hurried** 83:7,8
**hurt** 66:24 67:1,4,14,16
67:16 73:25 82:20
99:12,19 100:1 101:15
112:9 113:20 114:5
117:3
**hurted** 101:12
**hurting** 35:15 72:5,9
75:10,18 78:10 80:20
84:1 99:20
**hurts** 95:23

--- I ---

**idea** 32:13,14 112:10
**identification** 111:14
**identified** 106:16,23
107:1 108:25
**identify** 26:11 105:20
106:20 109:9 111:8
**identity** 12:7 15:23
**ignoring** 77:19
**imaginable** 37:4
**immediately** 72:5,9
**important** 6:17,23 7:4,22

8:24
**improper** 34:6 108:8
**improperly** 5:14 26:18
27:12,17 34:8 105:21
106:22
**incarcerated** 14:4
**inches** 68:3,11,14 99:10
**incident** 5:13 19:1 20:1
22:5 26:21 27:15,19
27:20 39:10,10 46:9
48:3,8,11 79:19,20
80:6 89:21 90:3 94:22
98:23 101:4 102:25
103:10 106:4,9 107:15
110:7 114:24 116:10
117:16,17
**incidents** 104:5
**inclined** 6:10
**included** 31:14
**incorporate** 27:23
**incorporates** 26:20
**increase** 102:3,17
**increased** 96:7 102:2,23
103:9
**independently** 97:8
**indicated** 9:10,11 22:8
25:7 29:1 50:4
**indifference** 18:9
**indifferent** 17:19
**individual** 39:6 42:2
106:20 115:2
**individuals** 8:6 71:9
108:25
**informal** 6:24
**information** 8:5 26:20
27:23 54:10 110:22
111:13,18
**informed** 12:16 48:25
**initials** 91:17
**injured** 23:11 75:17
80:21 81:2 83:3,6,12
102:9 104:8 112:17
113:7,21 116:11
**injuries** 103:17 104:4
115:4 120:21
**injuring** 70:21
**injury** 34:25 103:23
104:6 114:8 120:18
**ink** 59:21
**inmate** 22:14,24 23:5
42:8,21,22 44:1 90:2
115:15,18,19
**inmate's** 22:20
**inmates** 22:19 38:8,19
38:22,24 39:6,8,16,18
40:10,12 42:1 49:8
50:10 114:25
**inmates'** 22:16
**inquire** 44:23
**inquired** 44:7
**inside** 38:12 60:11,15,22
63:6,17,18 64:20
119:16,17,19
**instruct** 32:8 111:4
**instructed** 24:13
**intake** 21:15
**intended** 54:13
**intensity** 101:3,11,23

**interact** 36:21 37:18
38:19 39:7
**interacted** 37:15 38:23
39:15 48:10,10 93:20
**interactions** 36:17,20
38:1 43:12 46:13,17
46:22 47:9 77:4
**interdisciplinary** 84:24
98:17
**interested** 123:17
**interject** 86:24
**interpret** 64:3
**interrogatories** 4:9
10:17 33:25 35:22
110:21
**interrogatory** 23:23 25:8
26:5 31:13,22 33:14
35:2,11 103:16 105:10
105:18 106:18 108:7
109:8 111:14,18
**interrupted** 37:1
**interviewed** 21:14
**involving** 15:20 16:12
49:16
**IP** 85:24 86:4,14,17,19
90:16 91:17,18
**IP's** 86:5,18
**iron** 115:21
**irritate** 67:2,14
**isolated** 116:10
**issue** 83:21 90:12
**issued** 30:4,21
**issues** 44:14 49:16
104:24
**IV** 3:3

--- J ---

**J** 3:3 87:5,14
**J.C** 91:17
**JAM-CKD** 1:7 2:7
**jammed** 95:22
**January** 95:17 97:7
103:11 104:21,21
**JOAQUIN** 122:4
**job** 22:22
**Johnson** 50:25
**judge** 37:8,11 63:25
74:20
**judgment** 99:7
**jury** 7:19

--- K ---

**K-O-M-M-E-R** 47:16,25
**Kaina** 24:13
**keep** 6:13 59:10 60:17
75:13 112:10 119:15
**kept** 72:18 75:14
**key** 78:23
**killing** 72:18 77:17
**kind** 58:15 82:9 98:5
112:2 117:7,8
**knew** 39:25 42:3,21 71:6
73:2,3 77:15 83:12
87:21 89:25 90:5
**know** 5:9,18 7:11,24 9:3
9:17 11:8,23 12:3,4,6
18:17,18,19 19:3,7
20:9,23 24:8 27:3

30:23 36:9 37:11
38:13 39:3,9,24 43:8
44:23 47:2,15,17
48:24 49:9,13 50:21
50:24 52:23 53:10,15
56:5,23 57:2 58:2,20
61:12 67:21 68:13
69:10 70:20 71:7
72:19 77:23 78:2,3,11
78:24 80:17 82:3
85:11 86:25 87:11,21
88:3,5 89:9,16 90:7
92:2 93:4,5,9,25 98:5
101:18,18 104:18,24
105:9 106:1,2,4
107:16,17 108:2,3,10
108:11,15 109:14,20
110:19 111:12,20
112:10,11 113:7,13,14
113:15,16,18,19 116:4
116:7,17,18,19,21
117:2,3,5,6,8,9,9
118:8
**knowledge** 19:3 25:4
105:21 106:21,21
108:8 109:2
**knows** 112:16
**Kommer** 47:16,23
**Koran** 96:5 112:23

**L**

**ladies** 86:4,17
**lady** 60:16
**Lancaster** 14:9 19:15
29:8 30:1,3,5,10,13
31:7,14,16,20 33:13
34:10,11 35:1 95:20
104:22
**Lane** 3:4
**language** 74:23 75:3
**lapsed** 75:19
**lasted** 101:25
**law** 6:6
**laws** 123:19
**lawsuit** 5:12 10:7,14
11:1 13:5,13,19 17:18
18:10,21 20:2
**lawyer** 89:16
**lay** 36:14
**lead** 46:7,8 67:19 69:22
70:23 72:15
**leader-type** 39:5
**leap** 19:17
**learn** 54:12 73:8,12,15
74:1,3,9,14,24
**learned** 58:2
**leave** 42:12 55:6,9
**leaving** 49:1,3 50:5,8
117:19
**left** 38:13,17 50:17 55:12
68:3 69:10,14 72:14
75:20 77:2,13 78:11
78:13,14 81:12 83:9
88:8 90:4,9 95:21,23
103:21 104:6 110:8
**left-hand** 85:21
**leg** 92:20 95:23
**legal** 18:3,8 19:6 27:6

28:1,11,23 35:6 77:21
109:18,21 110:17
**legs** 59:24 60:1,3,15,22
60:25 61:6 63:8 64:12
65:25 66:6,9 96:2
119:15
**length** 59:15,16
**lengthy** 95:6
**let's** 26:4 36:15 49:24
51:2 58:23 59:6 67:7
69:16 81:16 83:14
90:7 120:10
**level** 9:15 53:3 96:3
102:8
**levels** 9:20 100:9,13
102:4
**license** 117:6 118:8
**licensed** 23:10
**lieutenant** 21:14,15
**lift** 5:15 17:20 18:11 22:5
26:8,14,18 27:12,17
29:2 30:6,14 34:6,9,16
43:5 45:16 51:20
53:14,15,18,23 54:7,9
54:13,17,24 55:12,16
56:2,6,12,13,18,25
57:6,13,21,21,22 60:4
60:5,9,15,17,18,19
62:9,11,24 63:2,5 64:9
64:13,24 65:3,15
66:12,23,25 67:13,17
67:24 68:17,18 69:15
71:5 72:16 75:17
80:15 81:20 83:9,15
84:7 86:1,4,5,6,15,17
86:18,19 87:25 88:4
88:13 91:11 92:17,17
94:4,16,21 95:24
96:13,20 97:4,12 99:8
99:25 105:22 106:22
108:9 110:10,15 112:8
113:12 114:5 115:10
116:14,25 117:23
118:3,10,16 119:19
120:4,6,17
**lifted** 64:17 68:14 69:17
70:18 71:15 73:25
**lifting** 67:23 69:4
**lifts** 56:8
**light** 37:21 44:8,10 51:25
52:11,15 54:23 55:2,6
72:19 75:11,13,25
76:1,3,10,15,20 77:14
79:9 83:11 90:5
115:13 117:18
**lights** 52:11 76:13,14
**likes** 37:8,11
**limited** 17:15 39:12
57:14
**line** 71:20,21 91:2 94:6
**lines** 26:5
**list** 103:17 104:20
**listed** 104:1,5,12
**listen** 12:2 77:24 111:2
118:9
**listened** 113:10
**listening** 54:4
**literally** 58:4

**litigation** 110:23 111:7
**little** 20:24 30:12 63:18
65:23 66:1 67:6 68:1
69:3 71:24 72:12 76:4
85:23 97:9 101:24
113:14
**locate** 36:9
**location** 14:10 20:6 23:8
42:23,23 47:7
**lock** 78:20 106:12
**locks** 78:20
**lodged** 97:6
**log** 109:9,11,14,20 110:1
110:5,23 111:8
**long** 15:16 50:19 51:18
52:14,22 55:9 58:11
101:17 102:3,6 116:16
116:18 117:19,23
**long-shot** 62:3
**longer** 9:5
**look** 23:18,20 24:2 25:8
58:15 62:1 88:25
105:7 107:10 116:3
120:24
**looked** 29:23 58:20
109:24
**looking** 21:20 23:21 24:3
25:25 26:1 59:13
74:21 84:17 88:7
**looks** 58:15 59:4,13
96:25
**loops** 59:14 60:23,24,25
62:23 63:14 66:8,16
**lose** 92:18 111:24
**lost** 28:23 102:20 109:21
**lot** 22:23 28:23 54:10
93:18 101:12 102:13
109:21 120:5
**loud** 40:20,20 116:5
**low** 21:5 85:25 86:14,20
90:12,12 99:11,21
**lower** 69:7 71:19
**lowered** 75:8
**lumbar** 100:10,14
102:18 103:1

**M**

**ma'am** 80:5 101:8 102:5
104:14 105:7 108:10
113:10
**Madam** 33:4
**mail** 35:22
**main** 101:25
**making** 15:20 18:24 66:2
75:5 122:12
**male** 39:5 50:25 113:14
**man** 40:21,25 53:20
60:16 66:22 69:13
72:16 75:16 79:2,3,6,8
79:14,17 86:20,25
87:1 93:3,23 112:1,8
112:10 116:18 117:2
**manner** 40:13 70:19
71:5 117:18
**manual** 56:3,12
**manually** 86:4,5,17,18
**March** 5:15 16:19,24
18:11 19:1,14 20:1,5

23:5 36:16 37:18 38:3
39:12 40:9,18 41:24
43:1,4,9,13,15,19,22
44:4 45:8,17 46:9,14
46:20,23 47:6,10
48:11 50:13 51:3
55:19 57:9,23 58:17
61:14 65:4 73:14 80:9
80:19 84:14,15,24
87:7,15,19 92:11,23
95:3 96:9,13,19 97:15
98:18,22 100:3,21,24
101:2,10,14 102:9,24
102:25 103:10,11,19
108:22 109:3 110:7
113:25 114:1,1,3,3,8
116:14,14,16 117:16
117:23,23 118:10,16
118:19,23,23 119:6
120:22,22
**mark** 58:19 59:2
**marked** 23:15,16,19 24:9
24:24 33:21,24 59:3,6
59:8 61:21 84:10,12
**marks** 99:22
**mate** 71:11
**material** 57:24 60:11
63:6,7,20 65:17,23
119:19
**matter** 60:16
**max** 99:13
**MD** 90:19,23 91:4,6,12
39:18 40:25 57:15
62:10 66:23 70:16
103:11
**meaning** 17:17 18:22
9:8
**means** 32:14,15 85:7
91:21 93:3
**meant** 7:20
**measurements** 68:6
**medical** 13:21 16:12,17
20:16 21:12,18 22:2
22:11,12,13,15 23:13
29:7,7,17,23 31:13,17
33:6,9 34:23,25 35:20
35:25 36:8 37:25
43:14 44:5,14,18,24
45:7 49:16 73:5 75:9
76:15,16,16,20,22,23
76:24 77:19 78:22
79:9,19 80:5 83:7,13
83:25 84:14 89:20
92:12 93:25 97:25
98:2,8,12,12 100:22
100:22 101:18 105:8
105:11 114:15 115:19
115:23 116:8,20
120:24
**medication** 91:23 96:8
102:11
**medications** 16:24
**meds** 21:18 102:8
**meeting** 9:3 99:16
**meets** 115:22
**member** 37:24,25
**members** 22:9

