J.D. Zink, SBN 58726
**Zink & Lenzi**
250 Vallombrosa Avenue, Suite 175
Chico, California 95926
Telephone: (530) 895-1234
Facsimile: (530) 895-1254

**FILED**
**Sept 15, 2022**
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States District Court

Eastern District of California

| | |
|---|---|
| William Barker, | ) |
|     Plaintiff, | ) Case No. 2:16-cv-3008-DAD-CKD |
| v. | ) **Fifth Amended Complaint** |
| California Department of Corrections and Rehabilitation; The State of California, | ) |
|     Defendants. | ) |

**COMPLAINT**

1. Plaintiff William Barker ("Barker") complains that the California Department of Corrections and Rehabilitation ("CDCR"), the State of California, and Certified Nursing Assistants ("CNA") Stephen Osemwingie ("Osemwingie") and Ms. Ramiscal ("Ramiscal") discriminated against him on the basis of his disability at the California Health Care Facility ("CHCF") and, thus, violated state and federal disabled access laws.

**PARTIES**

2. Barker is a California resident with physical disabilities. He is in the custody, care, and control of CDCR incarcerated at CHCF in Stockton, CA. CDCR physicians have diagnosed Barker with having a history of chronic infectious disease, a right femur fracture with open reduction and internal fixation, and severe degenerative arthritis in his right hip. Barker suffers from pain in his back, shoulder, and neck. Additionally, he has shrapnel lodged in his pelvic region that surgeons are unable to remove which causes him pain when moving. He requires a wheelchair for ambulating both inside and outside of his cell. He is unable to bend, squat, or kneel, lift more than five pounds, climb stairs, and is subject to falls.

3. Barker qualifies as disabled under the consent decree in *Armstrong v. Newsom*, No. 4:94-cv-02307-CW (N.D. Cal. 1994) ("*Armstrong* consent decree"), as an inmate who requires the use of a wheelchair on a full-time basis due to a permanent disability. He requires wheelchair accessible housing and accessible paths of travel.

4. The State of California is a public entity.

5. CDCR is a department or agency (or both) of the State of California.

6. Osemwingie is an employee of the State of California, was a CNA at the time Barker's injury occurred, and was charged with the care, custody and

safety of the inmates at CHCF, including Barker. Osemwingie was acting under the color of state law during all times at issue.

7. Ramiscal is an employee of the State of California, was a CNA at the time Barker's injury occurred, and was charged with the care, custody and safety of the inmates at CHCF, including Barker. Ramiscal was acting under the color of state law during all times at issue.

## JURISDICTION

8. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 for claims brought under Title II of the Americans with Disabilities Act of 1990 ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), and state law claims that arise under federal law because Barker's right to relief under those claims necessarily depend on resolving a substantial question of federal law.

9. Supplemental jurisdiction for claims brought under parallel California law – arising from the same nucleus of operative facts – is predicated on 28 U.S.C. § 1367.

10. Barker's claims are authorized by 28 U.S.C. §§ 2201 and 2202.

## VENUE

11. All actions complained of herein take place within the jurisdiction of the United States District Court, Eastern District of California, and venue is invoked pursuant to 28 U.S.C. § 1391(b), (c).

## FACTS

12. The Disability Placement Program ("DPP") is the CDCR's set of plans, policies, and procedures to assure nondiscrimination against inmates/parolees with disabilities. The DPP applies to all CDCR institutions and facilities, all programs that CDCR provides or operates, and to all inmates who have disabilities that affect a major life activity, regardless of whether the disability impacts placement. Under this program, inmates with permanent mobility

impairments, or other disabilities severe enough to require special housing and programming, are assigned to special placement in a "designated DPP facility."

13. CHCF is a designated DPP facility.

14. Designated DPP facilities are required to offer disabled inmates a range of programming equivalent to that available to nondisabled inmates.