**memories** 108:20
**memory** 37:20 102:10
**mental** 16:20,24 17:4
**mentally** 8:20 112:22
**mention** 14:11
**mentioned** 5:18 13:7
37:17 46:4 68:23
69:21 71:9 110:4
**mesh** 57:24 58:9 61:3
**messed** 53:23
**method** 83:2
**MG** 91:16,20
**Michelle** 1:24 2:15 123:4
123:24
**midback** 72:8
**middle** 47:23 86:9
**milligrams** 90:20
**million** 113:24,25 113:16
113:18,18 114:20
**mind** 24:4 42:16 104:18
105:24 106:17 107:2
107:12
**minute** 24:2 85:5,10
94:11 120:10
**minutes** 8:18,21,23
12:12,15 13:2 41:13
52:20 53:5,6
**misconduct** 110:6
**misread** 26:3
**misspelled** 47:21
**misspelling** 47:19
**misunderstood** 81:9
**money** 112:18
**month** 114:3,4 115:22
**morning** 5:8
**morphine** 96:6,7
**motion** 62:22 63:10 64:4
64:24 65:12 66:3
**motioned** 62:17
**motions** 17:12 64:3
65:11
**move** 41:3,7,8 47:6
72:21 94:10
**moved** 20:8,10 21:25
28:23,24 45:11 69:4
95:21
**movement** 99:19
**moves** 106:13
**moving** 21:25 41:14
42:22 45:10
**MSE** 91:5
**MSER** 90:19 91:16,19
**muscle** 90:10

**N**

**N** 3:1 4:1
**N-G-U-Y-E-N** 50:21
**name** 47:22,23 50:22
57:3,25 79:21,22
107:16,17
**named** 18:10
**names** 30:23,24
**narration** 32:13
**narrative** 32:1,6 36:23
39:2 52:6
**nature** 8:8 16:9 22:17
118:1
**near** 17:22 44:12

necessarily 89:8
necessary 111:13
neck 63:17
need 7:6 10:8 11:8,23
28:9 29:19 31:10 33:1
36:12 44:7,15 53:13
58:7 72:17 83:25 86:6
86:19 106:3 116:3
needed 33:19 35:2 38:22
78:7 112:24
needs 97:8
neglected 116:9
never 27:1 40:11 77:14
90:17 92:6 99:20
103:22 113:24
new 44:7 92:19,20,21
newly 95:12
Nguyen 50:21 92:10,23
107:6
Nguyen's 94:15
night 22:4,6 29:9 48:8
90:1 99:13,18,21
106:12 107:5,14
nods 7:3,5
nonverbal 7:2
normally 55:25 59:22
95:15
note 4:12 87:5,23 88:7
89:9,12 91:16 92:9
95:6 98:17
notes 26:24,25 29:4,4,5
29:25 30:21 84:24
90:8 114:13,14,15
120:12 123:14
notice 4:8 13:3 23:15
noticed 14:10 17:21
61:23 108:20
notified 106:3
notify 79:24 106:6
number 14:23,24 15:3,4
24:9,24 25:8,20,25
26:1,5 28:6,18 29:5
30:22 31:2,13,22
33:14,21 34:4,7,9,13
35:3 62:16 84:11,23
97:3 103:16,21 104:12
105:10,18,24 106:16
108:7 109:1,1,8,9,11
109:14,20 110:1,6
111:14,18
numbered 84:15,21
numbness 92:19
nurse 29:22 31:1 41:11
41:16 46:4,11,25
50:24 55:14 69:21
70:22,23 71:3 75:20
77:18 87:16,20,22
93:24
nurse's 52:13
nurses 31:10 47:16
nursing 5:14 17:20
18:24 29:9 70:25
99:16 117:4

**O**

o0o-- 4:6,16
o0o--- 3:13 121:7
oath 6:5,6 18:16 123:8

object 11:15 12:18,25
27:5 35:4 48:12 56:22
57:20 73:17 74:12
82:15 87:8 91:24
92:24 94:23 101:6
103:2 105:13 109:17
110:16,24
objection 18:12 19:5
28:1,9,10,10 31:25
32:5,10 36:22 37:3
39:1 52:3,6,17 77:21
87:17 88:16 96:16,22
97:17 103:12
objections 28:21 33:17
37:6,8 88:1 97:18
100:5 123:10
obligatory 112:24
observe 39:14
observed 114:23
obtain 16:2 111:7,13,17
obviously 63:23 70:5
occasion 27:4 44:20
46:1
occasions 43:19 45:22
80:13
occurred 8:3 26:13 51:2
80:9
October 1:18 2:15
123:22
office 10:16,19 24:12
35:22
officer 5:3 48:7 76:12,19
76:25 79:20 80:7,8
81:7 82:4 84:8 105:23
105:25 106:2
officers 22:23 48:4 79:5
105:23 106:11,23
oh 13:17 14:12 20:22
23:25 25:1 28:4 30:16
47:20 91:13 101:15
109:4 112:1 118:20
okay 6:3 9:8,14 10:21
11:6,14,23 12:1 13:21
13:22 14:13,15 15:10
16:7 19:3,11,13 21:13
21:23 22:5,22 23:1,25
24:20 25:7,22 26:2,3,3
26:4,15 27:14,16,22
28:15,22 29:15 32:19
36:5,6,7,8,15,25 39:14
41:3,5,20,21 42:13,14
42:16,19 44:20 47:2
47:20 49:13,21 54:10
55:1,5,9,19 56:15
57:17 58:9 59:1,4,10
60:8,11,18,19 61:10
61:13 62:3,5,9,9,15,22
63:6,9 64:19,22 65:2
65:10,17,21 66:24
67:6,11,12,14,15,21
67:25 68:15,19,20,22
69:6,16,21 70:16 71:3
74:24 76:6,7 79:24
80:5 81:1,9,22 82:2,3
82:6 83:10,14 84:4,20
85:2,4,16 86:13,21
89:4,13,15,22,23 90:7
91:3,3,13 92:15 94:19

96:11 104:2 105:19
106:8 107:8 108:5
109:6,8 110:3,12
116:18 117:22 119:16
119:21 120:10 121:1
old 92:12
older 39:24 95:19
omission 104:14
once 14:23 21:10 31:8
38:7 71:14 93:12,20
104:23 115:22 119:3
ones 57:9 62:4,18
oOo--- 1:3 2:3
open 42:13 44:11,25
78:23
opened 78:18
operate 37:9
operated 26:9 34:17
49:5,7
operating 67:24 72:12
operative 17:16
opinion 97:25 103:3
opportunity 8:19 17:14
78:8
opposed 7:5 8:21 33:3
65:18 74:11
opposing 26:21
order 31:1 94:16,20 97:3
orders 29:7 30:4,5,11,13
30:21 31:3,6,11,14,15
31:21 33:13 34:10
35:1 90:19,23 91:4,6
91:12
orientation 95:12 115:15
original 12:9,11 109:25
111:23
Originally 120:5
Osemwingie 1:8 2:8 3:7
17:21,23,24 26:8,23
27:11 34:16 36:17
37:15,19 40:7,10,17
41:16,25 42:20,25
43:4 44:3 45:4,18 51:7
53:9 54:12,22 65:3
66:13,18 70:5,11,25
72:15,24 73:10,14,21
74:2 80:14,22 81:16
81:18 82:7,10 83:17
106:15 110:2 112:7
116:4,8,13 118:2,7,14
119:14
Osemwingie's 74:10,17
114:22
outer 66:9
outside 52:12 60:23 61:1
61:8
override 76:23

**P**

P 3:1,1 99:6
p.m 85:1,7 87:23 88:7
92:10 115:6,7 121:6
P.O 3:10
package 84:13,13
page 4:3 17:8 25:8 26:5
84:13,23 85:10,20,21
88:19 91:9 92:9 94:15
95:5 96:24 97:1 98:16

103:17 105:18
pain 9:10,15,20 72:1,3
74:6 77:10 81:11
85:25 86:14,20 90:12
90:12 92:13,13,14,14
92:15,16 93:3,18
95:25 96:3 97:5 99:10
99:23 100:23 101:1,4
101:10,17,21,24 102:4
102:8,8,11,14,17,24
103:9 104:24 112:4
paper 58:7 61:16
paperwork 107:19
109:21
parachute 63:9
paragraph 26:9 95:8,14
parallel 59:15
part 10:20 28:13 61:2,7
63:11,21 64:11,14
68:1 69:7,16 71:19
90:25 92:12 98:19
103:18
partially 97:9
participant 16:19
particular 32:21
parties 123:16
partly 95:17 99:24
passage 53:1
passed 115:3
patient 56:7 85:25 95:12
97:4
patient's 95:10
patients 114:23 115:1
pause 123:18
PC 1:7 2:7
pen 58:22 59:19
penalty 6:8 25:5 122:9
123:18
pending 9:4 24:23 50:3
50:11
people 10:19 22:10,20
30:9 33:3 80:4 96:2
117:9 119:15
percent 80:3 114:16
period 39:13 75:23
90:11
perjury 6:8 25:5 122:10
123:18
perpendicular 59:16
person 47:19,24 71:13
113:3
personal 13:20
personally-owned 95:18
personnel 93:25
persons 22:3,10 29:19
30:9 34:11 45:23
53:21 77:8 105:20
phone 76:7,8
physical 41:25 42:5,5,8
42:10,20 43:1
physically 112:21
physician 31:7 48:17,20
50:16 97:22 98:4
physician's 97:3
pick 76:6,8,8
picture 73:6
piece 58:23 61:16
pieces,' 99:22

pits 65:14
pivot 95:23
place 9:6 14:16 21:21
49:5,7 123:7
placed 65:5,6,7,7 67:8
places 8:9 14:17
plaintiff 1:6 2:6 3:2
26:19
PLAINTIFF'S 4:8
please 7:11,24 12:2
23:17 28:15 32:3 33:4
49:21 58:22 73:11
74:1 75:17 77:16
78:17 86:13 89:16
104:3 111:16
plus 88:16
PMU 21:16
PO 90:20 91:16,20
point 54:11 68:14 89:23
96:4 116:10
politely 37:12
pop 44:25 71:15,18,25
72:4 73:1,10,14,22
74:2,5,11,18 82:9 84:7
88:10 100:23 102:17
114:8
popped 69:13 72:10,17
74:8 75:8 77:11,15,20
popping 68:17 69:12
75:1,4
portion 33:7 59:12 64:23
66:15
position 23:12 41:6
43:16
possession 34:21
possible 49:9
possibly 8:3 37:4
pounds 86:7,19
prayers 112:24
pre-March 101:22 102:4
105:4
preexisting 120:18
prefer 24:16 96:2
premonition 112:9
prepare 10:3 11:3,20
12:8
prepared 12:16
present 53:12 77:8,20
84:3 118:24
press 37:20 52:11 76:3,5
pressed 52:15 78:6
pressing 120:6,7,9
pressure 66:24
pretty 44:12 117:25
previous 26:24 29:3
previously 13:12 14:20
25:15
primarily 22:19,22
primary 48:17,20 50:16
97:22 98:3,13
prior 5:20 15:16 32:24
81:10
prison 13:20 14:20,24
15:1,8,16 29:8,15 30:1
48:22 114:4
prisons 14:5 29:13
private 49:16
privilege 32:9,10 111:5

pro 18:21
probably 5:10 8:17
  18:23,23 24:14,17
  32:14 38:12,15,17
  44:1 58:10 68:3
  102:14 104:16,25
problem 113:5 115:18
  115:19,20 120:8
problems 102:14 113:19
  115:25 120:3,5
proceed 7:17 9:12,22
proceedings 121:6
  123:6
process 6:3,14 35:16
processed 20:8 21:10
produce 35:17
production 4:10 33:22
  34:1,4 35:12
profanity 40:10,17,19
  82:20,21 83:4
professional 40:12
  70:19 114:22
program 22:18
progress 84:24 98:17
Pronounce 17:25
pronounced 17:22
proper 61:6,11,12 62:17
  62:25 63:13 69:23
properly 26:14 71:4
property 21:19
propounded 123:10
protrusions 100:10,11
  100:13 102:18 103:1
provide 9:16,25 27:2
  98:2 109:11,12 110:21
provided 20:15 21:11
  27:1 28:5,18 31:12,21
  33:13 98:8,13 106:18
  107:18
provider 98:14
pulled 99:11
pulley 120:6
pulling 42:9,11
pulls 68:18
purposes 42:19
pursuant 26:19 27:22
push 22:19 36:15 56:8
pushed 53:16
pushing 22:16
put 17:21 23:11 27:22
  35:19 42:17 54:9
  56:25 58:8 60:9,14,15
  61:14 62:11 63:11
  64:3,8 65:3,13,23,25
  66:24 67:9,13 68:9
  87:3 112:21 113:17
  114:12,14 115:10
  117:3 118:3 119:10,11
  119:14,16,17,19 123:8
puts 95:22
putting 77:3 81:4