15. On March 3, 2015, Barker was in his cell and needed to use the bathroom. He pressed his "call light" to notify the nurse's station that he required attention and waited in his wheelchair for assistance. Thereafter, Defendants Stephen Osemwingie and M. Ramiscal, certified nursing assistants employed at the prison, arrived. One of them brought a Liko Golvo 7007 ES Hoyer lift.

16. Osemwingie told Barker he would use the Hoyer lift to transfer him from his wheelchair to the toilet. Based on past experience, Barker advised Osemwingie against this and requested they proceed with the two-person lift used in the past for this transfer. Osemwingie refused. Barker pleaded, "Hey man, you've been transferring me with two-person assist, and I have a bullet under my scrotum. My back is already messed up. Why are you trying to use the Hoyer lift on me now?"

17. Osemwingie responded, "If he doesn't let me transfer him with this Hoyer left, then I'm not going to assist him." Barker was desperate. He needed to use the restroom very badly, as he was about to defecate himself. So Barker relented in the defendants' use of the Hoyer lift.

18. Under normal circumstances, Barker would sit in a thick mesh material ("the sling") that has four straps, two on the bottom and two on the top. The two straps at the top are put on the Hoyer lift, one strap over each shoulder, and his body would sit inside the material. The attendant would then take the bottom straps, crisscross them over his legs, and put them on the Hoyer lift to keep him from sliding out. That's not what Osemwingie did.

19. Instead, he placed the two top straps under Barker's armpits instead of over his shoulders, and did not crisscross the bottom straps between his legs. Osemwingie attached one side and Ramiscal – under Osemwingie's instruction – attached the other.

20. Barker again began to protest, complaining how the Hoyer lift was going to hurt his back and irritate the bullet under his scrotum. Osemwingie refused to listen, reassuring Barker that he was going to lift him in a way that didn't hurt the bullet or his back. But as Osemwingie sat Barker in the lift (and connected him to the sling), Ramiscal and another prison employee, RN Coloma, began to question his technique. Nevertheless, Osemwingie reassured his co-workers, "I know what I'm doing." This was after RN Coloma had already advised against even attempting to use the Hoyer lift.

21. Osemwingie turned on the machine and started lifting Barker. But when Barker was about six-inches high, suspended only by his arm pits, he heard popping sounds from his low back and screamed out in pain. His back – from the waist to the middle – immediately started throbbing with pain.

22. "Hold it, man," Barker cried, "you just popped my back out." Osemwingie then lowered him down, and Barker immediately asked for medical attention. Instead, he was disconnected from the lift and everyone left. For over an hour, Barker pressed his call light, shouting: "Hey man, you just popped my back out. I need to see somebody because my back is killing me." Finally, a second registered nurse, RN Qamer, appeared.

23. "I see your light keep coming on," he remarked, "what's going on?" Apparently, someone was turning Barker's call light off. Barker explained how the defendants injured his back and asked to see a doctor because his back was "hurting real bad."

24. A few hours later, he was escorted to the emergency room. Barker would later testify that his pain level could be described as, it "hurt like hell when it happened, and I sustained quite a bit of continued pain from it [quite a while] afterwards."

25. Osemwingie had first-hand experience of Barker's physical limitations – helping him get into bed, out of bed, and use the toilet – and spoke with him often about his medical condition.

26. Ramiscal also interacted with Barker in the days leading up to the incident, helping him move from one position to another. Ramiscal also spoke with Barker about his medical condition and "what [he] needed help with." Since the incident, Barker has successfully used the lift on multiple occasions, suggesting that the pain and suffering he endured was completely unnecessary.

27. The location of Barker's cell allowed him to watch Osemwingie interact with other disabled inmates. It was during these interactions that Barker noticed Osemwingie's pattern of abuse, including excessive force, aggressive behavior and treating other inmates "like crap." He even went so far as to speak with Osemwingie about these interactions before the incident only to be moved to a different cell where he could no longer observe the interactions.

28. Once Barker began complaining about the incident at issue, he was transferred to administrative segregation, where he was denied assistance transferring to and from his wheelchair.