**Q**
Q-A-M-E 46:25
Q-A-M-E-R 47:18,24
Q-A-U-M-A-R 47:22 48:1
Q-H-E-U 50:22
Qamer 46:25 47:1,2,18

73:6 75:12,21 106:25
Quamar 48:1
question 6:17,20 7:11
  7:14,17,19 9:4,5 10:9
  11:16,17 12:2,19,21
  12:25 15:12,14 18:3,6
  18:7 20:18 21:9 24:22
  25:13 26:6,16,17 27:5
  28:14 30:5,8,12,13
  32:3,11,17,21 33:5,8
  33:12,16,18 35:5,7
  36:23 37:2,3,14 39:11
  41:18,22 50:3,3,7,11
  51:16 52:8 56:10
  57:18 63:13 73:11
  74:1,13 77:22 78:2
  82:6,16 86:23 87:2,4
  87:10,15 88:6 93:7
  97:16 98:6 102:20
  104:2,4,7,8,16,25
  106:19,20 107:2,11
  108:13,24 109:6 111:6
questioning 94:7
questions 6:5,12 8:22
  13:10,12,18 17:8,14
  17:15 21:16 24:23
  34:5 35:14 37:5,9
  54:21 70:1 85:11
  120:13 121:1,2 123:10
quick 24:2 120:11
Quinton 14:8
quit 48:21
quite 100:15 101:16,25
  117:20 118:25
quotation 99:22

**R**
R 3:1 48:7
Ramiscal 3:7 17:21 18:1
  18:2,25 26:7,23 27:11
  34:15 43:8,21 44:5,17
  45:18 46:17 53:10,13
  53:16 54:16 55:15
  66:14,18 67:19 69:22
  70:4 72:13,15,25 83:8
  83:20 106:15 110:4,14
  117:15,21
Ramiscal's 74:25 110:6
ran 65:22,24 66:1 73:4
range 96:4
re-ask 7:25 32:16
reacted 74:20
reaction 74:18
read 24:19 25:11 32:20
  33:1,4,7 34:13 35:13
  44:23 73:9,13,19
  85:14 86:2,15 89:9
  91:19 92:11 95:7 96:5
  98:18 99:3 112:23
  122:10
reading 33:2 64:1 85:20
  85:22 86:8 90:21,22
  90:24
ready 79:1
real 35:15 39:23 40:6
  54:2 72:5,9 75:10,18
  80:17 95:10 113:6
  116:5

realize 63:25
really 24:20 35:9,14 69:8
  69:9 93:8 98:1 104:25
  105:7 113:17 120:19
reason 6:16 7:21 9:21,24
  35:17 41:9 45:9 49:2
  67:9 83:10 99:5
  103:24 106:1
reasonable 32:7
reasons 109:22
recall 14:25 16:23 18:24
  19:8,13 30:3,13 34:1
  36:19 50:24 51:17
  56:9 81:23 87:7,15,24
  93:14,20 95:2 96:18
  98:15,21,24 100:8,18
  100:21 109:2 114:11
  114:13 120:20
received 24:11 110:20
receiving 13:3 34:1
recollect 13:8
recollection 6:2 8:4,10
  10:6,13,23 13:4 23:5
  44:17 45:6 59:11
  81:24 88:13 89:10
  90:9 92:22 93:6 94:20
  96:12 97:11,24 99:4
  100:2 110:13 119:25
recommendation 88:19
  90:19 91:3
recommendations 90:23
  91:2,8
record 7:4 9:6 24:15
  49:21 58:8,25 63:23
  64:22 84:18 87:4
recorded 123:11
recording 89:21
records 31:1,14,18 33:6
  33:9 34:25 35:20,25
  36:8 84:14 105:8,11
  120:24
recovered 103:22
rectangle 59:14 61:24
  119:21
refer 19:9 84:22
reference 38:7
referenced 31:2
referring 13:14 27:25
  28:19 29:5 30:22
  47:17 62:16
refresh 6:2 10:6,12,23
  13:3 88:12 89:10 90:8
  92:22 94:19 96:12
  97:11 99:4 100:2
refreshed 93:6 108:21
refused 41:7 79:19
  90:18
refusing 79:9
regarding 110:7,10
  111:19
registered 29:22
regular 40:4
reinjured 112:20
reintroduced 5:9
related 32:24
relates 35:20
relative 123:15
relax 8:20

released 78:25
relocate 43:5,16 45:23
relocating 45:18
remain 20:11 64:20
remaining 17:9 18:8
remark 77:9
remedies 109:10 111:9
remember 5:10,21,22,23
  15:6,9,9,14,16 17:2,4
  18:5 19:17,19 25:2,22
  26:12 27:21 30:7,16
  30:17,19,20,23,24
  37:13 39:11 43:20
  45:24 46:2,24 48:2,6,7
  48:14,15 50:12,15,20
  51:5,21 52:19,22,24
  53:2,11,12,12,13,14
  53:14,16,17,18,19,20
  53:25 54:1,3,14,15,16
  55:3,3,4,10 56:11,14
  56:16 82:1,4,14,19,19
  83:5 91:22 92:4,7,8
  93:2,8,9,11,11,12,19
  93:22,23,24 94:1,2,3
  97:23 100:6,11,15,20
  100:25 101:5,8 102:6
  103:5,14,22 105:8
  106:7 108:1 110:9
  116:25 118:12,13
  120:19,20,25
reminder 15:10 52:25
repeat 7:12 20:17 26:15
  73:11 102:19 111:16
repeatedly 90:18
repeating 37:5
repetitive 13:9,17
rephrase 7:12,24 10:8
  32:3
report 85:17,24 86:12
  89:19 112:6
reported 1:24 99:16
reporter 6:4,15 8:24
  15:15 32:20,25 33:4
  121:3 123:5
REPORTER'S 123:2
REPORTERS 1:23
reports 85:25 86:14
represent 115:17
representative 115:21
representatives 115:16
representing 5:12 18:22
request 6:13 9:4 31:20
  33:12,22 34:4,7,13
  35:19 36:1,3,6,10
  37:21 50:2 51:3,22
  52:1,16 53:8 54:12
  76:15 77:19 78:17
  86:5,18 92:17 102:11
  105:12
requested 24:10 27:2
  31:17 33:5,8 36:8
  51:11,19 111:18,23
  123:25
requesting 83:6,12
requests 34:1
require 9:2 21:5
required 21:8,22 79:6
  109:12

requires 27:24
reserve 58:24
respect 18:2 89:16
respond 7:5 52:15 76:12
  76:14 79:6,9 84:3
  105:12 111:13
responded 51:22 53:8
  54:12 81:5 105:10,24
responding 76:20
response 4:9,10 7:7
  25:7 26:4,11,19 27:22
  28:6,18,19 29:5 30:22
  31:2,21 33:14 34:9,20
  35:2 54:23 55:2,6 75:1
  77:9,11 81:11 82:10
  82:22 103:19 104:12
  105:17 106:16,18
  109:1 116:22
responses 23:17,22,24
  24:8 25:3 31:12 33:21
  103:16
responsive 108:6
rest 8:24
restroom 8:20 24:4 51:4
  51:11,18 52:2 53:13
  54:2 78:9,11
rests 62:19
result 72:4
resulted 15:8 38:24
  51:19
rethinking 108:22
revealing 111:1
review 11:3,10,12,21,24
  12:1,11 13:2 85:10
  105:11 120:11
reviewed 12:3,7,9,14
  13:1
reviewing 24:8 85:12
revised 26:25 29:4
right 20:3 31:4 32:11
  35:16 36:2 37:20
  38:18 40:12 46:7 48:2
  49:4 52:25 53:10
  54:19 64:11 67:3,23
  68:2,16 69:8 70:24
  71:20 72:21 73:7 74:7
  75:7 82:8 84:7 85:15
  85:23 86:9 87:13 88:6
  88:11,21,23,24 89:7
  89:12 90:1,1,6,10,15
  90:22 91:2,4,8,11
  92:13 93:3 102:10
  108:12 109:4,7 113:12
  118:20
rise 10:7,13 11:1 13:4
  20:1
risk 117:3
RN 46:7 47:5,15 53:19
  54:3 72:15 75:11
  87:14
road 2:15 7:16
Rodriguez 79:21 81:7
room 12:12 22:21 69:25
  72:14 77:6 78:13 80:2
  93:15 113:9
rooms 22:24 52:10
rule 26:19 27:23,24
  109:12 112:5

**rules** 6:1
**run** 14:5 50:9 51:24
  117:10,13
**running** 37:3

---

**S**

**S** 3:1 4:7
**S&E** 106:10
**S&E's** 106:14
**Sacramento** 1:2 2:2 3:10
**safe** 70:19
**sailed** 49:16
**San** 14:8 122:4
**Savage** 1:24 2:16 123:4
  123:24
**saw** 40:7 41:10,11 42:20
  43:10 74:22,25 92:10
  100:22 107:4,14,23
  108:3 114:7
**saying** 6:23 19:25 53:20
  53:25 65:12 67:12
  68:24 71:3 72:16
  88:23
**says** 40:24 85:18,23,24
  85:24 86:12 87:14,14
  88:18 89:1 90:10,11
  90:18,23 91:1,5,6,11
  91:16,18,19,20,21
  96:1 97:7 99:4,14
**SC15,343** 110:6
**SC15,344** 110:1
**school** 15:25 16:5,7,8,9
  117:5
**Scott** 86:25 89:16
  120:13
**SCOTTLYNN** 3:3
**scream** 74:6
**screamed** 69:12 75:8
**screaming** 77:10
**screening** 17:12
**scrotal** 95:25 97:5
**scrotum** 53:22 66:22
  120:6
**se** 18:21
**seat** 19:1
**second** 17:18 25:9 26:10
  34:17 48:5 51:6 82:15
  89:15,17
**seconds** 53:5 113:2,3
**sections** 95:7
**secured** 78:19
**security** 106:10
**see** 6:15,25,25 21:14,18
  30:24 31:9,10 38:10
  38:12,16,17,18,21
  40:24 41:6,25 42:7
  44:9 58:22 59:5 72:17
  75:12,18 77:2,16
  81:21 86:20 88:19
  90:8,11,19,23 91:4,6,6
  91:7,11,13 93:4 94:16
  96:10 98:19 99:3,14
  107:24 115:12
**seeing** 95:2 108:1
**seen** 24:25 29:9,14
  40:23 58:14 83:13
  101:18
**self-contained** 13:14