29. On August 13, 2015, Barker exhausted all administrative remedies available to him.

30. On May 19, 2016, the California Victim Compensation and Government Claims Board denied Barker's claim.

1      31.    After exhausting all prison administrative remedies available to him, Barker filed the instant suit asserting six claims for relief, including Title II and the Rehab Act.

## COUNT ONE

### Title II of the Americans with Disabilities Act of 1990

32.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

33.    Barker is a qualified individual with a disability in the United States as defined by the ADA. 42 U.S.C. § 12102.

34.    The State's failed attempt to provide access to toileting services by means of the Hoyer lift amounted to a denial of such services on account of his disability. Specifically, Hoyer lifts qualify as health care appliances under the *Armstrong* consent decree. Op.cit. at § F.1, citing Calif. Code Reg., Title 22, § 51160. The defendant thus had a duty to operate that lift properly under the decree. *Id.* at § IV.F.5 ("It is the joint responsibility of CDC and the inmate[] to maintain all health care appliances in good repair and *operation*."); § IV.G ("The CDC has a duty to maintain in *operable* working condition … *equipment* necessary to make the prison[] system's services, programs, and activities accessible to disabled inmates[].").

35.    The defendants' failure to operate the Hoyer Lift – an accessibility device whose sole purpose is to assist disabled individuals transfer from one location to another – was thus not only an ADA violation, but the precise type of violation the decree was designed to remedy. *See, e.g., Armstrong v. Wilson*, 124 F.3d 1019, 1022 (9th Cir. 1997) (*Armstrong* provides the contours of inmate rights under the ADA); *Roberts v. CDCR*, No. 2:12-cv-0247-KJM-AC, 2014 WL

2109925, *12 (E.D. Cal. May 20, 2014) (citing same). The improper use of a Hoyer lift to transfer Barker from his wheelchair, and prolonged delay in receiving medical and nursing assistance, resulted in discrimination against Barker by prolonging his suffering needlessly. The accommodations that Barker requires are necessary to perform daily life functions able-bodied individuals do not need. Had Barker not been physically disabled, he would not have been injured by the acts and omissions of defendants.

36. The State failure to comply with Hoyer lift instruction manual, over Barker's verbal protests, when transferring him to the toilet constituted deliberate indifference. But even if it didn't, the State's need to follow the *Armstrong* consent decree (and the federal regulations upon which it was based) and Hoyer lift's instruction manual was obvious. Because these acts and omissions were performed without regard for the accommodation Barker requested, the State engaged in deliberate indifference, entitling plaintiff to actual damages, costs, and legal expense under the ADA. 42 U.S.C. §§ 12133, 12205.

37. Barker also seeks declaratory relief so that he may pursue statutory minimum damages under parallel state law claims.

## COUNT TWO

### Section 504 of the Rehabilitation Act of 1973

38. Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794 (a).

39. Section 504 of the Rehabilitation Act imposes the same obligations and liability on entities as Title II of the ADA. *See Wong v. Regents of the Univ. of Calif.*, 192 F.3d 807, 811 n.2 (9th Cir. 1999).

40. Defendants receive federal funding.

41. For the same reasons set forth in Count One, the defendants were deliberately indifferent to plaintiff's rights under the Rehab Act by improperly operating the Hoyer lift to transfer Barker from his wheelchair, and unreasonably delaying their response to his request for medical and nursing assistance.

42. For these same reasons, Barker suffered discrimination under a program that receives federal financial assistance because of defendants' indifference; and is thus seeking actual damages and, reasonable attorney fees and costs under the Rehabilitation Act. 29 U.S.C. § 794(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Barker prays judgment against the defendants for:

1. General and special damages according to proof.
2. Attorneys' fees, litigation expenses, and costs of suit.
3. Interest at the legal rate from the date of the filing of this action.
4. Such other and further relief as the court may deem proper.

Dated: September 14, 2022        ZINK & LENZI

                                          /s/ J.D. Zink
                                          J.D. ZINK
                                          Attorney for Plaintiff Barker