**SEMS** 77:5 80:1 88:24
  89:25 90:2 91:18
  93:14,21 94:3 99:16
  99:17 106:4,11 107:4
  107:25 108:2
**send** 24:13,18
**sensation** 78:10 90:16
  90:17 92:5
**sensations** 72:4
**sent** 21:17 88:23 90:2
  91:18 92:14
**sentence** 13:24 15:1,8
**sentenced** 14:23
**sentences** 15:17
**separate** 58:23 76:22
**sergeant** 79:13,16,25,25
  106:3,6,8
**served** 14:20
**serves** 37:20 102:10
**serving** 13:23
**set** 4:9,11 22:18 45:14
  67:17,17 69:14 72:11
  72:12 123:7
**setting** 6:24
**severe** 85:25 86:14
  95:25
**shakes** 7:2,5 17:3
**shape** 119:23,23 120:2
**sheet** 61:19
**shift** 26:22 46:7,8 67:19
  69:22 70:23 72:15
  115:4
**shift-lead** 55:14
**shifts** 44:13,22
**ship's** 49:15
**shoes** 22:17
**shooting** 99:10
**short** 24:5 49:25 94:12
  117:25 120:14
**shorthand** 123:5,14
**shoulder** 60:10,10 62:24
  63:4 64:4,25 65:18
  103:21 104:6
**shoulders** 59:17,18,23
  59:24,25 63:1,12,15
  63:16,18 64:5 119:17
**show** 23:16 31:7,11
  33:20 34:14 58:14
  63:3 64:6
**Showalter** 48:16 50:4,8
  50:14 95:3 96:19
  97:13,21 98:8,22
  100:3,9,18 102:15,22
  103:8 114:12
**shower** 103:25 104:10
**shows** 87:1
**sic** 47:22
**sick** 40:6
**side** 17:3,3 38:13 61:18
  64:15 66:8,13,14,18
  66:19 72:13 96:6
  113:3 115:9
**sides** 59:12
**Signature** 123:25
**significant** 92:13
**signing** 25:2
**signs** 90:18
**similar** 56:18 57:9,15,16

**simply** 64:15
**simultaneous** 75:6
**single** 37:3 71:12
**sit** 26:12 27:2 40:25
  44:16 105:3 108:5
  109:13 115:7
**sitting** 8:21 38:11 63:8
  69:20 108:19,24
**situation** 85:18,23
  115:17
**situations** 15:11
**six** 68:3,10,13
**size** 113:14 119:9
**skeletal** 90:10
**SKETCH** 4:13,14,15
**sleep** 99:22
**sleeve** 115:8
**slid** 68:24
**slide** 113:4
**sliding** 60:18 119:15
**sling** 57:25 58:16 61:7,9
  61:11,14 62:10,19
  63:4,14,17,21 64:9,10
  64:12,15,16,20,24
  65:7,17 67:18 68:24
  72:14 81:3,17 82:8
  119:5,5,17,18,24
  120:1,7,8
**slings** 58:15 65:13,22
**slipped** 104:18
**smaller** 95:19
**snap** 41:1
**snatched** 83:9
**snatching** 42:9,11
**solved** 113:6
**somebody** 10:17 72:17
  77:16 93:10
**soon** 30:25 84:7 94:6
**sorry** 12:20 23:1 28:4,4
  41:21 46:4 47:12
  51:23 52:3 55:17 56:5
  59:25 60:21 61:23
  62:15 67:6 68:20 70:1
  79:16 81:9 82:13
  84:15 89:6 91:19
  93:13 102:19
**sort** 21:17 63:9
**sought** 100:22 103:21
**sound** 6:1 17:22 74:6
  75:1,4 76:4
**source** 73:8,12,15,16
  74:2,3,9,15,16,22,24
**speak** 6:11,14 10:5,12
  33:2 49:10 50:2
  116:15
**speaking** 33:1 76:4
  100:18 107:14
**special** 109:18 110:18
**specific** 8:4,5,11 16:14
  27:1,3 30:12 37:8,8
  44:16 45:6 54:21,21
  68:5
**specifically** 30:14 34:24
  51:10
**specificity** 53:3
**specify** 26:6
**speculation** 28:13 32:12
  35:7 36:23 39:2 52:7

  77:22 87:10 91:25
  92:25 94:24
**spinal** 100:16,19
**spine** 95:22 100:10,12
  100:14 102:18 103:1
**spoke** 10:15,23 49:13
  81:6,7 116:2,6 117:17
**sprain** 114:9
**ss** 122:3
**staff** 22:2,9,11,12,13,15
  23:13 29:9,17 37:24
  37:25 43:15 76:15,16
  76:20 78:22 79:9 86:2
  86:4,6,16,17,18
  115:19,23 116:20
  117:12
**stapled** 35:21
**start** 6:18,20 41:11 44:25
  86:13 108:21,22
**started** 5:8 6:5 9:9 15:12
  52:25 67:23 68:17
  69:4,12 72:5,9 78:10
  102:24
**starts** 95:14 115:6
**state** 1:1 2:1 49:6 112:19
  112:21 122:3
**stated** 30:14,25 38:25
  50:8,16 67:3 70:11
  78:5 103:20 105:22
**statement** 15:21 75:5
  84:2 107:13
**statements** 123:10
**states** 85:17 95:17 97:4
**stating** 25:3 34:5 77:10
  94:16
**station** 52:13
**stay** 83:14
**stayed** 20:8
**stenographically** 123:12
**stenosis** 100:19
**step** 49:23
**Stockton** 1:17 2:15
  19:10,14,25 20:4,14
  20:25 21:10 22:14
  31:18 33:9 50:6 57:14
  96:14
**stop** 9:6 33:1 54:19
  65:10 72:21 73:7 82:6
  99:11
**straddling** 61:2,7
**straight** 60:5 64:16,17
  64:18 66:1,3 68:18,19
**strain** 114:9
**strange** 78:11
**strap** 66:23
**straps** 57:5,25 58:3,12
  58:13 60:2,8,14 63:4
  63:21 64:12 65:6,8
  67:25
**Street** 3:9
**stretch** 8:20
**stretched** 99:12
**strike** 42:6 98:20 100:16
**strings** 65:6
**stroke** 115:3,8
**strong** 62:2 113:14
**stuff** 21:17,18,19 22:21
  35:15 41:2 43:24

  93:19
**subjective** 98:19 99:3
**subsequent** 80:19
**subsequently** 7:21 16:2
  73:8
**sue** 77:18 78:4
**suffered** 103:18 104:21
  120:21
**suffering** 104:24
**suit** 62:2
**Suite** 3:9
**summarize** 81:25
**summary** 8:7 82:9
**summon** 41:12
**SUPERIOR** 1:1 2:1
**supervisor** 46:7
**support** 34:7,15
**supposed** 57:22 58:1
**sure** 11:16,19 17:10
  19:12 25:10 26:17
  28:17 44:6,12 46:2
  80:3 86:14,22 91:21
  94:9 102:21 104:4
  106:7 108:17,18
  114:16 116:17 118:13
**surrounding** 34:25
**survived** 17:12
**suspended** 68:3,15 69:5
  69:10,18
**sustained** 101:16 104:5
  105:5
**switch** 76:6,9,9
**swore** 6:7
**sworn** 5:2
**symptoms** 72:3
**system** 16:20 52:13

---

**T**

**T** 4:7 64:16,17 65:9
**take** 6:6 8:18 9:3,5 22:9
  23:17 24:2 49:24
  60:13 85:4,5,6,10 94:7
  94:10 115:9 120:10
**taken** 2:14 5:10,18 6:22
  13:8 16:11 24:5 49:25
  55:25 64:14 94:12
  95:18 120:14 123:6,14
**takes** 24:18
**talk** 10:2 38:21 40:13,14
  40:22,23 42:12,13
  51:2 54:3,4 76:7 80:12
  81:16 82:5 116:13
**talked** 38:20 39:16 40:11
  44:22 105:25 106:24
  106:24,25 114:20,24
  120:23
**talking** 8:2 10:17 41:10
  41:11,13,44:25 56:25
  57:1,11 72:1 84:9 94:3
  98:23 106:8 108:20
  113:10 118:14,15
**team** 10:20,22 95:9
**tell** 6:7 8:18 23:10,20
  25:25 29:18 32:21
  40:14 41:14 49:2
  54:22 67:5 69:8 72:25
  73:2 76:25 82:12,12
  85:16 88:4,18 102:2,5

102:7 105:6 114:8
115:9 118:20
telling 42:2 53:12 66:20
66:22 67:1,19,20
69:22 81:15 100:9
117:1 118:2
tellingly 93:2
ten 113:2
term 14:20 23:2 79:2
terms 8:9 48:4 50:5
51:23 101:22 108:7
119:11,21
testified 5:3 54:20 70:16
71:14
testimony 7:22 9:17,25
81:10 122:13 123:9
thank 37:11
theft 15:23
thick 58:9
thing 6:13 9:3 12:2,6
25:23 29:21 49:19
62:1 86:25 101:25
112:8 116:11 118:2
things 40:15 80:16,17,24
81:5,22 82:23 108:21
114:12 117:20
think 12:19 15:3,3,5 17:9
17:11 19:23 27:15
37:5 47:22 55:10,13
79:11,20 91:19 108:6
109:4 120:11
third 47:3,4,5 48:5 51:6
51:7,8 115:5
thorough 114:18
thought 35:16 71:6
three 8:3 58:11
throw 97:17
time 5:19 7:10 8:24 9:1
9:11,14 12:16 14:24
15:7 20:4 22:3 25:21
26:7,13 27:3,18,19,20
27:21 28:17 31:12,21
33:13 34:5,25 38:10
40:3 43:24 44:24 48:9
51:3,5,9 52:24 53:2
54:1 57:13 58:2 65:13
75:19,19,20 80:9
83:22 84:6,22 85:22
87:24 88:3,4,14,21,23
88:24 89:2,11,20
90:11 95:10,22 97:22
98:3 102:1 104:3
115:4,14 118:19 123:7
123:8,11
timely 117:18
times 6:10 7:4 8:5,9
14:25 26:12,13,18
27:1,3,10,11 28:24
36:20 37:17 45:24
84:2 88:15 89:12
95:16 100:22 101:17
118:22
tingling 90:16,17 92:5
today 5:16,20 9:22,25
11:20 26:12 27:2
44:16 99:23,24 105:3
107:19 108:5,19,25
109:14,23

toilet 19:1 23:7 37:22
45:12,20 55:22,24
56:1 57:23 70:14 78:7
86:3,16 99:9 110:8
113:4 117:19
told 21:25 31:10 38:8
40:21,22 41:8 48:25
49:10,10,14 53:1 67:3
72:6,10 73:9,13 75:16
99:25 100:6,11,16
112:14 116:18 118:7
120:16
tolerate 97:6
tone 39:19 82:23,25
tonight 92:18 94:16
tooth 58:15
top 58:13 60:6,8 62:18
63:4,12,14 69:11
92:12 96:9 105:6,9
totally 114:23 119:7,20
touch 59:12
touched 63:11
track 24:15,17
Tracy 14:8
trade 16:8
transcribed 123:12
transcript 13:14 33:7
121:3,4 122:10,13
123:14
transcripts 13:15 121:5
transfer 22:3 29:11,19
30:9,10 54:7 64:21
75:16 83:3 86:2,16
95:16 96:3 97:8 99:9
113:11
transferred 78:6
transferring 53:21
translate 7:3
tanspired 81:8 106:7
transporting 77:5
treat 40:24,25
treated 17:5 40:7 49:8
50:10,13 114:25
treating 31:6,7 38:8
48:23 102:16,23 103:8
treatment 29:7 43:2 80:5
103:21 114:22 116:8
treatments 40:2
trial 7:17
tried 75:16 77:12 83:2,10
95:24 97:4
tries 115:21
true 14:1 25:3 45:4 66:15
66:17 104:8 122:12
123:13,19
trust 23:13 71:4 97:25
98:1
trusted 67:22 70:12,17
truth 6:7
truthful 9:17
try 6:13 15:6 23:9 36:13
40:13 80:23 99:7,8
102:8
trying 14:17 53:23 54:3,4
56:11 63:3 64:6 78:24
86:1,15 113:11
turn 40:21 92:9 95:5

96:23
turning 75:14,23 94:14
turns 51:25
two 5:14 11:17 18:9 22:3
22:9,9,11,13 29:19
30:9,9 34:11 45:10,23
47:15 53:21 58:1,3,12
58:12 60:2,5,6,8,23
62:4 64:12 65:6,8 86:4
86:17 96:2 104:5
106:10 109:25
tying 22:17
type 56:18 113:24
typed 91:4
typing 62:8

## U

ugly 80:16,18
Uh 56:4
uh-huh 7:6 55:23 73:20
underneath 69:2 91:20
undersigned 122:9
understand 6:8,20 7:8
7:10,18,23,25 8:12,14
9:7 18:14 20:18 24:21
32:17,18 33:18 35:9
35:14 36:24 56:10
63:19 79:5 84:25
85:13,25 86:3 104:16
104:25 109:6 117:2
understanding 5:16
13:23 17:16 18:8
57:19 61:10 62:25
63:13 64:7
understood 7:14,20
35:18 62:18 73:25
unhooked 81:5 83:8
unit 43:10 48:4
unlocks 78:21
unprofessional 114:24
Unreportable 32:23
upper 62:4 63:11 64:14
64:23 66:15 69:18
85:21
upset 40:14 81:19 83:6
upward 66:3
Usdceast@hubslaw.c...
3:6
use 7:4 8:19 17:19 18:11
24:4 26:8,14 34:6,16
40:10,17,19 41:25
42:20,25 51:3,11,19
51:19,22 52:2 53:13
53:18,23 54:2,13,17
54:23 55:11,25 56:1
61:12,19 63:14 66:25
69:23 78:9 82:20,21
83:2,4 86:1,6,15,19
92:21 96:19 99:25
108:8 116:14,24 117:1
117:22 120:17
usual 95:18
usually 95:24

## V

Vacaville 14:11,12 40:1
42:3,21 103:25 104:10

vague 11:16 12:18 27:6
32:11 35:6 36:22 39:1
52:8,17 56:22 73:17
74:12 87:9 91:24
92:25 94:24 101:7
vaguely 116:25
value 111:24
various 20:15 21:12 34:2
84:14 89:12 103:10
verbal 83:16,19,23 84:8
verbatim 81:23
verification 24:11 25:2,4
verified 31:1
verify 24:14
vertebras 114:6
viable 19:4
violation 112:5
visit 95:11 98:24 99:5
visit/evaluation 95:11
vital 90:18
vocational 16:9
voice 39:19 40:20,20
vs 1:7 2:7

## W

w/c 86:3
waist 71:20,21 72:8
wait 25:24,24 99:18
101:12,12,12
waking 99:22
walkie-talkie 76:5
wall 38:15,16
want 12:2,3,6 17:7,10
23:11,16 24:19 25:15
25:18 32:6 36:13 41:6
49:14 61:15,17,17
66:25 67:9,13 85:5,6
86:24 87:3 89:13
111:12,20 117:8,22
120:11 121:3,4
wanted 39:4 41:3,8
42:14 80:15 81:21
115:3 117:2
wanting 53:18 54:8,17
55:11
war 80:4
wasn't 28:3,4 35:16
40:12 52:23 53:6,7
54:4 71:4 116:10,18
watch 41:1 47:3,4,5 48:5
48:5 51:6,6,7,8 115:5
watching 38:9 40:23
way 7:13 15:6 17:7,13
29:24 30:2 32:17 37:5
38:8,20,20,21,23
39:15,16,19 40:11
41:5 42:9,10,10 48:22
49:5,7,8 50:9,10 60:12
61:4,6,11,12 62:17,25
63:13 64:8,19 65:24
67:16,18 68:17 69:23
74:20 80:15 88:12
91:22 104:15,17,19
112:11 113:7,8,12
114:25 116:9 118:4
we'll 8:22 9:3 32:19 58:8
69:16 94:10

we're 13:14 88:14,15
weakness 92:19,20
Wednesday 2:15
week 31:8 96:4 116:17
117:25
weighs 86:6,19
weight 95:22 96:2 97:10
went 21:24 22:3 29:21
48:21 62:24 89:25
102:4 108:2 110:8
112:4,8,12,19 116:21
117:4
whatnot 21:15 29:11
105:8 108:3 112:16
115:23 116:1
wheelchair 20:25 21:3,8
22:4 23:6 34:12 42:18
42:23 43:6 45:3,12,13
45:14,19,19 51:14,15
57:22,23 69:20 75:9
78:14 86:3,16 95:15
95:18 115:8,10
wheelchairs 22:16
whichever 24:16
white 39:24
wide 58:12
WILLIAM 1:5,16 2:5,14
3:2 4:2 5:1 122:23
Williamsburg 3:4
withdraw 7:13
witness 4:2,13,14,15 5:4
5:23 10:10 14:17 18:5
18:14,19 19:7,20,23
20:19 23:1,25 24:20
27:8 28:3,15,22 30:18
32:16 33:11,15,19
35:9,13 36:13 39:4,7
41:23 48:14 49:13,18
49:20 52:10,19 56:11
56:16,24 58:22 59:1,4
59:22 60:8 62:3,9 68:7
68:22 73:19 74:14
77:24 78:3 82:18
86:24 87:3,18 88:3,18
89:15,19 91:13 92:2
93:2,8 95:1 96:17 97:1
97:19 100:6 101:8
103:5,14 105:16
107:10,17,22 109:20
110:19 111:2 112:4
123:8,9
women 48:22
wondering 29:18
word 39:17 85:4,6,9
86:16 93:5
words 6:24 7:5,7 8:5
83:5
work 28:23 109:22
worked 16:17
workers 22:24 23:3,5
working 42:16 43:10
44:13 48:8,21 51:8
79:13 113:15
works 51:8 117:12
worse 92:17 113:22
wouldn't 23:9 42:17
44:10,23 70:21 73:5
75:11,15 76:25 83:11

90:5 113:2
**wrap** 56:17,20,24
**wraps** 56:18
**writing** 33:3 85:13,22
86:1,9 89:4 93:5
**written** 7:4 25:19 29:6
87:23 88:7,24
**wrong** 75:21 91:19
**wrote** 29:13,13 31:11
107:3
**www.depo.com** 1:24

---

**X**

**X** 4:1,7

---

**Y**

**yard** 22:16
**yeah** 10:10,15 11:22
13:18 16:22 18:23
30:18,18 41:23 42:10
45:21 46:12 47:3,8
49:18 55:13 56:11
57:8 69:3,20,24 71:24
72:23 83:4 85:4 90:5
90:13 91:13 117:20
119:4,4
**year** 19:17,21 114:1
**years** 5:11,25 8:3
**yell** 51:25 79:14
**yelling** 79:17
**yes-or-no** 93:7
**yes/no** 7:7
**yesterday** 99:6

---

**Z**

---

**0**

---

**1**

**1** 4:8 23:15,19 95:5 97:3
111:23,25 113:16,18
**10** 96:3
**10-minute** 8:19
**10/10** 96:4 99:13
**10:00** 92:10 115:6
**10:26** 2:15
**10:30** 89:3 90:1,3 96:10
**105** 38:10 41:3
**108** 41:4,14
**11** 98:16
**115** 112:5
**12** 3:4
**125** 3:9
**12957** 1:24 2:16 123:4
123:24
**13** 109:8 111:14,18
**1300** 3:9
**1330** 98:18
**14** 84:13 98:17
**15** 8:17,23 26:5,9 90:20
91:16,20 114:5
**16th** 123:22
**18** 114:5
**1800** 84:25,25 85:7,9,19
87:24
**1830** 90:20 91:16,21,23
**1930** 90:14

**1990** 104:6
**1990s** 103:20

---

**2**

**2** 4:9 23:16,19 24:9,24
25:8,8 26:5,5 28:6,18
29:5 30:22 31:2,13,22
33:14 34:4,9 35:3
**2:00** 115:5,6,6
**2:16-cv-03008** 1:7 2:7
**20** 26:6 122:16
**20-year** 13:24
**2005** 13:24 14:19 15:1
**2013** 43:9 103:25 104:9
**2015** 2:15 5:15 16:19,24
18:11 19:14,16 23:5
36:16 37:18 39:12
40:9 41:24 43:1,4,15
43:19,22 50:13 51:3
52:5 55:20 65:4 80:9
84:15,15,24 87:7,15
87:19 92:11,23 95:3
96:9,14 97:15 98:18
98:22 100:21 101:2
103:11,19 104:21
105:4 108:23 110:7
114:8 118:10,16,23
120:22
**2018** 1:18 114:2 120:22
123:22
**2030** 89:1,2 91:18
**210-7320** 3:11
**2130** 97:3
**21st** 95:17 103:24 104:9
104:21
**227** 86:7,19
**23** 4:8,9
**24th** 95:17 104:21
**288-3376** 1:23
**28th** 19:16
**29** 19:20,23
**2nd** 84:14 95:3 96:9,19
97:15

---

**3**

**3** 1:18 2:15 4:10 27:15
33:21,24 34:7,13
41:24 103:21
**3-15** 27:15 85:18
**3-2-15** 97:3
**3/2/2015** 4:12
**3/26/19** 99:5
**3:03** 121:6
**33** 4:10
**33-D** 26:19 27:23,24
109:12
**3rd** 5:15 18:11 19:1,14
20:1,5 36:16 37:18
38:3 39:12 40:9,18
43:1,4,9,13,15,19,22
44:4 45:8,17 46:9,14
46:20,23 47:6,10
48:11 50:13 51:3 57:9
57:23 58:17 61:14
65:4 73:14 80:9,19
84:24 92:11,23 96:13
100:24 101:2,10,14,22
102:4,9,24,25 103:10

108:22 109:3 113:25
114:8 116:14,14,16
117:16,23,23 118:10
118:16,19,23 119:6
120:22

---

**4**

**4** 4:12 26:1 84:11,12
94:15 95:6 96:24
105:18
**4:30** 88:14
**49-year** 92:12
**4th** 84:15 98:18,22 100:4
100:21

---

**5**

**5** 4:4,13 8:18 59:2,3 96:4
96:24 103:17 105:18
105:24 106:16,18
108:7 109:1,1 113:18
**5-10** 94:10
**530** 3:5
**59** 4:13,14
**5th** 84:14

---

**6**

**6** 4:14 59:7,8 62:16
84:23 85:21 91:9 96:3
**6-8/10** 99:14
**6:00** 85:1,7,9 87:23 88:7
89:7,7,20,22,23 90:4
**6:15** 89:5,6
**602** 12:9,11,14 13:1
26:20 27:24 28:6,19
28:25 34:24 109:9,14
110:11,14
**602's** 98:7 109:14,25
111:8,15,19
**61** 4:15

---

**7**

**7** 4:15 61:20,21 65:2
92:9 99:13 110:7
**7707** 2:14

---

**8**

**8** 94:15
**8.5/10** 99:13
**8:30** 106:12
**800** 1:23
**84** 4:12
**895-3252** 3:5

---

**9**

**9** 103:16 104:13 105:10
**9:00** 106:14
**916** 3:11
**94244-2550** 3:10
**944255** 3:10
**95215** 2:15
**95926** 3:5

Exhibit 2



# Golvo™

## Instruction Guide

English
7EN140102-03
2009-07-03

**Applies to the following models:**
Golvo 7000 ES    Prod. No. 2000009
Golvo 7007 ES    Prod. No. 2000010
Golvo 7007 LowBase™    Prod. No. 2000061





Golvo 7000 ES/7007 ES                    Golvo 7007 LowBase™

# Product Description

Golvo is an electrically powered mobile lift, i.e., both raising and lowering of the lift arm and width adjustment of the base are done with electric motors.

To ensure maximum safety for caregivers and patients, Golvo is equipped for both mechanical and electrical emergency lowering. All Golvo lifts are equipped with convenient armrests, to assist both the caregiver and the patient. If needed, the armrests can be folded down into a support position.

Golvo is also available in a design with an extra low base; Golvo LowBase™. This model is recommended

for lifting to and from beds/barrack-beds that have a ground clearance of 58-110 mm (2.28-4.3 inch.).

Golvo can be used in most lifting situations: for example, between bed/wheelchair, to/from the toilet, in bath and shower, to/from the floor, for weighing patients and for horizontal lifting.

A comprehensive range of accessories are available for Golvo, including sling bars of different widths, slings in many sizes and fabrics, and accessories for ambulation/gait training, static weight-bearing, weighing patients, and for emergency room use and horizontal lifting, etc.

*In this document, the person being lifted is called the "patient" and the person helping is called the "caregiver".*

△ **are triangles used to warn of situations that demand extra care and attention.**

> 🛈 **IMPORTANT!**
> Carefully read these instructions and the instructions for the particular lifting accessory being used. Lifting and transferring patients always presents a potential risk. It is essential to thoroughly understand the content of these manuals, and that only trained persons use the equipment. If you have questions, please contact Liko or your local Liko representative.

# Table of Contents

Safety Instructions ....................................................................................... 2

Definitions..................................................................................................... 3

Technical Data .............................................................................................. 3

Measurements.............................................................................................. 4

Assembly ...................................................................................................5-6

Disassembly ................................................................................................. 7

Operation...................................................................................................8-10

Transfers from Bed ...................................................................................... 10

Charging the Batteries................................................................................. 11

Maximum Load ............................................................................................ 12

Recommended Lifting Accessories .......................................................12-14

Simple Troubleshooting .............................................................................. 15

Care and Maintenance ............................................................................... 16

△ **NOTE!** This instruction guide contains information that is important for users of the product. A complete under-standing of the contents of the instruction guide is essential, and only personnel who are well informed should use the equipment. Remember to keep the instruction guide readily accessible for users of the product.

# Safety Instructions

**Before using the lift for the first time, make certain that:**

• the lift is assembled according to the instructions
• the lifting equipment is correctly applied to the lift
• the batteries have been charged for at least 6 hours
• you have read the instruction guides for the lift and lifting accessories
• personnel using the equipment have received appropriate instructions and training.

**Before lifting always make certain that:**

• the lift strap is not twisted or worn and that it can move freely in and out of the lift unit
• you have selected the correct type, size, material, and design of slings and accessories to safely meet the patient's needs
• lifting accessories are not damaged
• the lifting accessory is correctly applied to the lifting equipment
• the lifting accessory is correctly and securely applied to the patient, so that no personal injury can occur
• the sling's strap loops are correctly fastened to the slingbar hooks when the sling strap is extended, but before the patient is lifted from the underlying surface.

△ **Never leave a patient unattended in a lifting situation!**

  

Golvo 7000 ES/7007 ES/7007 LowBase are tested by an accredited testing institute and comply with the require-ments of the directives for medical-technical Class 1 products (MDD 93/42/EEC).

Golvo 7000 ES/7007 ES/7007 LowBase comply with the requirements according to IEC 60601-1, IEC 60601-1-2, EN ISO 10535, UL-60601-1 and CAN/CSA C22.2 No. 606.1.

Particular care must be taken when using strong sources of electromagnetic interference, such as diathermy, etc, so that cables are not positioned on or near the lift. If you have questions, please consult the responsible assis-tive-device technician or the supplier.

This equipment is not suitable for use in the presence of flammable mixtures.

**Maximum load: 200 kg (440 lbs.)**

# Definitions

## Golvo 7000 ES / 7007 ES



## Golvo 7007 LowBase™



1. Lift strap
2. Sling bar with safety latches
3. Parking bracket for sling bar
4. Foldable armrest
5. Mast with built-in motor for lifting
6. Base
7. Front wheel
8. Rear wheel with brake
9. Motor for base-width adjustment
10. Control box with emergency stop, built-in charger and electrical emergency lowering/ raising
11. Battery box
12. Hand control
13. Manoeuvering handles
14. Emergency lowering (mechanical)
15. Product decal
16. Lift arm

# Technical Data

**Lifting speed:** Two speed levels: 4.8 cm/s (1.9 inch./s) and 3.2 cm/s (1.3 inch./s); both speed levels without load.

**Batteries:** Two 2.9 Ah, 12 V, valve-regulated lead-acid gel type batteries. New batteries are available from supplier.

**Battery charger:** Built-in charger for 100-240 V AC, 50-60 Hz, max 400 mA.

**Lift motor:** 24 V, 6.5 A. Manufactured by Liko with planetary gearing and safety nut (prevents excessive wear).

**Motor for width adjustment:** 24 V, 3.5 A. Geared motor.

**Wheels:** Standard front: 75 mm twin wheels. Standard rear: 75 mm lockable twin-wheels.

**Material:** Anodized aluminium.

**Emergency lowering:** Mechanical and electrical.

**Intermittent operation:** Int. Op 10/90, active operation max 2 min. Out of a time of 100, active must be less than 10, however not more than 2 min.

**Degree of protection:** IP 43

**Sound level:** 53 dB

This device is built for indoor operation.

 Type B according to the degree of protection against electric shock.

Class II equipment.

*Patented*

# Measurements

## Golvo 7000 ES/7007 ES



## Golvo 7007 LowBase™



**Maximum load and weight in kg. Measurement in mm.**

| Model | Wheel diameter | Max. load | L Max | A Max | A Min | B | B¹ | B² | B³ | C | D | E | F | G | H | H₁ | H₂ | Weight | Turning diameter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Golvo 7000 ES | 75/75 | 200 | 1750 | 1990 | 1340 | 540 | 1120 | - | - | 670-950 | 530-810 | 960 | 840 | 600 | 110 | 23 | | 42 | 1240 |
| Golvo 7007 ES | 75/75 | 200 | 1850 | 2080 | 1440 | 580 | 1190 | - | - | 750-1020 | 620-900 | 1060 | 940 | 600 | 110 | 23 | | 44 | 1330 |
| Golvo 7007 LowBase™ | 46/75 | 200 | 1850 | 2080 | 1440 | 580 | 1190 | 590 | 600 | 750-1020 | 620-900 | 1060 | 940 | 600 | 110 | 20 | 60 | 46 | 1330 |

*Lifting range (1260 mm) is adjustable. See page 9.*

**Maximum load and weight in lbs. Measurement in inches.**

| Model | Wheel-diameter | Max. load | L Max | A Max | A Min | B | B₁ | B₂ | B₃ | C | D | E | F | G | H | H₁ | H₂ | Weight | Turning diameter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Golvo 7000 ES | 2.96/2.96 | 440 | 69 | 78 | 53 | 21 | 44 | - | - | 26-38 | 21-32 | 38 | 33 | 24 | 4.3 | 1 | | 93 | 49 |
| Golvo 7007 ES | 2.96/2.96 | 440 | 73 | 82 | 57 | 23 | 47 | - | - | 30-40 | 24-35 | 42 | 37 | 24 | 4.3 | 1 | - | 97 | 52 |
| Golvo 7007 LowBase™ | 1.8/2.96 | 440 | 73 | 82 | 57 | 23 | 47 | 23.2 | 23.6 | 30-40 | 24-35 | 42 | 37 | 24 | 4.3 | 0.8 | 2.4 | 101 | 52 |

*Lifting range (49.6 inches) is adjustable. See page 9.*

# Assembly

**Before assembly, make sure you have the following parts and tools:**

- mast with lift arm, motor for lift arm, control box and sling bar with bolt and locking nut (M8)
- armrest
- base including motor for base width adjustment
- battery box, including holder for charger cable
- hand control with cable

- bag containing instruction guide, tag marked "Emergency lowering", charger cable and extension cable
- two M6 screws
- tools: Wrench: 17 mm
  Allen wrench: 4, 5 and 6 mm

△ **Lock the wheels before you begin assembling the lift.**



1. Start by unscrewing the transport safety plate (metal plate) at the lower edge of the mast. Then throw away the safety plate, the screws and the red information sticker attached to the safety plate.

A) Place the mast on the center beam of the base, between the two black plastic caps.

B) Push the mast forward as shown in the illustration above until it snaps onto the center beam.

2. Secure the mast with two M6 screws (enclosed) in the upper holes on the mast.

   **NOTE! Do not place any screws in the lower holes!**




3. A) Place the armrest unit in the bracket on the mast, inserting it into the lower track first.

   B) Lower the armrest unit, pressing on it until it snaps onto the upper track. Note that none of the premounted M8 screws should be completely unscrewed, although you may need to loosen some of them.

4. Secure the armrest by tightening the two pre-mounted M8 screws.



5. Assemble the sling bar (or other accessory) using M8 screws and locking nut (enclosed). Make certain to turn the screws 2 mm (0.08 inch.) past the lock function on the nut. Do not tighten so much that the sling bar connector cannot move in relation to the locking plate.

6. Connect the cables to the control box as follows:
   - Cable for hand control to socket number 1.
   - Cable for lift motor to socket number 2.
   - Cable for base motor to socket number 3.



7. A) Connect the extension cable for the charger cable to the control box.
   B) Insert it in the tension clip on the underside of the control box.
   C) Finally, connect the charger cable to the extension cable.

8. Place the battery in its holder above the control box. Check that the battery locks into the holder (audible click).



9. Mount the holder for the charger cable. Hook it on the outer edge and press down until you hear a 'click'.

10. Reset the emergency stop by turning the button in the direction indicated by the arrows.

11. Press the tag marked "Emergency" securely into place on the emergency lowering device.

**After assembly, check to ensure that:**

- the lifting motions correspond with the buttons on the handcontrol
- the emergency lowering works properly (mechanical and electrical)
- wheel brakes work properly
- the width adjustment of the base works properly
- the indicator lamps on the front of the control box light during charging.

# Disassembly

1. Start by loosening the sling bar or other accessory mounted on the lift.

2. Loosen the armrest holder as described below:



A. Loosen both of the M8 screws on each side of the mast.

B. Remove the armrest holder by using two screwdrivers.

3. Release cables for the hand control, the lift motor and the motor for base adjustment.

4. Remove the mast:

△ **When the mast is free from the base it must be supported so it does not fall.**



A. Remove both of the safety screws from the upper holes on the mast.

B. Screw in the safety screws in the lower holes on the mast. This releases the mast from the base and it can now be taken down.

# Operation



## Operation

Operate the lift using the pushbuttons on the hand control.

For raising and lowering, press either of the two upper pushbuttons. The direction in which the arrows are pointing applies when the hand control is held as shown in the illustration. The thicker sets of arrows refer to the maximum lifting speed. The thinner arrows refer to the lower lifting speed. The lifting motion ends as soon as the push button is released.

For base-width adjustment, press either of the two lower push-buttons:

ᵂ Wider

ᵘ Narrower.

## Emergency stop

**To activate**
Press in the red button on the control box.

**To reset**
Turn the button in the direction of the arrows.

## Electrical emergency lowering/raising

For electrical emergency lowering/raising, use a thin object and press into the hole marked "Emergency" on the control box.

△ **The object used to press must not be too sharp since this might cause damage to the control box!**

## Mechanical emergency lowering

1. Emergency lowering should always take place over a bed, wheelchair, or other appropriate place.

2. To operate, pull down the handle marked "Emergency Lowering" and then release the handle upward. Continue pumping the handle until the patient in the lift is on a stable surface. Press down on the sling bar and continue to pump the handle down and up until the sling bar is low enough to permit the sling's strap loops to be unhooked.

## Locking the wheels

The rear wheels can be locked for rotation and lateral movement. To lock the wheels, press down the brake lever with your foot. To release the brakes, press up the brake lever with your foot.

During lifting, wheels should remain unlocked so that the lift may shift to the patient's center of gravity. The wheels should, however, be locked if there is a risk for the lift moving into the patient, for example when lifting from the floor.

△ **Locked wheels during lifting increases the risk of the lift tilting over.**

△ **CAUTION! Due to the risk for injury, never use your hands to lock the foot brake!**



## Setting the lifting range

If you need to move the sling bar closer to the floor, you can do this by using the mechanical lowering device to extend the lift strap. Do not extend the lift strap more than necessary since this also influences the maximum lifting height. For example, when lifting a patient from the floor it may be necessary to lower the lifting range if the sling's strap loops do not reach the hooks of the sling bar even when the lift arm is in its lowest position.

**Do the following:** Hold down the red emergency lowering handle while simultaneously pulling down the sling bar with the other hand. This extends the lift strap and lowers the sling bar. Continue until you achieve the needed length.

## After mechanical lowering / Resetting the lifting range

If you extend the lift strap while testing/using the emergency lowering function, the height of the lifting range is lowered. To reset the maximum lifting height, you must re-establish the original length of the lift strap.

**Do the following:**

1. Unweight the lift strap above the emergency lowering device by placing the sling bar on the lift mast or by having another person holding up the sling bar to keep the lift strap slack.

2. Move the emergency lowering handle down and up with one hand, while turning the black knob clockwise (tightening the lift strap) with your other hand. Repeat the action until the red mark on the lift strap is slightly above the emergency lowering device.

## Armrest

If needed, the armrests can be folded down into a support position. The armrests have two functions: to give the patient a greater sense of security and to make it easier for the caregiver to move the lift.

△ **CAUTION! When moving a patient in the lift between different rooms, the armrests should be placed in the support position!**



**Parking the sling bar**
When the lift is not being used, or when moving an empty lift, the sling bar can be placed in the parking bracket.

The parking bracket is intended for use with Universal SlingBar 350, 450 and 600 (all models).

△ **Important when using the parking position:**
Never raise the lift arm while the sling bar is parked in the parking bracket since this might cause personal injury or damage on the lift if the sling bar suddenly releases from the hook and swings forward.

# Transfers from a bed

Always make certain that the lift strap is vertical and parallel to the mast. To achieve this, Golvo should be placed correctly under the bed. Adjust the width and/or change the position of Golvo in relation to the base of the bed to achieve the correct position.



Check that the lift strap is vertical during the lift.

Do not start the lift unless the sling bar is well balanced. An unbalanced load leads to wear and tear on the lift strap. It may also cause instability of the lift during the lift motion.

△ **An unbalanced load increases the risk of the lift tilting over!**

# Charging the batteries

For maximum battery life, batteries must be charged regularly. We recommend charging after use or each night. Maximum charge is reached after about 6 hours. When the batteries are fully charged, the charger disconnects automatically. **NOTE! A yellow indicator lamp on the control unit lights constantly during charging. When the batteries are fully charged, the yellow lamp shuts off. If this lamp continues to light after 8 hours, the batteries probably need to be replaced. Discontinue charging and replace batteries.**

**Never charge batteries in a wet area!**

If the lift is not in daily use, we recommend that the emergency stop be pressed in after the lift has been used. This breaks the current and conserves battery power. Make sure the lift is fully charged before pressing in the emergency stop.

**Battery capacity**

If the battery needs charging, a beep tone will sound and a lamp (A) is lit on the handcontrol. There is, however, enough power left in the battery for a few more lifts.

A display on the control box shows the current battery capacity. When all fields of the display are black, the battery is fully charged. When a plug symbol appears (see illustration), the battery must be re-charged immediately.



## Alternative charging procedures



**With built-in charger:**

Plug the charger cable into a power socket (100-240 V AC). Check that the yellow lamp on the control box lights (indicates charging).

If the charger cable is stretched out it should be replaced to avoid the risk of the cable getting caught and tear.

**With wallmounted charger or table charger housing:**

Loosen the holder for the charger cable. Remove the battery box from the control box by loosening the locking device on top of the battery box.

**Alt. A**. Place the battery box on the wallmounted charger. Check that the charger is plugged into the power socket (100-240 V AC) and that the yellow lamp on the front of the charger lights (indicates charging).

**Alt. B**. Place the battery box on the charger in the table charger housing. Check that the charger is plugged into the power socket (100-240 V AC) and that the yellow lamp on the front of the charger lights (indicates charging).

**Note! The lift does not operate when the charger cable is plugged into a power socket.**

 Old batteries are to be left at the nearest recycling station or given to personnel authorized by Liko.

# Maximum Load

Different maximum allowable loads may apply to different products on the assembled lift system: lift, sling bar, sling and other accessories. For the total lift system, the lowest max. allowable load indicated for the respective products on the system always applies. For example: A Golvo that is approved for 200 kg (440 lbs.) may be equipped with a lifting accessory that is approved for 300 kg (660 lbs.). In this case, the applicable max. load is 200 kg (440 lbs.) for the total lift system. Study markings on the lift and lifting accessories or contact your Liko representative if you have any questions.

# Recommended Lifting Accessories

△ **Using other lifting accessories than those recommended below may induce risk.**

Sling bars and accessories recommended for use with Golvo are described below.

Changing sling bars and adding extra accessories affects the maximum lifting height of the lift. Before changing sling bars and accessories, it is important to ensure that it will still be possible to achieve the desired lifting height for situations in which the lift will be used.

For choice of appropriate slings and other lifting accessories, see e.g., the brochure  "Lifting accessories". For further guidance on choosing a sling, consult the instruction guide for the respective sling model. Here you will find advice on suitable combinations of Liko sling bars and Liko slings.

Contact your Liko representative or visit www.liko.com for advice and information on Liko's product range.

| | | |
|---|---|---|
| **SlingBar Mini 220**<br>Max 205 kg / 450 lbs. | Prod. No. 3156005 |  |
| **Universal SlingBar 350**<br>Max 300 kg / 660 lbs. | Prod. No. 3156074 |  |
| **Universal SlingBar 450**<br>(Standard for Viking L)<br>Max 300 kg / 660 lbs. | Prod. No. 3156075 |  |
| **Universal SlingBar 600**<br>Max 300 kg / 660 lbs. | Prod. No. 3156076 |  |
| **Universal TwinBar 670**<br>Max 300 kg / 660 lbs. | Prod. No. 3156077 |  |
| **Sling SideBars 450**<br>**incl. storage bag**<br>Max 300 kg / 660 lbs. | Prod. No. 3156079 |  |
| **Sling Cross-bar 450**<br>Max 300 kg / 660 lbs. | Prod. No. 3156021 |  |
| **Sling Cross-bar 670**<br>Max 300 kg / 660 lbs. | Prod. No. 3156018 |  |

**SlingBar Cover Paddy 30**    Prod. No. 3607001

(fits Universal SlingBar 350, 450 and 600
and SlingBar Slim 350)



**Bag for SlingBars**    Prod. No. 2001025



**Golvo 7007 LowBase Kit**    Prod. No. 20090071

This reconstruction kit enables the lift to be adapted to beds
/barrack-beds with a very low ground clearance, 58-110 mm
(2.28-4.3 inch.).

Contact Liko for more informtion.



**Quick-release Hook**

Liko's Quick-release Hook system enables quick and easy
exchange of lifting accessories on Liko's mobile and stationary
lifts. Golvo requires Q-link for use with Quick-release Hook.

Quick-release Hook Universal fits Universal SlingBar 350,
450 and 600 (Prod. No. 3156074-3156076). Quick-release
Hook TDM fits Sling Cross-bar 450 and 670 (Prod. No.
3156021 and 3156018) and Universal TwinBar 670 (Prod. No.
3156077).

When a sling bar mounted with the Quick-release Hook
system is used, the lifting height will be 33 mm (1.3 inch.)
shorter than with a permanently mounted sling bar.

See "Guide to Liko´s Quick-release Hook System", which can
be downloaded from our website, www.liko.com, or contact
Liko for more information on the advantages and use of the
Quick-release Hook system.



**Quick-release Hook
Universal**
Prod. No. 3156508



**Quick-release Hook
TDM**
Prod. No. 3156502



**Q-link**
Prod. No. 3156509

**Standaid Set**    Prod. No. 2001020

For patients with sufficient body stability, the Standaid Set can
be used for shorter transfers, for example between a wheel-
chair and a toilet, or between a bed and a wheelchair. The
patient is lifted to a semi-standing position with the help of
SafetyVest or the SupportVest, behind the back and under the
arms.



**Stretchers**

Most Liko stretcher models can be used in combination
with Golvo.

Contact Liko for more information.



**Liko OctoStretch**
Prod. No. 3156055



**Scale**

In need of weighing patients in combination with Golvo, we recommend LikoScale 350. Max. load 350 kg (770 lbs.).

LikoScale 350 is certified according to the european directive NAWI 90/384 (Non Automatic Weighing Instruments).

Contact Liko for more information.



**Support Springs**

Elastic springs enable a gentler springing motion, which makes activities such as gait training easier and more natural. Springs are available in three different designs:

Long, max. 70 kg (154 lbs.)/pair          Prod. No. 3166511
Short, max. 70 kg (154 lbs.)/pair         Prod. No. 3166512
Short, max. 100 kg (220 lbs.)/pair        Prod. No. 3156513.

For more information, see instruction guide for Liko MasterVest, mod. 60, 64, or Liko Lift Pants, mod. 92.



**Leg Protector**

Leg Protector Set Golvo 7000, grey         Prod. No. 2006011G
Leg Protector Set Golvo 7007, grey         Prod. No. 2006012G



**Extra Battery Box**                      Prod. No. 2006106



**Charger for Extra Battery**              Prod. No. 2004106
for wall mounting or for use with Table Charger Housing



**Table Charger Housing**                  Prod. No. 2107103
**excl. battery box and charger**
a table charger housing for the charger when you do not wish to mount the charger on the wall.



# Simple Troubleshooting

| | |
|---|---|
| **The lift does not work up/down. Base-width adjustment does not work.** |  |

1. Check that the emergency stop button is not pushed in (page 8).
2. Check that the cables to the control box are correctly connected (page 6).
3. Check that the charger cable is not connected to the power socket.
4. Check that the battery is charged (page 11).
5. Check that the contact plates of the battery are not defective or broken off.
6. *If the lift still does not work satisfactory contact Liko.*

| | |
|---|---|
| **Battery charging does not work.** |  |

1. Check that the emergency stop button is not pushed in (page 8).
2. Check to ensure that the power socket is power-supplied.
3. Check that the charger cable is correctly connected (pages 6 & 11).
4. Check that the contact plates of the battery are not defective or broken off.
5. *If the lift still does not work satisfactory contact Liko.*

| | |
|---|---|
| **The lift stops in the elevated position.** |  |

1. Check that the emergency stop button is not pushed in (page 8).
2. Use the electrical emergency lowering to safely lower the patient (see page 8).
3. Use the mechanical emergency lowering to safely lower the patient (page 8).
4. Check that the battery is charged (page 11).
5. *If the lift still does not work satisfactory contact Liko.*

| | |
|---|---|
| **The lift does not reach its maximum lifting height.** |  |

1. Check that the correct lifting range has been set (page 9).
2. *If the lift still does not work satisfactory contact Liko.*

| | |
|---|---|
| **If you hear unusual sounds or discover wear and tear on the strap.** |  |

*Contact Liko.*

# Care and Maintenance

**Care and inspection**

For safe and troublefree operation, a few routine procedures should be performed every day the lift is used.

• Visually inspect the lift and check for external damage or wear
• Check the sling bar connector
• Check the lift strap for wear and make sure it is not twisted
• Check that the safety latches work properly
• Test the operation of raising and lowering and the base-width adjustment function
• Check that the correct lifting range has been set and that the emergency lowering works properly
• Charge the battery every day the lift is being used, and check the charger function

When necessary, clean the lift with a moist cloth, using common surface cleaners or disinfectants. **NOTE! Do not use cleaning products that contain phenol or chlorine, since these can eventually damage aluminum and polyamide material.**
△ **The lift must not be exposed to running water.**

**Service**

Golvo must be inspected at least once per year. Pay particular attention to parts that are subject to wear.
△ **Repairs and maintenance may only be carried out according to Liko service manual, by personnel authorized by Liko and using original Liko spare parts.**

**Service agreements**

Liko invites you to sign a service agreement for regular maintenance and testing of your Liko products. Contact your local Liko representative for more information.

**Transportation and storage**

During transportation, or when the patient lift is not to be used for some time, the emergency stop button should be pushed in. The environment where the patient lift is transported and stored should have a temperature between 10 ˚C and 40 ˚C and a humidity between 30 % and 75 %. The air pressure should be between 700 and 1060 hPa.

**Recycling**

For instructions on how your Liko product should be recycled, please visit our website www.liko.com.

**Product changes**

Liko's products are constantly being updated and refined. Liko reserves the right to change aspects of the products without prior notice. Contact your local Liko representative for updated information and advice.

**Design and Quality by Liko in Sweden**

*Liko is quality certified according to ISO 9001 and its equivalence for the medical device industry, ISO 13485. Liko is also certified according to environmental standard ISO 14001.*

© Copyright Liko AB 2009-07



www.liko.com

**Manufacturer:**
Liko AB
SE-975 92 Luleå
Sweden
info@liko.se

Exhibit 3



| VOLUME 5: NURSING SERVICES | Effective Date: 04/2018 |
|---|---|
| CHAPTER 20 | Revision Date: |
| 5.20.2 NURSING SCOPE OF SERVICE PROCEDURE | Attachments: Yes ☐ No ☒ |

## I. PROCEDURE OVERVIEW

This procedure outlines the California Correctional Health Care Services (CCHCS) scope of nursing services which are provided pursuant to the California Nurse Practice Act; California Code of Regulations (CCR), Title 22; Joint Commission standards; American Nurses Association standards; and other regulatory agencies and professional standards.

## II. DEFINITIONS

**Nursing Care:** Nursing care is delivered to patients within the frame work of the Complete Care Model in the correctional setting and delegated by licensed Registered Nurses (RN) to patients at CCHCS. Nursing care is the result of the nursing process and is directed toward assisting the patient to maintain or regain a maximum level of health, accept reduced capabilities, or cope with terminal illness and death.

**Nursing Practice:** The practice of nursing is defined as treatment of human response to health problems, through utilization of the nursing process. The performance of these acts requires specialized knowledge, judgment and skills based upon principles of psychological, social, physical and biological sciences and utilization of the nursing process. Nursing is both an art and a science.

## III. RESPONSIBILITIES

The Statewide Chief Nurse Executive (CNE) is responsible for statewide implementation, of this procedure, and the regional and institutional CNEs are responsible for the local implementation, monitoring, and evaluation of this procedure at their assigned institution(s).

## IV. PROCEDURE

### A. Scope of Nursing Services

1. The practice of nursing by the RN means assuming accountability and responsibility for delivering care as defined by the California Nurse Practice Act and by professional standards.

2. The practice of nursing by the Licensed Vocational Nurse (LVN) means the assumption of responsibilities, duties, and performance of care within the scope of the LVN license as defined in the Business and Professions Code and CCR, Title 16, within their educational background, delegated by and under the supervision of the RN. These nursing activities include, but are not limited to:

   a. Performing basic assessment/data collection (e.g., obtaining patient histories).
   b. Communicating findings to the RN or a higher licensure.
   c. Following and contributing to the interdisciplinary plan of care.
   d. Providing patient education.
   e. Providing patient interventions (e.g., dressing changes, emergency response, medication management, phlebotomy, and skin tests).

3. The practice of nursing by the Psychiatric Technician (PT) means the assumption of responsibilities, duties, and performance of care within the scope of the PT license as defined in the Business and Professions Code and CCR, Title 16, within their educational background, delegated by and under the supervision of the RN. These nursing activities include, but are not limited to:
   a. Performing basic assessment/data collection (e.g., obtaining patient histories).
   b. Communicating findings to the RN or a higher licensure.
   c. Following and contributing to the interdisciplinary plan of care.
   d. Providing patient education.
   e. Providing patient interventions (e.g., group therapy, emergency response, medication management, and skin tests).

4. The practice of nursing by the Medical Technical Assistant (MTA) means the assumption, duties, and performance of care within the scope of their nursing license as defined in the Business and Professions Code and CCR, Title 16, within their educational background, delegated by and under the supervision of the RN. This civil service classification requires a nursing license such as an LVN or PT license. The scope of services provided by the MTA shall be consistent with the level of their licensure by the State of California.

5. The practice of nursing by the Certified Nursing Assistant (CNA) means the assumption of responsibilities, duties, and performance of care within the scope of the CNA certificate as defined by Health and Safety Code and as outlined by the California Department of Public Health, Professional Certification Branch; within their educational background; delegated by and under the supervision of a licensed nurse. These nursing activities include, but are not limited to:
   a. Providing personal care and comfort measures.
   b. Performing basic nursing care procedures including, but is not limited to, feeding, vital signs, measuring intake and output, assistance with activities of daily living, toileting assistance, bladder/bowel retraining, application of non-sterile dry dressing to intact skin, application of non-legend ointments, creams, lotions and solutions to intact skin.
   c. Observing patient responses to treatment and or environment.
   d. Reporting changes to a licensed nurse or higher licensure.
   e. Communicating with the patient.

6. The services performed by a Medical Assistant (MA) are not nursing in function; however, the performance of their functions contributes to nursing services MAs are unlicensed individuals who perform non-invasive routine technical support services under the specific authorization (specific written order) and supervision of a licensed Physician and Surgeon, Podiatrist, Physician Assistant, Nurse Practitioner, or Nurse Midwife in a medical office or clinic setting without the need of receiving a certification as outlined under the Medical Practice Act in the Business and Professions Code. These activities include, but are not limited to:
   a. Administering medication by intradermal, subcutaneous, or intramuscular injections.
   b. Performing skin tests but not interpreting the results.
   c. Applying and removing bandages and dressings.
   d. Removing sutures.

    e. Performing ear lavage.

    f. Preparing patients for examinations.

    g. Shaving and disinfecting treatment sites.

    h. Other technical supportive services upon the specific authorization (specific written order) and supervision of a licensed Physician and Surgeon, Podiatrist, Physician Assistant, Nurse Practitioner, or Nurse Midwife.

## B. Structure Services

1. *Primary Care:* CCHCS Primary Nursing Care supports professional nursing practice via a therapeutic relationship established between the nurse and an individual patient within the framework of the Complete Care Model. The relationship is initiated by the nurse and is in effect for the duration of the patient's assignment to the nurse's patient panel or during an episode of care or service.

   a. Primary Nursing Care provides:

      1) Continuity of care for the patient.

      2) Accountability of the nurse for that care.

      3) Patient-centered care that is comprehensive, individualized, coordinated, and contributive to the professional satisfaction of the nurse.

   b. Primary Nursing Care includes, but is not limited to:

      1) Assessment.

      2) Analysis.

      3) Nursing diagnosis.

      4) Planning.

      5) Implementation of interventions, outcome identification, and evaluation of responses.

2. *Care Management and Care Coordination:* CCHCS Nursing Services supports care management and care coordination in collaboration with the patient and other members of the health care team by developing, implementing, and evaluating patient care services and care plans for patient panels to ensure patients receive necessary health care services in a safe, timely, and medically appropriate manner. These together facilitate the appropriate delivery of health care services and minimize care fragmentation by utilizing the nursing care process.

   a. The functions of care management and care coordination include, but are not limited to:

      1) Developing and maintaining positive relationships with patients across all care settings.

      2) Providing comprehensive assessment and reassessment of what patients can or cannot provide for their own care.

      3) Conducting face-to-face visits with ongoing support.

      4) Training and education of patients.

      5) Medical and social service providers.

      6) Co-creating a plan of care with patients that includes goals and targeted dates for completion.

      7) Assisting patients with coordination of services across the continuum of care.

      8) Initiating, maintaining, and leading communication between all members of the health care team including the patient.

9) Using data to support and evaluate cost-effective, patient-centered, high quality services across the continuum of care.

## C. Services Provided

The following is an overview of services provided:

1. *Medication Management:* CCHCS nursing staff provides services including, but is not limited to:

   a. Administering prescribed medications accurately and timely to patients in ambulatory and inpatient settings at standardized times.

   b. Assessing patients.

   c. Monitoring side effects.

   d. Planning care.

   e. Implementation of interventions.

   f. Identify outcomes.

   g. Evaluation of responses.

   h. Patient education.

   i. Communicating with the interdisciplinary care team regarding all aspects of medication continuity and the patient's response to medication.

2. *Urgent/Emergent Care:* CCHCS nursing staff provides services including, but is not limited to:

   a. Assessment.

   b. Analysis.

   c. Nursing diagnosis.

   d. Planning.

   e. Implementation of interventions.

   f. Patient education.

   g. Outcome identification.

   h. Evaluation of responses.

   i. Triage and prioritization when there is a sudden marked change in the patient's condition that requires immediate action for the preservation of life or the prevention of serious bodily harm to the patient or others.

   j. Pre-hospitalization.

   k. Non-emergent and emergent care.

3. *Continuity of Care:* CCHCS nursing staff provides services to all patients returning from a higher level of care, transferring between points of service (inter/intra facility), or returning from medical appointments and perform nursing functions including, but is not limited to:

   a. Assessment.

   b. Analysis.

   c. Nursing diagnosis.

   d. Planning.

   e. Implementation of interventions.

   f. Patient education.

   g. Outcome identification.

   h. Evaluation of responses to ensure the provision of care coordination and that the patient is placed at the appropriate level of care.

4. *Ambulatory/Outpatient Care:* CCHCS nursing staff provides services including, but is not limited to:
   a. Assessment.
   b. Analysis.
   c. Nursing diagnosis.
   d. Planning.
   e. Implementation of interventions.
   f. Outcome identification.
   g. Evaluation of responses.
   h. Rounds.
   i. Care management.
   j. Care coordination.
   k. Patient education.
   l. Nursing assistance with the activities of daily living in an outpatient setting.

5. *Specialty:* CCHCS nursing staff provide services to patients returning from specialty appointments and patients requiring the services of a telehealth provider including, but is not limited to:
   a. Assessment.
   b. Planning.
   c. Implementation of interventions.
   d. Outcome identification.
   e. Evaluation of responses.
   f. Review of documentation.
   g. Coordination of care.
   h. Patient education.
   i. Monitoring of side effects, problems, and issues.

6. *Inpatient Care:* CCHCS nursing staff provides services including, but is not limited to:
   a. Assessment.
   b. Analysis.
   c. Nursing diagnosis.
   d. Planning.
   e. Implementation of interventions.
   f. Outcome identification.
   g. Patient education.
   h. Evaluation of responses to patients in a licensed inpatient setting who have a severe illness or condition with potential significant risk factors and limited or no opportunity for improvement, or patients that need stabilization who do not require admission to a general acute care hospital.

7. *Mental Health Nursing Care:* CCHCS nursing staff provides services including, but is not limited to:
   a. Assessment.
   b. Analysis.
   c. Nursing diagnosis.
   d. Planning.
   e. Implementation of interventions.
   f. Outcome identification.

    g. Patient education.

    h. Evaluation of responses to patients undergoing mental health emergencies/crises or who require ongoing therapeutic action. Services are provided through the continuum of care from outpatient settings (General Population, Correctional Clinical Case Management System, Enhanced Outpatient Program) to inpatient settings (Mental Health Crisis Bed, Intermediate Care Facility, Acute Care Unit, Psychiatric Inpatient)) as indicated by the patient's care needs.

8. *Monitoring:* Nursing services shall be monitored at each level of the organization. The expectation is that each nurse provides services to the fullest extent possible within their licensed scope of practice in a professional, competent, and culturally sensitive manner. Monitoring activities shall be consistent with existing policies and procedures governing nursing practice including, but is not limited to:

    a. Inmate Medical Services Policy and Procedure, Volume 5, Chapter 4, Nursing Competency Program Policy and Procedure.

    b. Inmate Medical Services Policy and Procedure, Volume 5, Chapter 17, Nursing Professional Practice Council Policy and Procedure.

9. *Palliative/End of Life Care:* CCHCS nursing staff provide services including, but is not limited to:

    a. Assessment.

    b. Analysis.

    c. Nursing diagnosis.

    d. Planning,

    e. Implementation of interventions.

    f. Outcome identification.

    g. Patient education.

    h. Care coordination.

    i. Evaluation of responses to terminally ill patients housed in California Department Code of Regulations institutions.

## VI. REFERENCES

- California Business and Professions Code, Division 2, Chapter 5.4, Section 2544
- California Business and Professions Code, Division 2, Chapter 5, Article 3, Sections 2069-2071
- California Business and Professions Code, Division 2, Chapter 6, Sections 2700-2837
- California Health and Safety Code, Division 2, Chapter 1, Article 1, Section 1204
- California Health and Safety Code, Division 2, Chapter 2, Article 9, Sections 1337-1338.5
- California Code of Regulations, Title 22, Division 3, Health Care Services
- California Code of Regulations, Title 16, Division 25, Chapters 1 and 2
- Joint Commission Standards MM.04.01.01
- California Board of Registered Nursing Position Paper # NPR-B-12 11/93; Rev 02/00, *"RN Supervision of Medical Assistant"*
- American Nurses Association, Correctional Nursing: Scope and Standards of Practice, 2nd Ed; Silver Spring, MD., 2013

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

- California Correctional Health Care Services, Inmate Medical Services Policy and Procedures, Volume 5, Chapter 4, Nursing Competency Program Policy and Procedure
- California Correctional Health Care Services, Inmate Medical Services Policy and Procedures, Volume 5, Chapter 17, Nursing Professional Practice Council Policy and Procedure